# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

John McDonald,

        Plaintiff,

    v.

J.B. Pritzker, in his official capacity as
Governor of Illinois, and Grace B. Hou,
in her official capacity as Secretary of
the Illinois Department of Human
Services,

        Defendants.

Case No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND COMPENSATORY DAMAGES

Plaintiff John McDonald, by and through his undersigned counsel, hereby alleges as follows:

### PRELIMINARY STATEMENT

1.    The State of Illinois has announced that COVID-19 gives it the right to shut down services to intellectually and developmentally disabled individuals because, in the State's view, those individuals cannot be trusted to wash their hands or wear a face mask. That such rank discrimination still exists, as a matter of official policy at the highest level of state government, is both morally repugnant and plainly illegal. Because the State's flagrantly discriminatory policy violates federal anti-discrimination statutes and the Equal Protection Clause, this Court should enjoin the State's actions discriminatorily shutting down the essential services provided by Community Day Services ("CDS") programs, as well as award damages for the harm that Defendants have caused.

2.     CDS programs, and their predecessor Developmental Training programs, have long offered critically important services to the intellectually and developmentally disabled citizens of this State.  These programs offer disabled citizens assistance in gaining and improving self-help, socialization, and adaptive skills in a non-residential setting; training on quantitative skills; and enhancing productive work activities.

3.     To combat the transmission of COVID-19, Defendant Governor J.B. Pritzker has declared a state of emergency.  Once Illinois began to "flatten the curve" on COVID-19 transmissions, Defendant Governor Pritzker began to reopen the State and restart the economy, announcing his "Restore Illinois" Plan to return to work in phases.  Currently in "Phase 3 – Recovery," non-essential manufacturing and other non-essential businesses can reopen with social distancing, personal protective equipment, and adequate sanitation practices.  Furthermore, both outdoor recreation and non-overnight day camps for children may re-open under "Phase 3," as long as adequate safety measures are in place.  And upon entering "Phase 4 – Revitalization," which the entire State is on pace to enter on June 26, all manufacturing, non-essential businesses, outdoor recreation, bars and restaurants, health and fitness clubs, and movie theaters can open while following approved safety guidance, and public gatherings of 50 or fewer people can resume.

4.     Unlike all of these entities, Defendants have omitted CDS programs from the State's restart efforts despite their obvious similarities to manufacturing businesses and non-overnight day camps for children, both of which are *presently*

allowed to operate. Instead, Defendants have shuttered these CDS programs completely since March 17, 2020, and have recently announced the closures will extend *at least* through August 31, 2020. Moreover, while even recreational businesses like bars, fitness clubs, and movie theaters will soon be able to operate if following approved safety guidance, the essential services CDS programs offer to the disabled citizens of this State will remain shuttered by Defendants' decree.

5.     Defendants have refused to consider whether CDS programs can abide by the health and safety protocols developed by State and national experts, which would render CDS programs just as safe as the businesses and programs currently allowed to operate, instead contending that the intellectually and developmentally disabled are simply incapable of sufficiently "following instructions, understanding the need for and/or maintaining social distancing, hand washing[,] and the need to wear masks in enclosed environments" *as a class of persons.* John F. Schomberg, General Counsel to Ill. Dep't of Human Servs., Letter to Counsel for Plaintiff (June 19, 2020), Attached as Exhibit A. Thus, DHS has explicitly admitted that its decision to deprive Plaintiff of the essential CDS program he requires is based on the "serious and pervasive social problem" of disability discrimination, including "overprotective rules and policies" and "exclusionary qualification standards and criteria" that Congress expressly endeavored to stamp out. 42 U.S.C. § 12101(2), (5).

6.     While the COVID-19 pandemic has led to difficult decisions across the country, it does not provide states with cover to violate their citizens' federal statutory

and constitutional rights, notwithstanding Defendants' appalling and openly discriminatory beliefs about disabled people.

7. Defendants' ongoing closure of all CDS programs for disabled individuals violates Plaintiff's right to be free from discrimination under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and his rights under the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1.

8. This action seeks immediate relief from Defendants' shuttering of CDS programs for the disabled, by way of a temporary restraining order or preliminary injunction, a permanent injunction, and a declaratory judgment that the challenged action is contrary to federal law, unconstitutional, and void. This action further seeks compensatory damages for Defendants' illegal and unconstitutional conduct.

