# Exhibit B

Troutman Sanders LLP
227 West Monroe, Suite 3900
Chicago, IL 60606

troutman.com




**Misha Tseytlin**
**(312) 759-5947**
misha.tseytlin@troutman.com

**Sean T.H. Dutton**
**(312) 759-1937**
sean.dutton@troutman.com

June 17, 2020

**VIA EMAIL AND OVERNIGHT MAIL**

J.B. Pritzker
Governor of the State of Illinois
Office of the Governor
100 W. Randolph, 16-100
Chicago, IL 60601

Grace B. Hou
Secretary, Illinois Department of Human Services
401 South Clinton St., Seventh Floor
Chicago, IL 60607

**Re: The State of Illinois' Unconstitutional and Unlawful Shuttering of Community Day Services Providers**

Dear Governor Pritzker and Secretary Hou:

We write on behalf of John "Chris" McDonald regarding your unlawful decision to shutter Community Day Services ("CDS") providers statewide through (at least) August 31, 2020.

This indefinite elimination of these programs, thereby depriving disabled individuals like Mr. McDonald of the services that they so desperately need, has no COVID-19-related justification, especially when compared to the State's ongoing treatment of facilities and services for able-bodied persons. Although the Governor has claimed that his administration makes its COVID-19 decisions by "rely[ing] upon the data, rely[ing] upon the science, and rely[ing] upon the experts,"[1] that claim is patently false in this instance. The Centers for Disease Control and Prevention ("CDC") has determined that disabled persons "are not inherently at higher risk for

---

[1] Kristen Thometz, WTTW, *Pritzker Says Illinois on Track to Move to Phase 4, Won't Lift Restrictions Early* (June 10, 2020), https://news.wttw.com/2020/06/10/pritzker-says-illinois-on-track-move-phase-4.




becoming infected with or having severe illness from COVID-19."[2] And the State has given *no reason whatsoever*—let alone a reason grounded in data, science, and experts—for excluding CDS programs from the Governor's "Restore Illinois" Plan to reopen. This discriminatory shuttering is so obviously unjustified by any concerns related to COVID-19 that it can only be explained as a bad-faith effort to use this crisis as cover for reducing and changing fundamentally the services that the State of Illinois will provide to disabled individuals.

The actions here are obviously illegal. In shuttering CDS programs for no reason other than the disabled status of its participants, contrary to the State's treatment of similar businesses and programs for non-disabled persons, the State has discriminated against Mr. McDonald and other disabled individuals, in violation of the Rehabilitation Act and the Americans with Disabilities Act. Moreover, these actions are based on an impermissible attitude toward disabled persons, contrary to the Equal Protection Clause of the Fourteenth Amendment and the Supreme Court's decision in *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985).

In light of these clear and obvious legal defects, ***we demand that Mr. McDonald be able to attend his CDS program starting on Monday, June 22, and require a response to this letter by no later Friday, June 19, informing Mr. McDonald that he can promptly return to his program***. Every day that Mr. McDonald is unable to attend his CDS program imposes serious and unjustified emotional and physical suffering, caused by your unlawful actions.

Absent immediate corrective action, we intend to file a federal lawsuit next week, seeking emergency injunctive relief against your unlawful policy, a permanent injunction ensuring that you will no longer be able to indiscriminately shutter CDS programs in this way again, and damages for all of those harmed by your policy. In addition, we will inform the United States Department of Justice of your ongoing disregard of the federal statutory and constitutional rights of disabled individuals so that the Department can also consider taking appropriate actions against your illegal conduct.

## I. The COVID-19 Pandemic And DHS's Discriminatory Treatment Of Disabled Individuals Like Mr. McDonald

### A. The COVID-19 Outbreak In Illinois And The Governor's Response

On March 9, 2020, Governor Pritzker announced a state of emergency for the entire State of Illinois,[3] and, through mid-March, prohibited public gatherings, closed bars and restaurants to

---

[2] CDC, Coronavirus Disease 2019 (COVID-19): People with Disabilities (Apr. 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities .html.

