UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

John McDonald,

    Plaintiff,

  v.

J.B. Pritzker, in his official capacity as Governor of Illinois, and Grace B. Hou, in her official capacity as Secretary of the Illinois Department of Human Services,

    Defendants.

Case No. 1:20-cv-03653

Chief Judge Pallmeyer

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

The State of Illinois' discriminatory policy at issue in this case is as illegal as it is morally repugnant: the State has concluded that it will deny to disabled individuals access to critically needed programs during the COVID-19 pandemic because it does not trust those individuals to wash their hands and wear a face mask. Given that this policy plainly violates both federal anti-discrimination law and the Equal Protection Clause, this Court should immediately enjoin Defendants' closure of the State's Community Day Services ("CDS") to disabled individuals, which closure Defendants have admitted is based upon this discriminatory policy. Further, given the grave physiological and emotional harm that Defendants' closure policy inflicts every single day, Plaintiff John McDonald **respectfully requests an immediate injunctive order, so he can resume work at his CDS by Monday, June 29**.

Plaintiff's entitlement to this emergency, equitable relief is plain. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act"), Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12132 (the "ADA"), and the Constitution's Equal Protection Clause all prohibit States from discriminating against disabled individuals. In this case, Defendants have prohibited disabled individuals, like Plaintiff, from returning to work at their CDSs, which are critically important programs that provide a structure for these individuals to work and to have a sense of community. Defendants have attempted to justify these actions based upon discriminatory, false, and deeply insulting stereotypes about disabled individuals. Such discrimination is plainly unlawful. And immediate relief from this discrimination is desperately needed, as Defendants' cruel policy has devastated Plaintiff's emotional state, driving him to repeated bouts of tears and forcing his doctor to increase the dosage of his anti-depressant and anti-anxiety medications.

## BACKGROUND

A. On March 9, Defendant Governor Pritzker declared a state of emergency, in light of COVID-19, and imposed numerous closures and restrictions. Declaration of Sean T.H. Dutton ("Dutton Decl.") Ex. 1. On May 5, the Governor announced a five-phase reopening plan. Dutton Decl. Ex. 2. By June 3, the entire State entered phase 3. Dutton Decl. Exs. 3, 4. In this phase, manufacturing and non-essential businesses can reopen, if they comply with social distancing and safety guidance. Dutton Decl. Ex. 2. Fitness and exercise gyms can open for individual training, and barber shops, hair salons, nail salons, and similar facilities may also open. Dutton Decl. Ex. 2. Non-

overnight recreational day camps for children can also operate. Dutton Decl. Ex. 2, 16. Public and private schools serving pre-kindergarten through 12th grade in the State can open for summer school. Dutton Decl. Ex. 5. In phase 4, expected to begin on June 26, all manufacturing, non-essential businesses, outdoor recreation, bars, restaurants, health and fitness clubs, and movie theaters can open with safety guidance and some capacity limits, and public gatherings of 50 or fewer people can resume. Dutton Decl. Exs. 2, 6. Schools, higher education institutions, summer programs, and childcare facilities can also reopen. Dutton Decl. Ex. 2.

B. CDS programs provide disabled adults assistance in gaining and improving self-help, socialization, and adaptive skills in a non-residential setting, with an emphasis on training and enhancement of productive work activities. Dutton Decl. Ex. 7. These programs offer both skills training and job coaching to help these individuals succeed in their communities and workplaces. Dutton Decl. Ex. 8.

Plaintiff's experience shows the value of CDS programs for disabled individuals. Plaintiff is a 46-year-old man with the intellectual capacity of a 7-year-old, who is also deaf and legally blind. Declaration of Karen Haney ("Haney Decl.") ¶¶ 3–4, Ex. 1. For over twenty years, he has regularly participated in a CDS program in Peoria—the "Community Workshop and Training Center" ("CWTC")—working at this program on weekdays, while earning a salary. Haney Decl. ¶¶ 6–7, 9. This provides important structure and sense of purpose to Plaintiff's life, while also permitting him to earn income. Haney Decl. ¶ 8. CWTC employs disabled workers to do certain jobs in their communities, while also offering opportunities for social

interaction and support.  Dutton Decl. Ex. 9.  Plaintiff works at CWTC by individually packaging construction hardware like nuts and bolts for a Fortune 50 company, as well as for other companies, as photographed below:



Haney Decl. ¶¶ 7, 17.