## PARTIES, JURISDICTION, AND VENUE

9. Plaintiff John McDonald is a 46-year-old man with intellectual and developmental disabilities. He is deaf and legally blind, but able to communicate primarily with sign language. At all times relevant to the allegations herein, he has received services from CDS providers, primarily working at the Community Workshop and Training Center, Inc. ("CWTC"), in his hometown of Peoria, Illinois.

10. Defendant Pritzker is and was Governor of Illinois and is and was acting under color of state law, in his official capacity, at all times relevant herein. He lives and works in Cook County, Illinois. Defendant Pritzker's principal place of business is the Office of the Governor, James R. Thompson Center, Chicago, Illinois.

His address for service of process is Office of the Governor, 100 W. Randolph St., 16-100, Chicago, IL 60601.

11.     Defendant Hou is and was Secretary of the Illinois Department of Human Services ("DHS") and is and was acting under color of state law, in her official capacity, at all times relevant herein.   In her official capacity, Defendant Hou, through her agency's Division of Developmental Disabilities, is responsible for providing comprehensive services, including CDS services, to people with intellectual and developmental disabilities.   Defendant Hou's principal place of business is in the Chicago Office of DHS, Chicago, Illinois.   Her address for service of process is 401 South Clinton St., Seventh Floor, Chicago, IL 60607.

12.     This action raises federal questions under the Fourteenth Amendment of the United States Constitution, U.S. Const. amend. XIV, § 1, and under federal law, 29 U.S.C. § 794; 42 U.S.C. § 12132, as well as 42 U.SC. § 1983.

13.     This Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

14.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343(a)(3), the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Plaintiffs' prayer for costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

15.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391, as Defendants reside in this District and all Defendants are residents of the

State of Illinois, 28 U.S.C. § 1391(b)(1), and a substantial part of the events giving rise to the claims herein arose in this District, 28 U.S.C. § 1391(b)(2).

## BACKGROUND

### The Governor's Response To COVID-19

16.    In early March 2020, public health officials began finding evidence of community transmission of the COVID-19 virus in Illinois.

17.    On March 9, 2020, in response to this finding, Defendant Governor Pritzker announced a state of emergency for the entire State of Illinois. Gubernatorial Disaster Proclamation (Mar. 9, 2020).[1]

18.    Thereafter, Defendant Governor Pritzker, through a series of executive orders, prohibited public gatherings, closed all bars and restaurants to in-person dining, closed schools and nonessential businesses, and entered a statewide stay-at-home order for all citizens not performing essential functions. *See, e.g.*, Executive Order 2020-10 (Mar. 20, 2020).[2]

19.    Defendant Governor Pritzker deemed these measures necessary to stop the rapid spread of COVID-19, especially among our most vulnerable populations. *Id.* In particular, the CDC has explained that both the elderly, *see* CDC, Coronavirus

---

[1] Available at https://www2.illinois.gov/sites/gov/Documents/CoronavirusDisaster Proc-3-12-2020.pdf.

[2] Available at https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-10.aspx.

Disease 2019 (COVID-19): Older Adults (Apr. 30, 2020),[3] and persons with underlying chronic medical conditions, *see* CDC, Coronavirus Disease 2019 (COVID-19): Clinical Questions about COVID-19: Questions and Answers (June 4, 2020),[4] face increased threats from contracting COVID-19 when compared to the general population. The intellectually and developmentally disabled, on the other hand, "are not inherently at higher risk for becoming infected with or having severe illness from COVID-19." CDC, Coronavirus Disease 2019 (COVID-19): People with Disabilities (Apr. 7, 2020).[5]

20. On May 5, 2020, once Illinois began to "flatten the curve" on COVID-19 transmissions, Defendant Governor Pritzker announced his supposedly "data-driven" "Restore Illinois" Plan, *see* Office of the Governor, Restore Illinois: A Public Health Approach to Safely Reopen Our State (May 5, 2020),[6] under which each of four regions of the State would return to non-essential business and other normal operations once they met certain thresholds, Lecia Bushak, Ill. Newsroom, *Gov. Pritzker Announces 'Restore Illinois' Plan to Re-Open State in Five Phases* (May 5, 2020).[7] Defendant

---

[3] Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[4] Available at https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission.