[3] Gubernatorial Disaster Proclamation (Mar. 9, 2020), *available at* https://www2.illinois.gov/ sites/gov/Documents/CoronavirusDisasterProc-3-12-2020.pdf.




in-person dining, closed schools and nonessential businesses, and entered a statewide stay-at-home order for all citizens not performing essential functions.[4] The Governor deemed these measures necessary to stop the rapid spread of this virus, especially among our most vulnerable populations.[5]

After the State began to successfully "flatten the curve" on COVID-19 transmissions, the Governor announced his "Restore Illinois" plan to safely re-open the State and restart the economy.[6] Currently in "Phase 3 – Recovery" of the Plan, non-essential manufacturing and other non-essential businesses are permitted to reopen with social distancing, personal protective equipment, and adequate sanitization practices. Furthermore, both outdoor recreation and non-overnight day camps for children may re-open under "Phase 3" of the plan, as long as adequate safety measures are in place.[7] Upon entering "Phase 4 – Revitalization"—which can begin as soon as June 26,[8] with all four regions currently on pace to meet the metrics necessary to do so[9]—all manufacturing, non-essential businesses, outdoor recreation, bars and restaurants, health and fitness clubs, and movie theaters can open with approved safety guidance, and public gatherings of 50 or fewer people can resume.[10]

**B. CDS Programs And The State's Unlawful Closure Of All Such Operations Through—At Minimum—August 31.**

CDS programs provide developmentally disabled adults assistance in gaining and improving "self-help, socialization[,] and adaptive skills in a non-residential setting," including

---

[4] *See, e.g.*, Executive Order 2020-10 (Mar. 20, 2020), *available at* https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-10.aspx.

[5] *Id.*

[6] *See* Office of the Governor, Restore Illinois: A Public Health Approach to Safely Reopen Our State (May 5, 2020), *available at* https://coronavirus.illinois.gov/sfc/servlet.shepherd/document/download/069t000000BadS0AAJ?operationContext=S1.

[7] *See* Ill. Dep't of Commerce, Day Camps Guidelines (May 24, 2020), *available at* https://dceocovid19resources.com/assets/Restore-Illinois/businessguidelines3/summerprograms.pdf.

[8] Thometz, *Pritzker Says Illinois on Track to Move to Phase 4, Won't Lift Restrictions Early*, *supra*.

[9] Chad Yoder, et al., Chicago Tribune, *When Can Illinois Move to Phase 4 of Reopening Plan? Here's Where Each Region Stands* (June 14, 2020), *available at* https://www.chicagotribune.com/coronavirus/ct-viz-region-status-reopen-illinois-plan-20200520-crs7jzzejng67c2supwcn2trkm-htmlstory.html.

[10] *See* Restore Illinois, *supra*.




training on "[q]uantitative skills" and "[e]nhancement of productive work activities."[11] These programs offer both skills training and job coaching to help developmentally disabled individuals succeed in the workplace.[12] Notably, while the CDC has explained that COVID-19 poses a higher risk of death and serious illness among the elderly[13] and persons with underlying chronic medical conditions,[14] the CDC has found no similar elevated risks among the disabled.[15]

Under the Governor's early shutdown measures, and beginning on March 17, the Illinois Department of Human Services ("DHS") shuttered CDS programs, barring any of the disabled workers from returning to work.[16] Disabled workers were paid through March 17, but have not received any work or payment since, with the exception of some lingering checks related to pre-shutdown work. DHS's COVID-19 guidance for CDS providers states that they may no longer provide their services to disabled workers, but that "CDS funds will be used to pay staff salaries" in the interim,[17] and DHS has continued to receive federal funding "to provide services to . . . persons with disabilities who are disproportionately affected by the ongoing COVID-19 pandemic."[18] Furthermore, DHS has recently issued a guidance letter stating that the prohibition of CDS program operations will extend to at least August 31, 2020, to be "consistent with the Illinois Department of Aging and their decision to keep Adult Day Sites closed through

---

[11] *See* DHS, Community Day Services, https://www.dhs.state.il.us/page.aspx?item=48074.

[12] *See* DHS, Developmental Disability, https://www.dhs.state.il.us/page.aspx?item=32253.

[13] *See* CDC, Coronavirus Disease 2019 (COVID-19): Older Adults (Apr. 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[14] *See* CDC, Coronavirus Disease 2019 (COVID-19): Clinical Questions about COVID-19: Questions and Answers (June 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Transmission.