The State has made clear that it will continue to bar disabled individuals like Plaintiff from returning to CDS programs—notwithstanding the otherwise applicable phases 3 and 4 of the reopening plan—based upon discriminatory stereotypes about these individuals.  On March 17, the Illinois Department of Human Services ("DHS") prohibited disabled individuals from returning to their CDS programs in light of the general COVID-19 closures and measures.  Haney Decl. ¶ 10; Dutton Decl. Exs. 10, 15.  Then, on June 9, DHS announced that it will continue to prohibit disabled individuals from returning to their CDS programs until at least August 31, 2020, Dutton Decl. Ex. 11, even though this access should have been restored under a neutral application of the guidelines governing phase 3 reopening, or, at the absolute latest, during phase 4.  On June 17, undersigned counsel sent a letter to Defendants, voicing concern over the discriminatory nature of this decision.  Dutton Decl. Ex. 12.

In its response, DHS's General Counsel explained the core reason for the decision: "*CDS . . . operations are tailored to individuals with intellectual and developmental disabilities, many of whom have incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to wear masks in enclosed environments*." Dutton Decl. Ex. 13 (emphasis added). In the same letter, the DHS General Counsel also made various false statements about the particular susceptibility of disabled individuals, as a class, to COVID-19 because of their alleged underlying health issues. Dutton Decl. Ex. 13.

Defendants' ongoing closure policy has caused serious harm to Plaintiff. Haney Decl. ¶¶ 12–13. Having lost the core work and social structure that guides his life, Plaintiff has repeatedly broken down in tears, while asking if he still works at his job and when he can return to work. Haney Decl. ¶ 12. Plaintiff's physician has even had to increase the dosage of his anti-depressant and anti-anxiety medicine to attempt to stabilize his physiological and emotional state. Haney Decl. ¶ 13.

Perpetuating this ongoing harm is unnecessary. CWTC has developed a plan to safely resume pre-COVID-19 operations, including reducing disabled workers' hours so that there are never more than 50 disabled individuals in the building at one time, maintaining appropriate distancing, instituting increased sanitation measures, and suggesting transportation modifications so fewer disabled workers take public transportation to the center. Haney Decl. ¶ 14. And Plaintiff is fully capable of maintaining proper masking and hygiene protocols. Haney Decl. ¶ 15.

ARGUMENT

To obtain either a temporary restraining order or a preliminary injunction, a plaintiff must show that: "(1) without such relief, [he] will suffer irreparable harm before final resolution of [his] claims; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of success on the merits." *Courthouse News Serv. v. Brown,* 908 F.3d 1063, 1068 (7th Cir. 2018) (citations omitted). If a plaintiff makes this initial showing, the court weighs the harm the plaintiff will suffer if an injunction is denied against the harm the defendant will suffer if one is granted. *Id.* "This assessment is made on a sliding scale . . . ." *Id.* Finally, the court also asks whether the preliminary injunction serves the public interest, "which entails taking into account any effects on non-parties." *Id.* Plaintiff has carried these burdens here.

I. Plaintiff Has A High Likelihood Of Success On The Merits

   A. Rehabilitation Act And The Americans With Disabilities Act

1. Section 504 of the Rehabilitation Act and Title II of the ADA are largely "materially identical," providing a "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Steimel v. Wernert*, 823 F.3d 902, 909 (7th Cir. 2016) (citation omitted). The Rehabilitation Act requires proof of four elements: "(1) the plaintiff must be a handicapped individual as defined by the Act; (2) the plaintiff must be otherwise qualified for participation in the program; (3) the program must receive federal financial assistance[1]; and (4) the

---

[1] The Illinois DHS receives federal financial assistance, part of which is applied toward the CDS programs. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).

plaintiff must have been denied the benefits of the program solely because of his handicap." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) (citations omitted). Similarly, the ADA requires the plaintiff to show that "he is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132). Plaintiff is likely to prevail on each of these elements.