[5] Available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html.

[6] Available at https://coronavirus.illinois.gov/sfc/servlet.shepherd/document/download/069t000000BadS0AAJ?operationContext=S1.

[7] Available at https://illinoisnewsroom.org/gov-pritzker-announces-restore-illinois-plan-to-re-open-state-in-five-phases/.

Governor Pritzker's Plan expressly provides that it "can and will be updated to reflect the latest science and data." Governor, Restore Illinois, *supra*.

21. Upon announcing the Plan, Defendant Governor Pritzker also announced that the State had already progressed into "Phase 2 – Flattening," which he claimed was marked by his issuing a modified stay-at-home order effective May 1, 2020. *Id.*; *see also* Executive Order 2020-32 (Apr. 30, 2020).[8]

22. By June 3, 2020, all of Illinois entered "Phase 3 – Recovery" of the Plan. Executive Order 2020-38 (May 29, 2020)[9]; *see also* NBCChicago, *Illinois Enters Phase 3 of Reopening Plan: Here's What's Changing* (May 29, 2020).[10] In "Phase 3 – Recovery" of the Plan, non-essential manufacturing and non-essential businesses are allowed to return to work with social distancing and by following Illinois Department of Public Health-approved safety guidance, and businesses are "encouraged to provide accommodations for COVID-19-vulnerable employees." Governor, Restore Illinois, *supra*. Non-overnight recreational day camps for children are allowed to operate, as well as limited child-care services, consistent with approved safety

---

[8] Available at https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder 2020-32.aspx.

[9] Available at https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder 2020-38.aspx.

[10] Available at https://www.nbcchicago.com/news/local/illinois-enters-phase-3-of-reopening-plan-heres-whats-changing/2279871/.

guidance and sanitation procedures. Governor, Restore Illinois, *supra*; Ill. Dep't of Commerce, Day Camps Guidelines (May 24, 2020).[11]

23.     In "Phase 4 - Revitalization"—which can begin as soon as June 26, with Defendant Governor Pritzker recently announcing that all four regions are currently on pace to meet that transition date, NBCChicago, *All 4 Regions in Illinois on Track to Enter Phase 4 Next Week, Pritzker Says* (June 18, 2020)[12]—all manufacturing, non-essential businesses, outdoor recreation, bars, restaurants, health and fitness clubs, and movie theaters can open with approved safety guidance, and public gatherings of 50 or fewer people can resume. Governor, Restore Illinois, *supra*. Furthermore, all schools, institutes of higher education, summer programs, and child-care services are permitted to open with approved safety guidance. *Id.*

24.     On June 4, Defendant Governor Pritzker announced that all public and private schools serving pre-kindergarten through 12th grade in the State could open for summer school, following the completion of the regular 2019–2020 school year. Executive Order 2020-40 (June 4, 2020).[13]

---

[11]     Available at https://dceocovid19resources.com/assets/Restore-Illinois/business guidelines3/summerprograms.pdf.

[12]     Available at https://www.nbcchicago.com/news/local/all-4-regions-in-illinois-on-track-to-enter-phase-4-next-week-pritzker-says/2291864/.

[13]     Available at https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder 2020-40.aspx.

## CDS Programs And The State's Unlawful Closure Of All Such Operations

25. CDS programs provide intellectually and developmentally disabled adults assistance in gaining and improving self-help, socialization, and adaptive skills in a non-residential setting, with a particular emphasis on training in quantitative skills and enhancement of productive work activities. These programs offer both skills training and job coaching to help developmentally disabled individuals succeed in their communities and the workplace.

26. CDS programs also offer disabled adults opportunities to work both in the community and at the CDS program's building. These jobs offer disabled adults additional skills and job training, while also providing many participants with their only opportunities to hold a job and earn income.

27. DHS, under the direction of Defendant Secretary Hou, regulates and administers CDS programs, and both the State and DHS receive federal funding to assist with such programs.

28. Beginning on March 17, DHS has shuttered all CDS programs for the disabled statewide, barring any of the disabled workers from returning to work or receiving services from such programs.