[15] *See* CDC, Coronavirus Disease 2019 (COVID-19): People with Disabilities, *supra* ("Most people with disabilities are not inherently at higher risk for becoming infected with or having severe illness from COVID-19.").

[16] *See* DHS, UPDATED – COVID 19 Community Day Services (CDS) & Residential Rates and Reimbursement, https://www.dhs.state.il.us/page.aspx?item=123490.

[17] *Id.*

[18] Victoria Idoni, WSILTV.com, *Keeping Seniors Connected in Illinois* (May 29, 2020), https://wsiltv.com/2020/05/29/keeping-seniors-connected-in-illinois/.




August 31."[19] This decision was made without contacting all CDS programs to determine their ability to operate safely with precautions in light of COVID-19. Critically, the State gave *no justification whatsoever* for excluding CDS programs from the "Restore Illinois" Plan, while at the same time permitting similar businesses and programs to open under "Phase 3," provided that they adopt reasonable safety precautions. And the State has offered no explanation why CDS programs cannot reopen under the even-more-permissive Phase 4.

**C. The Damaging Effects Of The State's Decision On Mr. McDonald**

Mr. McDonald is a 46-year-old man with the intellectual capacity of a 5 year old. Before the COVID-19 pandemic, he was a regular participant in a CDS program in Peoria called "Community Workshop and Training Center" ("CWTC"),[20] which he attended on weekdays. CWTC has been in operation for over 60 years,[21] and pays intellectually and developmentally disabled workers (whom they refer to as "consumers") to do certain jobs and be productive in their community—in Mr. McDonald's case, individually packaging construction hardware like nuts and bolts—while also providing attendant care and supervision to the disabled individuals. CWTC has maintained long-term contracts with essential private firms, employing roughly 170 consumers to process and package.[22] This makes CWTC an essential business, so it has continued providing its packaging services even during the COVID-19 shutdown of CDS programs, although the work was completed through the efforts of its non-disabled employees who have replaced CWTC's disabled consumers for the time being. In addition to revenue CWTC receives from these contracts, it also receives grant funding to support its operations.[23]

CWTC is a superior provider of CDS programming, and its consumers get personal satisfaction and a sense of purpose from their work. In addition to work programming, CWTC

[19] Allison Stark, Director, Division of Developmental Disabilities, Letter to Providers (June 9, 2020).

[20] *See* CWTC, https://www.cwtc.org/.

[21] CWTC, CWTC Promotes 60th Anniversary on TV!, https://www.cwtc.org/cwtc-promotes-60th-anniversary-on-tv/.

[22] *See* CWTC, Organizational Employment, https://www.cwtc.org/organizational-employment/.

[23] *See* CWTC, Annual Report 2019 at 2, *available at* https://www.cwtc.org/wp-content/uploads/2019/10/2019-Annual-Report.pdf.




offers its consumers community programming, such as an art show, [24] annual awards dinner,[25] and more. CWTC has developed a plan to safely return to pre-COVID-19 operations, including reducing consumers' hours so that there are never more than 50 consumers in the building at one time, maintaining appropriate distancing, instituting increased sanitation measures, and suggesting transportation modifications so fewer consumers take public transportation to the center.

Despite these principled and extensive plans for re-opening, DHS' discriminatory decision orders CWTC and all other CDS providers closed through August 31, with devastating effects on those who most require DHS' assistance, including Mr. McDonald. In particular, Mr. McDonald's mental health has declined as a result of the State's shuttering of CWTC, necessitating an increase in his anti-depressant and anti-anxiety medications. He has broken down in tears and asked his caretaker-sister if he still worked at his job or when he could get back to work. Even beyond these grave emotional and mental harms inflicted on disabled consumers like Mr. McDonald, consumers are currently unable to earn *any* income. All of these problems will continue and will exacerbate the harms disabled citizens currently suffer, to disastrous results, unless the State promptly acts to reverse their discriminatory treatment.