a. *Plaintiff Is A Qualified Individual With A Disability*

A plaintiff is a "qualified individual with a disability" if he has a physical or mental impairment, and is otherwise qualified to participate in the program. *See* 29 U.S.C. § 705(20)(A); 42 U.S.C. § 12131(2). In considering whether an individual is "qualified," the court first must determine whether that individual has an impairment that "constitutes for the particular person a significant barrier to employment." *Byrne v. Bd. of Educ., Sch. of W. Allis-W. Milwaukee*, 979 F.2d 560, 565 (7th Cir. 1992) (citation omitted). Thereafter, "the district court will need to conduct an *individualized inquiry*" to determine whether, with or without reasonable accommodation or modification, that individual meets the eligibility requirements for the specific program. *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 851 (7th Cir. 1999) (quoting *School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273 (1987)).

Plaintiff is a qualified individual with a disability. Plaintiff is a 46-year-old man with the intellectual capacity of a 7-year-old, who also suffers from deafness and legal blindness. Haney Decl. ¶¶3–4, Ex. 1. Plaintiff is also qualified to participate in

- 7 -

the CDS programs, having been active and successful participant in CDS programs for more than 20 years. Haney Decl. ¶ 8. The only relevant change that occurred recently was Defendants' decision to bar all disabled individuals from their CDS programs, which was not based upon any individualized decision that Plaintiff was somehow unqualified to take part in the program.

### b. *Plaintiff Was Excluded From The Program Because Of His Disability*

This Court has long held that showing the "because of" disability element of the Rehabilitation Act and the ADA requires no proof of discriminatory intent. *See McWright v. Alexander*, 982 F.2d 222, 228–29 (7th Cir. 1992); *accord Washington*, 181 F.3d at 846. Rather, the plaintiff need only make one of three showings, any of which is sufficient, standing alone: (1) "the defendant intentionally acted on the basis of the disability," (2) "the defendant refused to provide a reasonable modification" to accommodate a disabled person, *or* (3) "the defendant's rule disproportionally impacts disabled people." *Washington*, 181 F.3d at 847. Plaintiff is likely to prevail under *each* of these three independently sufficient paths.

*First*, to show that the "defendant intentionally acted on the basis of the disability," *id.*, a plaintiff can show that the policy was enacted based—in whole or in part—upon "unfounded . . . stereotypes" about, or "paternalistic concerns" for, individuals with disabilities. *See Knapp v. Nw. Univ.*, 101 F.3d 473, 485–86 (7th Cir. 1996); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995). "The fact that some persons who have" a condition may be excluded from a program, "does not justify excluding" everyone with that condition. *Arline*, 480 U.S. at 285.

Here, Defendants *admitted* in a letter to Plaintiff's counsel that the State's decision to prohibit disabled individuals from participating in their CDS programs was based upon paternalistic stereotyping of disabled individuals: "CDS . . . operations are tailored to individuals with intellectual and developmental disabilities, many of whom have incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to wear masks in enclosed environments." Dutton Decl. Ex. 13. This is a textbook "unfounded . . . stereotype[]," asserted out of "paternalistic concerns" for individuals with disabilities. *See Knapp*, 101 F.3d at 485–86.

Many disabled individuals, *including Plaintiff*, are fully capable of wearing a mask, washing their hands, and abiding by all relevant public-health requirements. Haney Decl. ¶¶ 15–16. Defendants can point to no support for their rank, offensive stereotyping assumption that intellectually disabled individuals are, as a class, incapable of abiding by such basic sanitation requirements. While the Centers for Disease Control and Prevention ("CDC") has noted that *some* disabled individuals may have "trouble understanding information or practicing preventive measures, such as hand washing and social distancing," Dutton Decl. Ex. 14, that does not justify Defendants' broad-based exclusion of *all* disabled individuals from the reopening plan, *see Arline*, 480 U.S. at 285. Rather, this merely calls for reasonable accommodations for any such particularly limited individuals. *See infra* pp. 10–11.