29. Disabled workers were paid through March 17, but have not received work or payment since, except for some lingering checks related to prior work.

30. DHS's COVID-19 guidance for CDS providers states that they may no longer provide their services to disabled workers, but that "CDS funds will be used to

pay staff salaries" in the interim. DHS, UPDATED – COVID 19 Community Day Services (CDS) & Residential Rates and Reimbursement.[14]

31. CDS programs have been completely omitted from Defendant Governor Pritzker's "Restore Illinois" Plan, even though there is no reason these programs cannot follow the same public-health guidelines required of the manufacturing businesses, non-overnight day camps, and child-care services that are presently allowed to operate. CDS facilities can be set up to follow social-distancing guidelines, and sanitation practices and mask requirements can easily be implemented.

32. On June 9, DHS issued an additional guidance letter to CDS providers stating that the prohibition of CDS program operations will extend until *at least* August 31, 2020, to be "consistent with the Illinois Department of Aging and their decision to keep Adult Day Sites closed through August 31." Allison Stark, Director, DHS Division of Developmental Disabilities, Letter to Providers (June 9, 2020).

33. DHS has not given CDS providers any other guidance besides the initial notice of closure and this June 9 extension of closure through August 31.

34. On June 17, 2020, Counsel for Plaintiff advised Defendants of the illegality and unconstitutionality of their discriminatory treatment towards the disabled citizens of this State. Misha Tseytlin & Sean T.H. Dutton, Letter to Defendants (June 17, 2020), Attached as Exhibit B.

35. In response, Defendants *explicitly admitted* their prejudice against the disabled, based on claims that the entire group of persons like Plaintiff "have

_____

[14] Available at https://www.dhs.state.il.us/page.aspx?item=123490.

incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to wear masks in enclosed environments.".  Exhibit A at 2.  Furthermore, Defendants erroneously contended that disabled individuals are especially vulnerable to COVID-19 because of underlying health conditions, Exhibit A at 1–2, even though disabled persons are not inherently at higher risk from COVID-19.  Defendants reiterated that they "anticipate[d]" CDS programs will be allowed to restart, at the very earliest, by September 1, 2020.  *Id.*

### The Damaging Effects of the State's Discriminatory Decision on Plaintiff

36.    Plaintiff is a 46-year-old man who suffers from intellectual and developmental disabilities, leaving him with the intellectual capacity of a 7-year-old.

37.    Plaintiff is legally blind and deaf, and he communicates primarily through sign language.  He lives with his sister, Karen, who is his caretaker.

38.    Before COVID-19, Plaintiff was a regular participant at CWTC, a CDS program in his hometown of Peoria, Illinois, which he has attended on weekdays for over 20 years.

39.    CWTC has been in operation for over 60 years, and provides intellectually and developmentally disabled workers with certain jobs that meet their capabilities—in Plaintiff's case, individually packaging construction hardware like nuts and bolts for a large manufacturing company—while also providing them attendant care and supervision.


Plaintiff working at CWTC.

40.     CWTC has maintained long-term contracts with essential private firms, employing roughly 170 disabled workers to process and package products for these companies. *See* CWTC, CWTC.org, Organizational Employment.[15]

41.     These contracts with manufacturing firms make CWTC an essential business under Defendant Governor Pritzker's various executive orders, so CWTC has continued providing its packaging services even during the COVID-19 shutdown of CDS programs. During this time, the work has been completed through the efforts of its non-disabled employees who have replaced CWTC's disabled workers while DHS has forced CWTC to cease its CDS services.

42.     In addition to the revenue CWTC receives from these contracts, it also receives grant funding to support its operations. *See* CWTC, CWTC.org, Annual Report at 2 (2019).[16]

---

[15] Available at https://www.cwtc.org/organizational-employment/.

[16]     Available     at     https://www.cwtc.org/wp-content/uploads/2019/10/2019-Annual-Report.pdf.

43. CWTC is a superior provider of CDS programming, and its disabled workers get personal satisfaction and a sense of purpose from their participation in this program. CWTC also offers its disabled workers community programming, such as an art show, annual awards dinner, and more.