## II. <u>The State's Denial of Services Violates Disabled Individuals' Constitutional and Statutory Rights</u>

### A. The Right To Be Free From Discrimination On The Basis Of Disability Under The Rehabilitation Act And The Americans With Disabilities Act

Congress has found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . overprotective rules and policies, . . . and relegation to lesser services, programs, activities, benefits, jobs, and other opportunities." 42 U.S.C. § 12101(a)(5). Thus, Congress "invoke[d] the sweep of congressional authority" and sought "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Id.* § 12101(b)(1), (4). To that end, federal law now provides disabled Americans with broad protections from discrimination "in three major areas of public life": the workplace; public services, programs, and activities; and public accommodations. *Tennessee v. Lane*, 541 U.S. 509, 516–17 (2004). Central to Congress' goals related to disabled individuals are the Rehabilitation Act and the Americans with Disabilities Act ("ADA").

Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

---

[24] *See* CWTC, Inspiring Abilities Virtual Art Show, https://www.cwtc.org/test/.

[25] *See* The CWTC Insider, Iss. 52 at 2 (Aug. 2019), *available at* https://www.cwtc.org/wp-content/uploads/2019/10/August-2019-Newsletter.pdf.




Federal financial assistance." 29 U.S.C. § 794(a). A claim under this Section requires proof of four elements: "(1) the plaintiff must be a handicapped individual as defined by the Act; (2) the plaintiff must be 'otherwise qualified' for participation in the program; (3) the program must receive federal financial assistance; and (4) the plaintiff must have been denied the benefits of the program solely because of his handicap." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) (citations omitted). Proving federal assistance merely requires a showing that "the relevant state agency . . . accept[s] federal funds, which all states do." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). And "blanket exclusions" of disabled persons from programs are generally unacceptable. *Knapp v. Nw. Univ.*, 101 F.3d 473, 483 (7th Cir. 1996).

Similarly, Title II of the ADA prohibits a public entity from excluding a disabled individual "from participation in," or denying them the benefits of, any "services, programs, or activities of [the] public entity." 42 U.S.C. § 12132. To succeed on a claim under Title II of the ADA, which is "functionally identical" to a claim under the Rehabilitation Act, *Wagoner*, 778 F.3d at 592, a plaintiff must prove three elements. First, the plaintiff must show that he "is a qualified individual with a disability," 42 U.S.C. § 12131(2), which, "in turn," requires him to prove that he may "participat[e]" in a state "program[ ] with or without reasonable accommodations," *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). Second, the plaintiff must prove that he was "denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination by such an entity." *Wagoner*, 778 F.3d at 592 (citations omitted). And third, the plaintiff must demonstrate that "the denial or discrimination was by reason of his disability," *id.*, which includes claims of mixed-motive discrimination. *See Reed*, 915 F.3d at 484. Discriminatory intent is *not* required, and even a failure to provide a reasonable accommodation suffices to support a claim under the ADA. *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846–47 (7th Cir. 1999). Furthermore, Title II of the ADA authorizes an award of compensatory damages against public entities, *United States v. Georgia*, 546 U.S. 151, 154 (2006), upon a showing of "deliberate indifference." *Lacy v. Cook Cty.*, 897 F.3d 847, 857, 863 (7th Cir. 2018). Deliberate indifference requires "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* (citation omitted).

The State's decision to shutter CDS programs like CWTC has unlawfully denied disabled citizens like Mr. McDonald the benefits and services of this public program. Mr. McDonald is a disabled individual who is otherwise qualified to participate in CDS programs—indeed, he has been an active and successful participant in these programs for over 20 years. This denial is plainly based on his disability, as evidenced both by the fact that the State has authorized similar businesses and programs for the non-disabled—such as manufacturing businesses and non-overnight day camps for children—to resume operations with basic safety measures in place, *see supra* p. 3, and that DHS has explicitly authorized state funds for the operation of CDS programs to continue to be used to pay the salaries of their non-disabled employees, *see supra* pp. 4–5. *See Reed*, 915 F.3d at 484; *Wagoner*, 778 F.3d at 592. Nor is this a situation in which a disabled citizen seeks a modification that would fundamentally alter the nature of the service, program, or activity. *See P.F. by A.F. v. Taylor*, 914 F.3d 467, 472 (7th Cir. 2019). To the contrary, disabled citizens like Mr. McDonald would simply be required to abide by *the very same* social distancing, personal




protective equipment, and adequate sanitization guidelines governing non-disabled participants in similar businesses and programs that have been, or soon will be, permitted to reopen.