Defendants also referenced another false stereotype about disabled individuals, asserting that disabled individuals are especially vulnerable to COVID-

19 because of their underlying health conditions. Dutton Decl., Ex. 13. As the CDC has explained, "people with disabilities are not *inherently* at higher risk for becoming infected with or having severe illness from COVID-19." Dutton Decl., Ex. 14 (emphasis added). "*[S]ome* people" with "*certain* disabilities" "*might* experience higher rates of chronic health conditions that put them at higher risk of serious illness and poorer outcomes from COVID-19." Dutton Decl. Ex. 17 (emphases added). But as the CDC makes clear, that is an individual-specific assessment that each person must discuss with his "healthcare provider." *Id.* Plaintiff, like many disabled individuals, has no such underlying medical conditions. Haney Decl. ¶ 5. Defendants have not limited their closure of CDS to only those disabled individuals with these underlying medical conditions, but have instead adopted a blanket, discriminatory policy, based upon "unfounded . . . stereotypes" and "paternalistic concerns." *See Knapp*, 101 F.3d at 485–86; *Arline*, 480 U.S. at 285, 287.

*Second*, a plaintiff can prevail on the "because of" element of the statute discrimination claims by showing that the defendant failed to provide a reasonable accommodation. *Washington*, 181 F.3d at 847. "A public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices or services, when necessary." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001). "The overall focus should be on whether waiver of the rule in the particular case at hand would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." *Id.* at 838–39.

Here, Plaintiff is fully capable of following basic sanitation requirements, such as handwashing and mask-wearing, and has no underlying medical conditions that make him particularly susceptible to COVID-19, meaning that no particular accommodation is necessary. *See supra* p. 9. But to the extent that Defendants were genuinely concerned about any particular COVID-19-related issues with disabled individuals in general, or Plaintiff, in particular, they have not even *attempted* to implement any reasonable accommodations to permit these individuals to resume participating in their CDS programs. Rather, Defendants have barred disabled individuals, as a class, from taking part in these critical programs until at least August 31, which is the antithesis of making a reasonable accommodation.

*Finally*, a plaintiff can prevail by showing that the challenged policy disproportionately impacts disabled people. *Washington*, 181 F.3d at 847. The focus of a disparate impact claim here is "not whether the [program] denied [the plaintiff] a service he is entitled to," but rather "whether the denial of that service affected [the plaintiff's] access to [the program] in relation to nondisabled [participants]." *Brown v. Dist. 299–Chi. Pub. Sch.*, 762 F. Supp. 2d 1076, 1084 (N.D. Ill. 2010). In the present case, Defendants singled out disabled individuals' participation in CDS programs, a selection which is inconsistent with the generally applicable reopening of the State. Defendants have now permitted the reopening of *numerous* businesses and programs for the non-disabled, such as manufacturing businesses, pre-kindergarten class, non-overnight day camps for children, and childcare. Given that disabled individuals—as a class—are fully capable of taking part in CDS programs, consistent with public

health guidance that Defendants applied to these other reopenings, Defendants' policy toward disabled individuals disproportionately impacts this protected class.

### B. Equal Protection Clause

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Laws and policies that differentiate on the basis of intellectual or developmental disability are generally subject to "rational-basis review," which requires the State to show at least a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366–67 (2001). In *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985), the Supreme Court made clear that even under this relatively deferential standard, the intellectually and developmentally disabled are not left "entirely unprotected from invidious discrimination," and a "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* at 446. Thus, while in many instances, "the mentally [disabled] as a group are indeed different from others not sharing their misfortune," when "this difference is largely irrelevant" it may not serve as a rational basis for distinguishing the disabled from others unless treating them identically "would threaten legitimate interests of the [State]." *Id.* at 448.

Defendants' justifications for categorically excluding disabled individuals from their CDS programs are "so attenuated as to render the distinction arbitrary or irrational," for all of the reasons explained above in the statutory discrimination discussion. *Id.* at 446. Defendants' primary justification for their decision is the

alleged inability of disabled individuals to abide by basic hygiene protocols, such as hand washing and mask wearing. That is a false, discriminatory rationale, which does not apply to Plaintiff or many other similarly disabled individuals. *See supra* pp. 4–5, 9. Indeed, that Defendants have reopened programs for children as young as pre-kindergarten—who surely will have more trouble with handwashing and mask wearing than many disabled individuals—shows the depth of their arbitrary, irrational discrimination against disabled individuals. *See supra* pp. 11–12. Further, Defendants also made clear that their decision was informed by their discriminatory view that disabled persons, as a class, are more susceptible to COVID-19, contrary to guidance from the CDC. *See supra* pp. 5, 9–10. This, again, is impermissible, irrational discrimination against disabled individuals, in violation of the Equal Protection Clause, as interpreted in *Cleburne*.