Plaintiff and his sister giving the keynote
address at CWTC's annual awards dinner.

44. CWTC has developed a plan to safely return to pre-COVID-19 operations, including reducing disabled workers' hours so that there are never more than 50 in the building at one time, maintaining appropriate distancing, instituting increased sanitation measures, and suggesting transportation modifications so fewer disabled workers take public transportation to the center.

45. Other CDS providers are similarly competent to institute their own safety measures, consistent with all public-health guidelines, and to make their own

determinations as to whether and when they can safely begin re-offering the essential services they provide to the disabled citizens of this State.

46.     Despite these extensive plans and competencies for re-opening, DHS's discriminatory decision orders closed CWTC and all other CDS providers through August 31 on an across-the-board basis, with devastating effects on those who most require DHS's assistance, including Plaintiff.

47.     In particular, Plaintiff's mental health has declined as a result of the State's and DHS's shuttering of CWTC, necessitating an increase in his anti-depressant and anti-anxiety medications.  He has also broken down in tears and asked his caretaker-sister if he still had a job or when he could return to work.

48.     Beyond these grave emotional and mental harms inflicted on disabled workers like Plaintiff, disabled workers are currently unable to earn any income or receive the other crucial services CDS programs provide, as a direct result of DHS's closure of such programs through August 31.

## CLAIMS FOR RELIEF

### COUNT I
### Section 504 of the Rehabilitation Act
### 29 U.S.C. § 794

49.     Plaintiff incorporates and realleges Paragraphs 1 through 48 as if fully set forth herein.

50.     Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance."
29 U.S.C. § 794(a).

51.     Plaintiff is disabled under the Rehabilitation Act, as his intellectual and developmental disabilities, deafness, and legal blindness substantially limit one or more of his major life activities. *See Garg v. Potter*, 521 F.3d 731, 736 (7th Cir. 2008).

52.     Plaintiff is fully qualified to participate in CDS programs and had been successfully doing so for over 20 years before the DHS shuttered these programs because of COVID-19.

53.     The State of Illinois and DHS receive federal funds to operate their programs, including programs for the disabled like CDS.

54.     Defendants have intentionally excluded Plaintiff from the benefits of CDS programs solely on the basis of his disability, as noted in Defendants' abhorrent explanation of the basis for their decision, where Defendants stated that "individuals with intellectual and developmental disabilities . . . have incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to wear masks in enclosed environments." Exhibit A.

55.     The discriminatory basis for the State's decision is also evident from DHS's express allowance of non-disabled employees of CDS programs to continue to conduct essential functions that were previously assigned to the disabled workers in CDS programs, as well as DHS's decision to allow its funding to continue to be used

to pay CDS employees' salaries, while at the same time barring disabled adults from these programs, statewide, through August 31.

56.     Second, Defendants have discriminated against Plaintiff by refusing to even *consider* making reasonable accommodations or modifications to the broad-based policy excluding *all* disabled people from participation in this vital program, regardless of the capabilities of any individual disabled person to comply with the State's COVID-19 safety guidelines.

57.     Many disabled citizens, including Plaintiff, are fully capable of following basic sanitation requirements, such as handwashing and mask-wearing, and have no underlying medical conditions that make them particularly susceptible to COVID-19. But, instead of making reasonable accommodations to permit these individuals to resume participating in their CDS programs, Defendants have barred disabled individuals, as a class, from taking part in these critically needed programs until at least August 31.

58.     Finally, Defendants' discriminatory conduct is evident from the disparate treatment the disabled are facing as compared to the able-bodied, including the clear disparity between the State's across-the-board prohibition on the safe resumption of CDS programs and the State's rules for manufacturing businesses and non-overnight day camps for children, the latter of which are similar to CDS programs but which are *currently* allowed to operate under "Phase 3" of the Governor's "Restore Illinois" Plan.

59. Disabled adults have no greater risks from COVID-19 than the general population, CDC, Coronavirus Disease 2019 (COVID-19): People with Disabilities, *supra*, such as the general public who work at these manufacturing businesses and the children who attend these non-overnight day camps.