Further, rather than treat the disabled consumers of CDS services like these similar groups, the State has instead lumped them in with the elderly, and tie-barred access to CDS services with re-opening of services by the Illinois Department of the Aging.[26] But the risks of COVID-19 to the elderly and the disabled are wholly dissimilar, with the disabled facing no greater risk of COVID-19 than the general population.[27] *See Knapp*, 101 F.3d at 485–86 (observing that the Rehabilitation Act "prohibits authorities from deciding without significant medical support that certain activities are too risky for a disabled person" and that "[d]ecisions of this sort cannot rest on paternalistic concerns"). The State has offered no reasoned basis for excluding CDS programs from the "Restore Illinois" plan. Given that DHS and the Governor are certainly aware that disabled citizens like Mr. McDonald have been unlawfully denied these benefits, your decisions here constitute deliberate indifference of federally protected rights. *Lacy*, 897 F.3d at 863.

**B. The Right to Equal Protection of the Laws**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This Clause's "command" is that "all persons similarly situated should be treated alike." *Lane*, 541 U.S. at 522 (quoting *Cleburne*, 473 U.S. at 439). Laws that differentiate on the basis of intellectual or developmental disability are generally subject to "rational-basis review," which requires the State to have a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366–67 (2001). But even under this relatively deferential standard of review, the intellectually and developmentally disabled are not left "entirely unprotected from invidious discrimination," and a "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446. Therefore, even though in many instances "the mentally [disabled] as a group are indeed different from others not sharing their misfortune," when "this difference is largely irrelevant" it may not serve as a rational basis for distinguishing the disabled from others unless treating them identically "would threaten legitimate interests of the [State]." *Id.* at 448. Any alternative rule would impermissibly allow discrimination that "rest[s] on an irrational prejudice against the mentally [disabled]." *Id.* at 450.

Here, the State's decision to prohibit the continued operation of CDS programs and their benefits for the intellectually and developmentally disabled for the foreseeable future has harmed citizens like Mr. McDonald. Withholding these benefits from the intellectually and developmentally disabled would similarly seem to be based on "irrational prejudice against" them,

---

[26] *See* Stark, Letter to Providers, *supra*.

[27] CDC, Coronavirus Disease 2019 (COVID-19): People with Disabilities, *supra*; CDC, Coronavirus Disease 2019 (COVID-19): Older Adults, *supra*.




*id.*, and is actually harming those it claims to be protecting. Again, the intellectually and developmentally disabled do not face elevated risks as a group.[28] Manufacturing employees and youth attendees of day camps are "most like" the disabled consumers of CDS programs, meaning they are the relevant comparators for treatment. *Elim Romanian Pentecostal Church v. Pritzker*, ___ F.3d ___, 2020 WL 3249062, at *5 (7th Cir. June 16, 2020). Treating the disabled differently than these manufacturing employees and youth attendees of day camps, both of which the State is allowing to return to their respective activities with certain precautions, is based on nothing more than irrational prejudice. There is no legitimate, let alone rational, basis to distinguish the intellectually and developmentally disabled from the general population in the context of COVID-19-related restrictions, and doing so in this instance violates the Equal Protection Clause's "command" that "all persons similarly situated should be treated alike." *Lane*, 541 U.S. at 522.

* * *

We demand that you lift immediately the prohibition on CDS operations, allowing disabled citizens like Mr. McDonald to have the same opportunities as everyone else to work and seek care, while complying with generally applicable public-health guidelines. Absent such immediate corrective action—including informing Mr. McDonald that he can return to his CDS program by no later than Monday, June 22—we will be forced to undertake legal process to protect the rights of our client and similarly situated disabled individuals across the State, and will inform the United States Department of Justice of your ongoing unlawful discrimination.

Sincerely,

MISHA TSEYTLIN
SEAN T.H. DUTTON
TROUTMAN SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(312) 759-5947
(312) 759-1939 (fax)
misha.tseytlin@troutman.com
sean.dutton@troutman.com

[28] *See* CDC, Coronavirus Disease 2019 (COVID-19): Older Adults, *supra*; CDC, Coronavirus Disease 2019 (COVID-19): People with Disabilities, *supra* ("Most people with disabilities are not inherently at higher risk for becoming infected with or having severe illness from COVID-19.").