## II. Declining To Issue An Injunction Here Would Irreparably Harm Plaintiff, And No Legal Remedies Would Be Adequate

Absent immediate injunctive relief, Plaintiff will continue to suffer grave physiological and emotional injuries, as well as ongoing deprivations of statutory anti-discrimination and constitutional rights, which are all irreparable and cannot adequately be remedied by money damages. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017); *Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011); *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988).

Defendants' discriminatory decision is imposing grave harm on Plaintiff every day that it continues. For more than 20 years, Plaintiff's CDS provided routine,

purpose, and stability in his day-to-day life. Haney Decl. ¶¶ 6–8. Plaintiff developed a strong sense of independence through making his own money, receiving his own paycheck, and receiving praise for a job well done. Haney Decl. ¶ 9. These factors were made possible only through his participation in CWTC, and are paramount to Plaintiff's mental and emotional wellbeing. Defendants' decision to rip this structure away from Plaintiff's life, based upon their false, discriminatory view of disabled individuals as a class, has destroyed him emotionally, causing him to repeatedly break down in tears. Haney Decl. ¶ 12. This harm to Plaintiff's wellbeing has been so grave that Plaintiff's physician had to increase Plaintiff's daily level of anti-depressant and anti-anxiety medicines to attempt to stabilize his physiological and emotional state. Haney Decl. ¶ 13.

### III. The Public Interest Strongly Favors Injunctive Relief

The issuance of the requested injunction will greatly benefit the public interest and non-parties. *See Courthouse News Serv.,* 908 F.3d at 1068. As Congress has explicitly found, "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7). Further, "[e]nforcing a constitutional right is in the public interest." *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019). Defendants have flouted these statutory and constitutional goals by depriving disabled individuals, such as Plaintiff, of critically needed services, based upon stereotypical, paternalistic and false generalizations about disabled individuals. *See supra* pp. 5, 9–10.

The State is now deep into phase 3 of its reopening, and is expected to reach phase 4 by the end of this week. As the State's citizens return to a semblance of normalcy, with everything from gyms to pre-kindergarten programs opening again, the public interest demands that the State allow disabled individuals to return to their lives as well, consistent with the ADA, the Rehabilitation Act, and the CDC's public health guidance. Notably, Plaintiffs' CDS—CWTC—has developed a plan to reopen its operations, consistent with COVID-19 precautions, and Plaintiff is fully capable of complying with all such precautions. *See supra* p. 5.

## CONCLUSION

This Court should grant this Emergency Motion.

Dated this 23rd day of June, 2020.

    Respectfully submitted,

    /s/ Misha Tseytlin
    MISHA TSEYTLIN
    SEAN T.H. DUTTON
    TROUTMAN SANDERS LLP
    227 W. Monroe Street, Suite 3900
    Chicago, IL 60606
    Telephone: (608) 999-1240
    Facsimile: (312) 759-1939
    misha.tseytlin@troutman.com
    sean.dutton@troutman.com

    BLAKE T. HANNAFAN
    HANNAFAN & HANNAFAN, LTD.
    180 N. Lasalle Street
    Suite 3700
    Chicago, IL 60601
    (312) 527-0055
    (312) 527-0220 (fax)
    bth@hannafanlaw.com

    *Attorneys for Plaintiff John McDonald*

# CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2020, a true and accurate copy of the foregoing was served on counsel for both Defendants, who have agreed to accept service via email, at the email addresses below:

| | |
|---|---|
| Gary S. Caplan | Meghan Maine |
| Deputy General Counsel | Deputy General Counsel |
| Office of the Governor, J.B. Pritzker | Illinois Dep't of Human Services |
| gary.caplan@illinois.gov | meghan.maine@illinois.gov |

/s/ Misha Tseytlin
MISHA TSEYTLIN
TROUTMAN SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com