60. Rather than treat Plaintiff and other disabled workers equally to these similar groups, Defendants have instead lumped them in with the elderly, tie-barring the re-opening of CDS services to similar programs for senior citizens. But, unlike the disabled, the elderly do face higher risks from COVID-19. *See* CDC, Coronavirus Disease 2019 (COVID-19): Older Adults, *supra*.

61. There is no basis other than Plaintiff's disability on which Defendants could have relied to shutter completely CDS programs, while allowing these similar groups to operate while following public-health guidelines, such as social distancing, mandating masks, and increased sanitation procedures.

62. Defendants' discrimination against the disabled evinces paternalistic concerns, and their blanket exclusion of all disabled adults from these programs violates Plaintiff's rights under the Rehabilitation Act. *See Knapp v. Nw. Univ.*, 101 F.3d 473, 483, 485–86 (7th Cir. 1996).

63. Defendants' discriminatory treatment against Plaintiff—and other disabled citizens across Illinois—caused and will continue to cause Plaintiff grave emotional, mental, and financial harm.

64. Plaintiff has no adequate legal remedy for the continuing irreparable harm Defendants have inflicted upon him, which cannot be fully and adequately

addressed through an award of damages. Furthermore, Defendants will suffer no harm if required to comply with federal anti-discrimination law, and the public interest requires the government to abide by federal law.

## COUNT II
## Title II of the ADA
## 42 U.S.C. § 12131

65.    Plaintiff incorporates and realleges Paragraphs 1 through 64 as if fully set forth herein.

66.    Title II of the ADA prohibits a public entity from excluding a disabled individual "from participation in," or denying them the benefits of, any "services, programs, or activities of [the] public entity." 42 U.S.C. § 12132.

67.    Plaintiff is a "qualified individual with a disability," 42 U.S.C. § 12131(2), given that he is legally blind, deaf, and developmentally disabled, and he is fully qualified to continue to participate in the CDS programs he has been a part of for over 20 years, with or without a reasonable accommodation.

68.    Defendants have denied Plaintiff the services and programs of a public entity—DHS—by completely excluding him and all other disabled adults from CDS programs through August 31.

69.    Defendants have done so explicitly on the basis of his disability and their own prejudicial assumptions about the disabled, as evidenced by their June 19, 2020 letter. Exhibit A.

70.    Defendants have also discriminated against the disabled under the ADA by refusing to allow, or even consider allowing, these programs to re-open with

"reasonable accommodations" in place to address any specific disabled citizen's ability to abide by the same social distancing, personal protective equipment, and adequate sanitation guidelines governing non-disabled participants in similar businesses and programs that have been, or soon will be, permitted to reopen under Defendant Governor Pritzker's "Restore Illinois" Plan. And many disabled citizens, including Plaintiff, would not need reasonable accommodation at all because they are fully capable of following basic sanitation requirements, such as handwashing and mask-wearing. Thus, it is unreasonable to refuse to make accommodations or modifications to the current restrictions, as such position is supported by neither facts nor science.

71.    This statewide shuttering of CDS programs also constitutes disparate-treatment-based discrimination against the disabled, given that such programs have been treated less favorably than similar businesses and programs for the able-bodied—including manufacturing businesses, non-overnight day camps for children, and summer school for all children from pre-kindergarten through 12th grade—which are presently allowed to operate while following public-health guidelines.

72.    Such discrimination and failure to reasonably accommodate Plaintiff is based on his status as a person with a disability, in violation of the ADA.

73.    Plaintiff has suffered, and will continue to suffer, grave mental and emotional harm and lost wages as a result of Defendants' malfeasance.

74.    Given the obvious nature of this disability discrimination and Defendants' refusal to rectify the discrimination when presented with facts showing

clear discriminatory treatment, Defendants' actions also constitute deliberate indifference of Plaintiff's federally protected rights.

75.     Plaintiff has no adequate legal remedy for the continuing irreparable harm Defendants have inflicted upon him, which cannot be fully and adequately addressed through an award of damages.  Furthermore, Defendants will suffer no harm if required to comply with federal anti-discrimination law, and the public interest requires the government to abide by federal law.

**COUNT III**
**Equal Protection**
**U.S. Const. Amend XIV, 42 U.S.C. § 1983**

76.     Plaintiff incorporates and realleges Paragraphs 1 through 75 as if fully set forth herein.

77.     The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The Equal Protection Clause's "command" is that "all persons similarly situated should be treated alike." *Tennessee v. Lane*, 541 U.S. 509, 522 (2004) (quoting *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985)).

78.     Laws and policies that discriminate against persons with intellectual and developmental disabilities are subject to "rational-basis review," which requires the State to show a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366– 67 (2001).

79.     A "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational"; therefore, the Constitution prohibits discrimination that "rest[s] on an irrational prejudice against the mentally [disabled]." *Cleburne*, 473 U.S. at 446, 450.

80.     Manufacturing employees, youth attendees of day camps, and children in Summer school classes from pre-kindergarten through 12th grade are "most like" the disabled workers in CDS programs, meaning they are the relevant comparators for treatment. *Elim Romanian Pentecostal Church v. Pritzker*, ___ F.3d ___, 2020 WL 3249062, at *5 (7th Cir. June 16, 2020).

81.     Plaintiff is similarly situated to these able-bodied citizens in the context of COVID-19. *See* CDC, Coronavirus Disease 2019 (COVID-19): People with Disabilities (Apr. 7, 2020), *supra*.

82.     Because Defendants have no legitimate basis to distinguish the disabled from the general population with respect to the decision to safely re-open under Defendant Governor Pritzker's "Restore Illinois" Plan, this decision is "arbitrary" and "rest[s] on an irrational prejudice against the mentally [disabled]." *Cleburne*, 473 U.S. at 446, 450.

83.     Defendants have explicitly discriminated against Plaintiff based on nothing more than irrational prejudice about his intellectual and developmental disability.  Exhibit A.

84.     As a result, Plaintiff has suffered and will continue to suffer from Defendants' unconstitutional misconduct.

85.    Plaintiff has no adequate legal remedy for the continuing irreparable harm Defendants have inflicted upon him, which cannot be fully and adequately addressed through an award of damages.  Furthermore, Defendants will suffer no harm if required to comply with the Constitution, and the public interest requires the government to abide by the Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.    A temporary restraining order or preliminary injunction restraining Defendants, and all those acting in concert with them, from:

  i.  Mandating the continued shuttering of CWTC, which is presently able to safely open consistent with public-health guidelines; and

  ii. Enforcing the statewide closure of all Community Day Services programs through at least August 31, 2020;

b.    A permanent injunction restraining Defendants, and all those acting in concert with them, from:

  i.  Mandating the continued shuttering of CWTC, which is presently able to safely open consistent with public-health guidelines; and

  ii. Enforcing the statewide closure of all Community Day Services programs through at least August 31, 2020;

c.    A declaratory judgment that the statewide closure of all Community Day Services programs:

i. Violates Plaintiff's rights under Section 504 of the Rehabilitation Act;

ii. Violates Plaintiff's rights under Title II of the ADA;

iii. Is unconstitutional, in violation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment;

d. Compensatory damages under the Rehabilitation Act and Title II of the ADA;

e. An award of costs of this litigation, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920; and

f. Such other and further relief as the Court may deem just and proper.

Dated, June 23, 2020

Respectfully Submitted,

/s/ Misha Tseytlin

MISHA TSEYTLIN
SEAN T.H. DUTTON
TROUTMAN SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com
sean.dutton@troutman.com

BLAKE T. HANNAFAN
HANNAFAN & HANNAFAN, LTD.
180 N. Lasalle Street
Suite 3700
Chicago, IL 60601
(312) 527-0055
(312) 527-0220 (fax)
bth@hannafanlaw.com

*Attorneys for Plaintiff John McDonald*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2020, a true and accurate copy of the foregoing was served on counsel for both Defendants, who have agreed to accept service via email, at the email addresses below:

<table>
<tr>
<td>Gary S. Caplan<br>Deputy General Counsel<br>Office of the Governor, J.B. Pritzker<br>gary.caplan@illinois.gov</td>
<td>Meghan Maine<br>Deputy General Counsel<br>Illinois Dep't of Human Services<br>meghan.maine@illinois.gov</td>
</tr>
</table>

/s/ Misha Tseytlin
MISHA TSEYTLIN
TROUTMAN SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com