**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

John McDonald,

        Plaintiff,

    v.

Governor JB Pritzker and Grace B. Hou,

        Defendants.

No. 20 C 3653

Hon. Rebecca R. Pallmeyer

**STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
<u>AND PRELIMINARY INJUNCTION</u>**

KWAME RAOUL
Attorney General of Illinois

Amanda L. Kozar
Mary A. Johnston
Sarah Newman
Mike Dierkes
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601

June 29, 2020

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 3

    The COVID-19 Pandemic Spreads Throughout the World. ............................... 3

    The Governor Takes Action to Protect the State. ............................................... 4

    IDHS's Community Day Services Program ........................................................ 8

    COVID-19 and Individuals with Intellectual or Developmental Disabilities.................. 11

    IDHS's Plan to Reopen the CDS Program ....................................................... 13

LEGAL STANDARD................................................................................................. 15

ARGUMENT ............................................................................................................. 16

    I.    Plaintiff Is Unlikely to Succeed on the Merits of His Claims.............................. 18

        A.    Plaintiff does not have standing to request the far-reaching relief he seeks. ....................................................................................................... 18

        B.    Granting the relief Plaintiff seeks would require a violation of the principles of federalism............................................................................ 19

        C.    IDHS's decisions regarding when to restart the CDS program are entitled to deference under *Jacobson*........................................................ 22

        D.    Plaintiff is not likely to succeed on the merits of his claims. .................. 26

    II.    Plaintiff Has Not Shown That He Will Be Subjected to Irreparable Harm Absent Judicial Intervention. ......................................................................... 38

    III.    The Balance of Interests Weighs Heavily in Favor of the State. ......................... 39

CONCLUSION........................................................................................................... 42

## TABLE OF CASES

*A.H. by Holzmueller v. Illinois High Sch. Ass'n*,
  263 F. Supp. 3d 705 (N. D. Ill.) (Jul. 7, 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31-34

*Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*,
  134 F.3d 821(7th Cir. 1998) ). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-6, 18, 39

*BRK Brands, Inc. v. Nest Labs, Inc.*,
  28 F. Supp. 3d 765 (N.D. Ill. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Cassell v. Snyders*,
  No. 20 C 50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020) . . . . . . . . . . . . . 1, 4, 22, 24

*City of Chicago v. Shalala*,
  189 F.3d 598 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*City of Cleburne, Tex. V. Cleburne Living Ctr.*,
  473 U.S. 432 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35-7

*Conrad v. Boiron, Inc.*,
  869 F.3d 536 (7th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Chicago United Indus. v. City of Chicago*,
  445 F.3d 940 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Elim Romanian Pentecostal Church v. Pritzker*,
  No. 20-1811, 2020 WL 3249062 (7th Cir. June 16, 2020) . . . . . . . . . . . . . . . . .3, 4, 40

*Elim Romanian Pentecostal Church v. Pritzker*,
  No. 20 C 2782, 2020 WL 2468194 (N.D. Ill. May 13, 2020) . . . . . . . . . . . . . . . . . . 3-4

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Graham v. Med. Mut. of Ohio*,
  130 F.2d 293 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Grand River Enterprises Six Nations, Ltd. v. Pryor*,
  425 F.3d 158 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Jacobson v. Commonwealth of Massachusetts*,
  197 U.S. 11 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-4

*Lawson Prods., Inc. v. Avnet, Inc*.,

782 F.2d 1429 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mich. v. U.S. Army Corps of Eng'g*,
667 F.3d 765 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Milner v. Apfel*,
148 F.3d 812 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Minerva Dairy, Inc. v. Harsdorf*,
905 F.3d 1047 (7th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36-7

*Missouri v. Jenkins*,
495 U.S. 33 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Monarch Beverage Co., Inc. v. Cook*,
861 F.3d 678 (7th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Money v. Pritzker*,
Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), 19-20, 26,
28-30, 39

*Novak v. Hall*,
139 F. Supp. 3d 901 (N.D. Ill. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Oconomowoc Residential Programs v. City of Milwaukee*,
300 F. 3d. 775 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Orr v. Shicker*,
953 F.3d 490 (7th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*,
337 F. Supp. 3d 308 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Platinum Home Mort. Corp. v. Platinum Fin. Group, Inc.*,
149 F.3d 722 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*Ploss as Trustee for Harry Ploss Trust DTD 8/16/1993 v. Kraft Foods Group, Inc.*,
431 F.Supp.3d 1003 (N.D. Ill. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Pursuing America's Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Radaszewski ex rel. Radaszewski v. Maram*,

iv

383 F.3d 599 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 38

*Rowe v. Finnan*,
    No. 11-CV-524, 2013 WL 74609 (S.D. Ind. Jan. 4, 2013) . . . . . . . . . . . . . . . . . . . . . . 41

*Sandin v. Conner*,
    515 U.S. 472 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .41

*Shelby Cty. v. Holder*,
    570 U.S. 529 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Smith v. Avino*,
    91 F.3d 105 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*South Bay United Pentecostal Church v Newsom*,
    140 S. Ct. 1613 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23-4

*Srail v. Vill. of Lisle, Ill.*,
    588 F.3d 940 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*,
    919 F.3d 1003 (7th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Trump v. Int'l Refugee Assistance*,
    138 U.S. 353 (2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

*Tuan Anh Nguyen v. I.N.S.*,
    533 U.S. 53 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Chalk*,
    441 F.2d 1277 (4th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23-4

*U.S. v. Loria*,
    No. 3:08 CR233–2, 2010 WL 1779998 (W.D.N.C. April 30, 2010) . . . . . . . . . . . . . . . 27

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*,
    402 F. Supp. 3d 427 (N.D. Ill. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Valencia v. City of Springfield*,
    883 F.3d 959 (7th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . 15, 30-1

*W.A. Mack, Inc. v. Gen. Motors Corp.*,
    260 F.2d 886 (7th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*Wisconsin Comm. Serv., Inc. v. City of Milwaukee*,
    465 F.3d 737 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .34

## INTRODUCTION

We are living in extraordinary times. The deadly and highly infectious coronavirus 2019 disease, or COVID-19, swept across the world with astonishing speed. The resulting pandemic has touched every corner of this State and altered residents' lives in fundamental and unprecedented ways. More than three months ago, the Governor ordered Illinoisans to stay at home except to engage in essential activities. He also ordered nonessential businesses to limit their operations. Most residents embraced these public health measures and others, like practicing social distancing and donning face coverings. These decisive actions are now paying dividends. The devastating shortages of hospital beds and protective equipment that many experts feared have not materialized in Illinois. To the contrary, the State is seeing fewer and fewer new cases every day.[1] Meanwhile, infection rates are rapidly rising in other states where COVID-19 restrictions were either looser or lifted too soon.[2]

Recognizing this remarkable progress in Illinois, the Governor recently began to move forward with a measured plan to gradually relax the public health measures he had ordered to fight the COVID-19 pandemic. Residents are no longer required to stay at home. Most businesses may resume operations, though often with substantial limitations on capacity and with many other public health measures (*e.g.*, face coverings and social distancing) remaining in place. But in the same way that it would be foolish to toss out "your umbrella in a rainstorm because you are not

---

[1] Coronavirus Resource Center, John Hopkins University & Medicine, Daily confirmed new cases (3-day moving average): Illinois, https://coronavirus.jhu.edu/data/new-cases-50-states/illinois (showing significant decline in new COVID-19 cases in Illinois since peak in mid-May). All internet resources cited in this memorandum were last visited June 26-28, 2020. This court may take judicial notice of this and other external information cited in this brief as they are facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

[2] Coronavirus Resource Center, John Hopkins University & Medicine, Daily confirmed new cases (3-day moving average), https://coronavirus.jhu.edu/data/new-cases-50-states (showing significant increases in new COVID-19 cases in states like Arizona, Florida, South Carolina, and Texas).

1

getting wet," *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *7 (N.D. Ill. May 3, 2020) (quoting *Shelby Cty. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting)), life has not returned completely to "normal." As Illinois residents venture out and businesses open their doors, following public health guidance and the State's measured and gradual approach ensures the recent improvement is not undone by a resurgence of the deadly virus.

As part of the State's efforts to battle this pandemic, the Illinois Department of Human Services ("IDHS") was required to suspend many of its programs for the safety and health of not only the participants in those programs, but also their families, roommates, and friends, and the public in general. One of the programs that was suspended was the Community Day Services program ("CDS"), which provides day-time activities, recreational programming, outings, and skill building activities for individuals with intellectual and developmental disabilities. Among other programs, some CDS providers like the Community Workshop and Training Center, Inc. ("CWTC") provide pre-vocational skills training programs, which allow participants to learn job skills by working in a highly supervised setting. Plaintiff John McDonald has been a participant in CWTC's program for many years, but he has not been attending this program with funding through the IDHS Division of Developmental Disabilities. He is eager, however, to now return to CWTC's program now that he has been determined eligible for Division-funded Home-Based Services, which includes funding for CDS. And IDHS is eager to restart its programs, including the CDS program, but not until it is safe to do so. Toward that end, as discussed in more detail below, IDHS is working with the Illinois Department of Public Health ("IDPH") to develop guidance and assessment tools that will enable CDS providers like CWTC to reopen safely, and as soon as possible without endangering their participants staff, and others.

Through his motion, Plaintiff asks this Court to order a widespread and immediate reopening of the CDS program *all across Illinois*. [ECF #1 at p. 23]. This Court should deny Plaintiff's motion. As an initial matter, Plaintiff lacks standing to demand such sweeping, class-like relief, which would affect thousands of people beyond just himself, especially as Plaintiff himself has never attended CWTC through the Division-funded CDS program. He does not purport to bring this matter as a class action, and therefore cannot obtain such class-like preliminary relief. Plaintiff's demands also offend principles of federalism, which counsel strongly against federal interference in the State's administration of its own affairs, especially during a public health emergency. Through this lawsuit, Plaintiff asks that the Court force IDHS, a State agency, to fund and administer one of its own programs according to the wishes of one individual, while ignoring the counsel of the public health experts who continue to urge caution. Plaintiff is unlikely to succeed on the merits of the federal constitutional or statutory claims, he has not demonstrated that he will be subjected to irreparable harm absent Court intervention or that damages alone would not prevent such harm, and the balance of harms weighs strongly in favor of the State. If the State were compelled to prematurely reopen its programs, without sufficient time to develop adequate safety measures, the consequences could be devastating— both for the program participants and their families, as well as for the State and its residents. The law does not compel this tragic result.

## BACKGROUND

**The COVID-19 Pandemic Spreads Throughout the World.**

COVID-19 is a novel severe acute respiratory illness that spreads easily through respiratory transmission, including by asymptomatic individuals. *See generally Elim Romanian Pentecostal Church v. Pritzker*, No. 20-1811, 2020 WL 3249062, at *1 (7th Cir. June 16, 2020) ("*Elim II*"); *Elim Romanian Pentecostal Church v. Pritzker*, No. 20 C 2782, 2020 WL 2468194, at *1 (N.D.

Ill. May 13, 2020) ("*Elim I*"); *Cassell*, 2020 WL 2112374, at *1, *2. The virus has infected millions of people all over the world and claimed the lives of hundreds of thousands. *Elim I*, 2020 WL 2468194, at *1; *Cassell*, 2020 WL 2112374, at *2. As of today, 141,723 people have been infected in Illinois, and 6,888 have died.[3]

For months, millions of Americans, including Illinois residents, have fought to abate the virus by staying home, tempering the spread of the virus and reducing the estimated death toll. *E.g., Elim II*, 2020 WL 3249062, at *1. Yet the threat of the virus has not passed, and there remains no vaccine or treatment available for COVID-19, or evidence that recovered individuals are immune to a second infection. *Elim I*, 2020 WL 2468194, at *1; *Cassell*, 2020 WL 2112374, at *2. Given these dangers, the Centers for Disease Control and Prevention ("CDC") urge Americans not to "gather in groups" and to "wear a cloth face cover when they have to go out in public"[4] because "the virus can spread between people interacting in close proximity—for example, speaking, coughing, or sneezing—even if those people are not exhibiting symptoms."[5] *See also Elim II*, 2020 WL 3249062, at *1.

**The Governor Takes Action to Protect the State.**

Faced with this unprecedented and ongoing public health emergency, on March 9, 2020, the Governor proclaimed the COVID-19 pandemic to be a "disaster" within the meaning of the Illinois Emergency Management Agency Act, 20 ILCS 3305 *et seq.* ("Emergency Management

---

[3] State of Illinois, Coronavirus (COVID-19) Response, https://coronavirus.illinois.gov/s/.

[4] CDC, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[5] CDC, *Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

Act")[6]. Section 4 of the Emergency Management Act defines a "disaster" to be "an occurrence or threat of widespread or severe damage, injury or loss of life or property resulting from any natural or technological cause," including (as relevant here) both an "epidemic" and "public health emergencies." Section 7, in turn, provides that, "[i]n the event of a disaster, as defined in Section 4, the Governor may, by proclamation declare that a disaster exists" and, "[u]pon such proclamation . . . shall have and may exercise for a period not to exceed 30 days the following emergency powers."

After proclaiming the COVID-19 pandemic to be a disaster on March 9, the Governor exercised his powers made available under the Emergency Management Act to issue a series of executive orders to stop the spread of COVID-19 and protect the healthcare system from being overwhelmed.[7] Among these was Executive Order 2020-07, issued on March 16, which closed all bars and restaurants to in-person dining.[8] On March 20, the Governor issued Executive Order 2020-10, the first "stay at home" order," which was effective for 17 days and required Illinoisans to practice social distancing by limiting nonessential activity outside their homes, remaining at least six feet apart from others, and refraining from gathering in groups of more than ten. *Id.*

The Governor issued proclamations declaring that the COVID-19 pandemic remained a disaster within the meaning of the Emergency Management Act on both April 1 and April 30, thus authorizing him to exercise emergency powers under the statute for an additional 30 days

---

[6] Gubernatorial Disaster Proclamation (Mar. 9, 2020), https://www2.illinois.gov/sites/gov/Documents/CoronavirusDisasterProc-3-12-2020.pdf.

[7] The Governor's 40 executive orders relating to COVID-19 are available at https://coronavirus.illinois.gov/s/resources-for-executive-orders.

[8] Executive Order 2020-07 § 1 (Mar. 16, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-07.aspx.

following each proclamation[9]. On both April 1 and 30, he exercised those emergency powers to issue new "stay at home" orders, each of which was effective for 30 days and contained limitations similar to those set forth in the first such order. *Id.*

On May 29, 2020, the Governor issued a fourth proclamation declaring that the COVID-19 pandemic remained a disaster within the meaning of the Emergency Management Act.[10] The Governor cited numerous facts in support of his determination. He noted that, "although the number of new COVID-19 cases has stabilized and potentially begun to decrease in recent weeks, the virus continues to infect thousands of individuals and claim the lives of too many Illinoisans." *Id.* And he noted that while prior orders reduced COVID-19's spread, "the State's modeling continues to show that without extensive social distancing and other precautions, the State will face a shortage of hospital beds, ICU beds, and/or ventilators." *Id.*

Taking into account both the State's success in limiting the spread of COVID-19 and the ongoing threat of a resurgence, the Governor exercised his powers under the Emergency Management Act on May 29 to issue Executive Order 2020-38 ("EO38"). EO38 does not instruct Illinois residents to stay at home but rather requires them to take "public health steps to protect their own and their neighbors' health and lives" when they venture out, including practicing social distancing, wearing a face covering, and limiting gatherings to ten or fewer people. *Id.* In addition, EO38 sets forth mandatory safety measures based primarily on business function. *Id.* Many businesses have been allowed to reopen subject to capacity limits and requirements that their

---

[9] Gubernatorial Disaster Proclamation (Apr. 1, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-18.aspx; Gubernatorial Disaster Proclamation (Apr. 30, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-32.aspx

[10] Gubernatorial Disaster Proclamation (May 29, 2020), https://www2.illinois.gov/Pages/Executive-Orders/ExecutiveOrder2020-38.aspx

employees and customers practice social distancing and observe other public health guidance. Nonprofit organizations were allowed to reopen subject to these restrictions. *Id.*

EO38 is consistent with the Governor's intention to reopen Illinois in accordance with scientific principles and public health guidance, as outlined in his Restore Illinois plan.[11] Guided by health metrics, the plan maps out how restrictions for different regions of the State will relax as the rates of infection and hospital admissions due to COVID-19 plateau and then decline. Id. at 3-4. Illinois is now in Phase 4[12] because the number of new COVID-19 cases is steadily decreasing. This Phase permits all gatherings of up to 50 people, subject to social distancing and the use of face coverings, and permits – but does not mandate – the reopening of the following establishments: all health care providers, P-12 schools, higher education, all summer programs, child care, manufacturing, non-essential businesses, bars and restaurants, personal care services and health clubs, entertainment, and retail. Important to note is the caveat included beside every establishment permitted to reopen – **with IDPH-approved safety guidance.** Restore Illinois at 9. And, finally, regions of Illinois will enter Phase 5, which does not limit any gathering, only when there are "no new cases over a sustained period," or there is a vaccine or treatment. *Id.* at 10. It should be noted that these phases are not a one-way process: should the infection rates increase, or hospital resources become less available, Illinois will return to more restricted phases of the process. *Id.*

---

[11] Office of the Governor, "Restore Illinois: A Public Health Approach to Safely Reopen Our State," https://coronavirus.illinois.gov/sfc/servlet.shepherd/document/download/069t000000BadS0AAJ?operatio nContext=S1 ("Restore Illinois").

[12] https://coronavirus.illinois.gov/s/restore-illinois-regional-dashboard.

**IDHS's Community Day Services Program**

IDHS, through its Division of Developmental Disabilities (the "Division"), serves over 30,000 individuals with intellectual and developmental disabilities across Illinois through a number of programs. The Division provides services directly through seven State Operated Developmental Centers ("SODCs"), ranging in size from 100 to nearly 500 individuals. In addition, the Division provides funding, regulation and licensure of Community Integrated Living Arrangements ("CILAs"), smaller, community-based residential settings which house up to 8 individuals, Home Based Services, which provides funding for services and supports for individuals who reside at home, and CDS, which provides day programming and services. The Division also provides funding and guidance for congregate residential facilities that are regulated by IDPH: Intermediate Care Facilities for the Developmentally Disabled ("ICF/DDs"), ranging in size from six to over 200 residents, and Community Living Facilities ("CLFs"), which house up to 12 individuals. [Declaration of Allison Stark ("Stark Decl."), attached hereto as Exhibit 1, at ¶ 2].

CDS is a day service program that operates generally from 9 a.m. to 5 p.m., Monday through Friday. The program assists individuals with developing various adaptive skills, engaging in appropriate behavior, increasing independence, and providing socialization in a non-residential setting. CDS programs range in size from small, community programs designed to facilitate community integration, to large, congregate workshops. CDS programs vary in size, serving between 30 and 500 individuals, with the average serving approximately 100 individuals. The programs also assist in developing employment skills and participants' ability to engage in productive work activities through a focus on such habilitative goals as compliance, attendance, and task completion. Activities offered through the program include job exploration activities and

job skills training, volunteer work, recreation, educational experiences in natural community settings, and purposeful activities and services where persons without disabilities are present. Certain employment-related programs include sub-minimum wage skill development programs in which participants perform "piece work" for manufacturers with the goal of competitive integrated employment. [Stark Decl. at ¶ 2].

To be eligible to receive funding through the Division for CDS, an individual must meet a number of criteria. First, the individual must have an IQ of below 70, a related condition such as cerebral palsy or epilepsy, or a related condition that similarly impairs general intellectual functioning or adaptive behavior. In addition, the individual must be experiencing substantial limitations in three or more major life skills areas. The life skills areas are: (1) self-care; (2) language; (3) learning; (4) mobility; (5) self-direction; and (6) capacity for independent living. [Stark Decl. at ¶ 3]; *see also* Determination of Disability & Associated Treatment Needs: 500.10 Purpose and Definitions, available at https://www.dhs.state.il.us/ page.aspx?item=53024.

CDS programs are utilized by individuals in both congregate and home-based settings. Of the 21,000 individuals with intellectual or developmental disabilities who attend CDS programs, approximately 11,000 reside in CILAs, 3,600 reside in private ICF/DDs, 800 reside in SODCs and 33 reside in CLFs. [Stark Decl. at ¶ 2]. Over 70% of all CDS participants live in congregate settings. [Stark Decl. at ¶ 7].

Illinois is not the only state to temporarily suspend its CDS program as a result of the COVID-19 public health emergency. States with significant COVID-19 infections, such as New York and New Jersey also suspended their CDS programs, which remain closed as of this filing. [Stark Decl. at ¶21] Other states with lesser rates of infection have begun to reopen, but are

9

instituting restrictions on who is eligible to attend. For example, Minnesota, while allowing its CDS programs to reopen, is not allowing any individual who resides in a congregate setting to attend—only those living at home or with family may participate.[13] And Connecticut is planning for a phased reopening, with CDS providers required to submit detailed individual reopening plans.[14] Such measured, and well-planned, reopenings are required to guard against the public health risks associated with COVID-19.

Plaintiff is a participant in CWTC's program. Through CWTC's job skills training program, intellectually or developmentally disabled individuals work to package parts for Caterpillar Inc. through CWTC's contract with Caterpillar. Some participants are funded through IDHS's CDS program, while others pay CWTC out-of-pocket, *i.e.*, they are private-pay participants in the program. IDHS provides funding for approximately 100 individuals with intellectual and/or developmental disabilities in CWTC's CDS program (Stark Decl. ¶17), but CWTC reports that it has approximately 200 individuals enrolled in its program.[15] The Division pays CWTC $12.79 per hour for each Division-funded participant.[16] The other 100 participants are presumably private-pay participants.

---

[13] *See* Chris Sertes, "Minnesota disability service providers on the brink of collapse from COVID-19, Star Tribune (June 25, 2020), available at https://www.startribune.com/virus-leaves-disability-service-providers-on-brink-of-collapse/571488372/.

[14] *See* Jordan A. Scheff, Commissioner of Connecticut Dept. of Developmental Services, Mem. to DDS Providers re: Reopening of Employment and Day Services, available at https://portal.ct.gov/-/media/DDS/COVID-19/DDS_Employment_and_Day_Services_reopening_memo_FINAL_6_10_20.pdf.

[15] *See* Organizational Employment, Community Workshop and Training Center, Inc., available at https://www.cwtc.org/organizational-employment/ ("Our workforce of 200 people now process and allocate more than half a million pieces of work for CAT each week.").

[16] This is the rate that IDHS pays CDS providers, such as CWTC, for each CDS participant. [Stark Decl. ¶17.] IDHS does not know whether private-pay participants pay more or less to participate in CWTC's program.

For more than 20 years, it is assumed, Mr. McDonald has been a private-pay participant in CWTC's job skills training program, as he was only approved for IDHS funding on March 26, 2020, *after* CDS programs had been suspended due to COVID-19. *See* Declaration of Karen Haney (ECF 8) ¶ 6; Stark Decl. ¶¶ 15-16. To be clear, IDHS has never actually paid for Mr. McDonald to attend any day services program, including CWTC. [Stark Decl. ¶ 16]

As a nonprofit entity, technically speaking, CWTC has been free to reopen to its private-pay participants since the State entered Phase 3 on May 29, 2020. EO38 ¶ 3. However, IDHS continues to believe that it is not yet safe to reopen the Division-funded CDS program without appropriate steps and safeguards in place. As discussed below, IDHS has been working diligently to safely reopen the program with appropriate guidance for both providers and participants to prevent the spread of COVID-19.

**COVID-19 and Individuals with Intellectual or Developmental Disabilities**

As Dr. Susan Bleasdale, an infectious disease expert working with IDPH explains, CDC guidance states that individuals with intellectual and developmental disabilities are "at increased risk of becoming infected or having unrecognized illness." [Declaration of Susan Casey Bleasdale, M.D. ("Bleasdale Decl."), attached hereto as Exhibit 2, at ¶3] Research indicates that people with developmental disabilities who live in group homes have some of the highest death rates from COVID-19 in the country. [Stark Decl. ¶ 14] In fact, they are four times more likely to contract COVID-19 than the general population, and if they do contract it, they are approximately twice as likely to die from it. *Id.* Researchers cite two main reasons for this increased risk: (1) people with developmental disabilities are far more likely to have a pre-existing health condition, such as respiratory disease, that adds to their risk; and (2) they are much more likely than even elderly people to live in a setting with roommates and staff, which greatly increases risk of transmission,

11

should one resident become infected. *Id.* ¶¶ 2, 14. With respect to individuals with intellectual and developmental disabilities in Illinois, and specifically those housed in the above-referenced CILA settings, 23% have Health Care Level scores that indicate that they are particularly vulnerable to COVID-19 complications due to pre-existing medical conditions. Twenty-six percent are over the age of 50, and an additional 16% are over the age of 65. *Id.* at ¶ 13. Finally, 4% have a Q score in their Health Care Level, which indicates a significant medical complication that puts those individuals at increased risk for fatality should they contract COVID-19, and includes individuals already on ventilators and with tracheotomies. *Id.*

As of June 26, 2020, there were 396 reported positive cases of COVID-19 in residents of five of the seven SODCs, and another 270 staff infections. Ten residents and four staff have died as a result. The fatality rate among SODC residents is approximately 25.8%. *See* https://www.dhs.state.il.us/page.aspx?item=125170, Stark Decl. ¶ 9. CILA settings have self-reported 331 resident cases, with providers reporting between one and 20 cases. CILA deaths (self-reported by providers) have totaled 25, resulting in a 7.55% fatality rate. *See* https://www.dhs.state.il.us/page.aspx?item=12570; Stark Decl. ¶ 10.

The CWTC program Plaintiff attends serves approximately 200 individuals, with 100 of those individuals funded through the Division. Nearly half of these Division-funded individuals with intellectual and developmental disabilities live in congregate settings. Thirty-three (33) individuals live in a CLF, and sixteen (16) live in a CILA. [Stark Decl. ¶17]

The danger of transmission from congregate setting to congregate setting has unfortunately already been established in Illinois. [Bleasdale Decl. at ¶ 5] In addition, one of the earliest instances of COVID-19 spread within Division-funded programs occurred as a result of one CDS program. Recipients travelling together from the CDS site, where a driver was infected with COVID-19, led

to additional cases in two separate IDF/DD facilities, one CILA, and in the home of a recipient of Home-Based Services. Two individuals died as a result of their COVID-19 infections. [Stark Decl. ¶12]

**IDHS's Plan to Reopen the CDS Program**

CDS programs in Illinois have been temporarily suspended since March 17, 2020, but the Division has continued to work to develop appropriate standards, tools, and guidelines to allow CDS and other programs to reopen safely and minimize the risk of the spread of COVID-19. [Stark Decl. ¶¶ 6, 19-26; Bleasdale Decl. ¶ 6]

The Division has been working with IDPH to create reopening guidance, and has studied other states guidance, consulted with the National Association of State Developmental Disability Directors (NASDDD) on best practices and participated in a workgroup developing best practices on CDS reopening. [Stark Decl. ¶22; Bleasdale Decl. ¶6] The Director of the Division personally met with CDS providers, families, associations and residential providers to hear and understand their concerns. [Stark Decl. ¶22] The Division also issued a survey to CDS providers to gauge readiness and concerns on reopening, and has worked closely with the Illinois Department on Aging as they also operate a congregate day program, which has also not yet reopened. [Stark Decl. ¶22] Based on these ongoing discussions, and following IDPH and CDC guidelines, the Division created two tools and a guidance document to assist and inform the reopening of CDS sites, with an anticipated gradual reopening as early as August 1, 2020. [Stark Decl. ¶22]

The tools and guidance for CDS participants and providers involve the following: First, there is an individualized risk/benefit tool, to initiate discussions with participants in CDS programs. [Stark Decl. ¶23] This tool is based on one developed for use in Ohio, and is intended to help weigh the desire of an individual to return to CDS against the individual risk, situational

risk, health risk, and potential impact on the individual's household. [Stark Decl. ¶23] Second, there is a Provider Readiness tool, based on a tool developed by Hawaii's Division of Developmental Disabilities, that assists providers in developing strategies to mitigate risk within their facilities. [Stark Decl. ¶24] Finally, the Division has worked with IDPH to develop guidance to providers on group size, use of PPE, disinfection schedules, safe transportation strategies and other ways to ensure any transmission risk of COVID-19 is minimized to the greatest extent possible. [Stark Decl. ¶25; Bleasdale Decl. ¶¶ 2, 6]

Once the guidance and tools are released, which is anticipated to be as early as July 1, 2020, providers will need some time to develop procedures, engage with families, Independent Service Coordination ("ISC") agencies, and individuals to conduct individualized risk/benefit assessments, and prepare for reopening. It is anticipated that this process will take at least one month. [Stark Decl. ¶26, 27] While it is not anticipated that all providers will be able to reopen in August, providers that are able to complete these tools and follow the guidance and demonstrate that they can reopen safely, will be able to open as early as August 1, 2020. [Stark Decl. ¶28] The Division anticipates that the remainder of CDS providers will be able to reopen by September 1, 2020. It should be noted that the need for guidance and time to implement appropriate safeguards is something about which both the Illinois Association of Rehabilitation Facilities ("IARF") (Illinois' largest association of community-based providers serving children and adults with intellectual/developmental disabilities) and the ARC (a statewide coalition of individuals with disabilities, families, and community organizations), agree. [Declaration of Joshua G. Evans ("Evans Decl."), attached hereto as Exhibit 3, at ¶¶ 5-7; Declaration of Margaret Cooch ("Cooch Decl."), attached hereto as Exhibit 4, at ¶3]

## LEGAL STANDARD

"The standards for granting a temporary restraining order and a preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). Each is an "extraordinary and drastic remedy," *Checker Car Club of Am., Inc. v. Fay*, 262 F. Supp. 3d 621, 626 (N.D. Ill. 2017), that is "never awarded as of right" and "never to be indulged in except in a case clearly demanding it," *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). Injunctive relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *see also Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998).

"To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase. To survive the threshold phase, a party seeking a preliminary injunction must satisfy three requirements. He must show that: (1) absent a preliminary injunction, he will suffer irreparable harm in the interim period prior to final resolution of his claims; (2) traditional legal remedies would be inadequate; and (3) his claim has some likelihood of succeeding on the merits. If the moving party satisfies each of these requirements, the court proceeds to the balancing phase of the analysis. In the balancing phase, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. . . . Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018). The court should pay "particular regard for the

15

public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

Here, Plaintiff's burden is even greater than usual because, rather than seeking to preserve the *status quo*, he seeks *mandatory* interim relief directing IDHS to begin paying for him to attend the CDS program (when it never has before), and further to immediately restart the CDS program. Mandatory injunctions are "rarely issued," interlocutory mandatory injunctions are "even more rarely issued," and neither should be issued "except upon the clearest equitable grounds." *W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958); *see also Graham v. Med. Mut. of Ohio*, 130 F.2d 293, 295 (7th Cir. 1997) ("[M]andatory preliminary writs are ordinarily cautiously viewed and sparingly issued."); *Chicago United Indus. v. City of Chicago*, 445 F.3d 940, 945-46 (7th Cir. 2006).

Not only does Plaintiff seek mandatory relief, the interim injunction he requests in his motion would give him substantially all the relief he seeks through this lawsuit. In such cases, the plaintiff's burden is even higher. *See, e.g.*, *Boucher*, 134 F.3d at 827 n.6 ("A preliminary injunction that would give the movant substantially all the relief he seeks is disfavored, and courts have imposed a higher burden on a movant in such cases."); *W.A. Mack,* 260 F.2d at 890 ("A preliminary injunction does not issue which gives to a plaintiff the actual advantage which would be obtained in a final decree.").

## ARGUMENT

During argument on June 25, 2020, Plaintiff's counsel alternated between asserting that the only relief sought by Mr. McDonald is that he be permitted to return to CWTC, and asserting that the Court should order the immediate statewide reopening of the CDS program. [June 25, 2020 Transcript 16:7-16; ECF #1 at 23]. These are two very different requests for relief, varying

16

greatly in scope and implementation. And Plaintiff's complaint reveals that the relief he seeks is not, in fact, limited to his ability to return to CWTC; rather, he seeks a temporary restraining order or preliminary injunction restraining Defendants from "[m]andating the continued shuttering of CWTC," and from "enforcing the statewide closure of all Community Day Services programs through at least August 31, 2020." [ECF #1 at p. 23].

Aside from the legal problems with Plaintiff's requested relief, addressed below, there is the additional issue of factual misrepresentation. Plaintiff makes the inflammatory statement that despite Illinois' move to Phase 4 of the Restore Illinois Plan, CWTC remains "shuttered" due to IDHS's unwillingness to reopen the CDS program. This is untrue. CWTC is free to resume its operations, while following appropriate safety protocols, as are other businesses in Illinois. *See* EO38 ¶ 3. The only difference relevant to this case is that until CDS resumes operation, CWTC, along with other providers of CDS services, will not receive subsidies from IDHS for offering a work training program to Mr. McDonald or other individuals with intellectual or developmental disabilities. However, this does not mean CWTC is "shuttered" by the State or even prohibited from restarting its work training program for intellectually and developmentally disabled individuals – if it wishes to do so, it is free to move forward by making use of private-pay agreements (explained *infra* at page 10), despite being contrary to the the Division's public health concerns. And based on the very limited information that Plaintiff has provided, CWTC is apparently doing exactly that. *See* ECF #9-15. Through these agreements, the families or guardians of individuals with intellectual or developmental disabilities who wish to participate in work training programs pay the providers directly for program participation, as opposed to the payment being made by IDHS. In fact, it was via such a private-pay agreement that Mr. McDonald participated in the CWTC program for almost 20 years, until he was recently approved, on March

26, 2020, for Division-funded Home Based Services, which will pay for his participation in the CDS program. [Stark Dec. at ¶ 15]. There is nothing precluding him from resuming his prior arrangement now, despite the Division's position on the Division-funded CDS program and its public-health-based belief that CDS is not ready to reopen safely absent further guidance, assessment tools, and time for implementation.

## I. Plaintiff Is Unlikely to Succeed on the Merits of His Claims.

A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits. *Winter*, 555 U.S at 20. To meet his initial burden, Plaintiff must show that he has a "better than negligible" chance of success on the merits. *Roland Mach. Co.*, 749 F.2d at 387. Where it is more likely than not that a defendant will prevail, injunctive relief is improper, particularly where the balance of harms tips decidedly in favor of the defendant. *See Boucher*, 134 F.3d at 826-27, 829. Even if a plaintiff makes the required showing, the court must determine how likely it is that the plaintiff actually will succeed: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach. Co.*, 749 F.2d at 387. Moreover, when there are "two equally credible versions of the facts the court should be highly cautious in granting an injunction without the benefit of a full trial." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1440 (7th Cir. 1986) (citation omitted).

Here, Plaintiff has no chance of success on the merits, and his motion should be denied for that reason alone.

### A. Plaintiff does not have standing to request the far-reaching relief he seeks.

Through this action, Plaintiff seeks an injunction that would implicate not only his own health and safety, but also the health and safety of thousands of other individuals across Illinois.

By claiming that this Court should order the immediate, statewide reopening of the CDS program, Plaintiff assumes that every other individual involved in the CDS program shares his opinion that the delayed opening of the program is due to discriminatory animus on the part of IDHS, as well as that to return immediately would pose no greater risk to any of the individuals in the program than to the general population at large. A request for such sweeping relief would only be appropriate in the context of a class action suit after class certification, once there has been a finding that the named plaintiff "fairly and adequately protect[s] the interests of the class." *Ploss as Trustee for Harry Ploss Trust DTD 8/16/1993 v. Kraft Foods Group, Inc.*, 431 F.Supp.3d 1003, 1011 (N.D. Ill. 2020). However, to be an adequate representative, the named plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (citing *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017). Here, Plaintiff neither purports to bring this suit as a class action nor attempts to establish that his claimed situation represents the intellectually and developmentally disabled persons involved in the CDS program as a whole. It is thus wholly inappropriate for him to demand such far-reaching relief, which would affect not only his rights, but the rights of thousands of other unrepresented individuals as well.[17] *See* Stark Decl. at ¶¶ 2, 7-13, 20, 25, 27.

## B. Granting the relief Plaintiff seeks would require a violation of the principles of federalism.

"One of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Money v. Pritzker*,

---

[17] Moreover, any attempt to bring this matter as a class action would fail at the outset. because each class member would need to be individually assessed in order to determine whether it appropriate for him or her to return to a CDS program, precluding any finding of commonality. *See Money v. Pritzker*, Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660, at *15 (N.D. Ill. Apr. 10, 2020) (noting that in instances where each putative class member comes with a unique situation – whether it be age, medical history, proximity to others who may be infected, likelihood of transmitting the virus to someone else, etc. – the "imperative of individualized determinations . . . makes [such a] case inappropriate for class treatment").

Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660, at *15 (N.D. Ill. Apr. 10, 2020) (citing *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990)). Plaintiff's request for a sweeping injunction mandating the statewide reopening of a State-administered program runs afoul of this principle. The United States Supreme Court has recognized that where "the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and the State administration of its own law.'" *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (citation omitted). Even in suits between private parties, injunctions are "to be used sparingly, and only in a clear and plain case." *Id.* When a plaintiff seeks to enjoin the activity of a government agency, however, "his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Id.* at 378-79 (citations and internal quotations omitted) (noting also that an injunctive order issued by a district court that significantly revised the internal procedures of the Philadelphia police department was "indisputably" a sharp limitation on the department's latitude in the dispatch of its own affairs, and reversing and remanding the district court's decision).

Courts within the Northern District of Illinois have acknowledged that the judiciary is ill-equipped to manage decisions regarding programs and/or populations that are generally left to the State executive branch. *See, e.g., Money*, 2020 WL 1820660, at *16 ("The judiciary is ill-equipped to manage decisions about how best to manage any inmate population – let alone a statewide population of tens of thousands of people scattered across more than a dozen facilities. And the concern about institutional competence is especially great where, as here, there is an ongoing, fast-moving public health emergency."). Here, Plaintiff seeks relief that would override the judgment of Illinois Department of Human Services officials and Illinois Department of Public Health

20

officials who have determined that it is not yet safe to restart the CDS program, and the position of the association of the very providers who operate these services and those that receive them. *See* Stark Decl. ¶¶ 19-28, 32; Bleasdale Decl.¶¶ 2-6; Evans Decl. ¶¶ 5-7; Cooch Decl. ¶ 3.

Federalism principles counsel strongly in favor of abstention for another reason: the breadth of Plaintiff's requested relief both vastly misrepresents the complexity of the issues at play and demonstrates a grave misunderstanding of the functioning of the CDS program. Plaintiff demands that this Court mandate that a State agency, IDHS, manage one of its programs in a particular way, solely based on the wishes of one individual who does not represent the other program participants, and who has in fact, ***never participated in*** the Division-funded program he wishes to mandatorily enjoin. Since the onset of COVID-19, officials in charge of administering the CDS program and developing adequate safety protocols have fielded countless calls from family members of CDS participants who have expressed serious concerns about resumption of the program while the risk from COVID-19 remains. [Stark Decl. at ¶ 20, 25, 27]. Of course, an order compelling IDHS to restart the CDS program immediately is not coterminous with an order mandating that all CDS participants immediately return to participating in the program. However, it is crucial to understand that thousands of individuals who participate in the CDS program also live in group homes with up to eight other individuals with intellectual and developmental disabilities, or in even larger congregate facilities, housing many more. [Stark Decl. at ¶ 2, 8-12]. If the program is ordered reopened immediately, it is possible (if not likely) that other individuals in addition to Mr. McDonald will choose to return prior to the implementation of IDHS recommended safety protocols. It is also likely that at least some of those individuals will be residents of CILAs, SODCs, ICF/DDs or CLFs. Not only will the lack of identified and implemented safety protocols impact the individuals in attendance, it necessarily follows that many

individuals with intellectual and developmental disabilities who have chosen not to return to the CDS program prior to implementation of safety protocols (and who may be at higher risk for infection and/or complications due to underlying health conditions) may nonetheless be exposed to infection by housemates who choose to return early. [Bleasdale Decl. ¶ 5] An order granting the broad relief Plaintiff seeks will necessarily affect the health and safety of thousands of people beyond just himself, a fact Plaintiff does not address in his motion and did not address at argument.

      **C.**    **IDHS's decisions regarding when to restart the CDS program are entitled to deference under *Jacobson*.**

Illinois, along with the rest of the world, is in the throes of an unprecedented public health crisis that has brought normal life to a halt. In an extraordinary public health crisis such as this, the State has broad emergency powers that it may exercise to protect public health, and courts are to afford deference to temporary actions taken to curb the spread of a dangerous disease and mitigate its effects.

It is well established that "the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905). COVID-19 qualifies as the kind of public health crisis contemplated in *Jacobson*. *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *7 (N.D. Ill. May 3, 2020). As such, in this instance, the actions taken by IDHS to prevent the transmission of COVID-19 should be upheld so long as there is a "real and substantial relation" to public health and safety, and the action does not constitute "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Jacobson*, 197 U.S. at 31.

Here, IDHS's actions are entitled to deference under *Jacobson*. First, IDHS's decision to temporarily suspend the CDS program while it finalizes plans to safely reopen the program is

undoubtedly related to public health. Second, the decision to temporarily suspend a State-run program is not a clear invasion of Plaintiff's fundamental rights, especially as alternative options have been offered. As such, IDHS's decisions, made after extensive consultations with public health officials and experts, about how to safely resume the CDS program should be afforded extreme deference under *Jacobson*. *See South Bay United Pentecostal Church v Newsom* ("*South Bay*"), 140 S. Ct. 1613, at *1 (2020) (Roberts, C.J., concurring).

At the hearing on Plaintiff's Motion for a Temporary Restraining Order on June 25, 2020, Plaintiff asserted, without any legal basis, that the *Jacobson* standard does not apply to claims brought under the ADA or Rehabilitation Act. June 25, 2020 Hearing Transcript at 11:24-12:4. This argument misunderstands the premise of *Jacobson*, which is intended to provide deference to state decisions necessary to protect the public health, even if those decisions impact individual rights. *Jacobson*, 197 U.S. at 26. Courts have recognized that "[t]he invocation of emergency powers necessarily restricts activities that would normally be constitutionally protected." *United States v. Chalk*, 441 F.2d 1277, 1280 (4th Cir. 1971).

Unquestionably, *Jacobson* only applies in extraordinary circumstances. *Jacobson*, 197 U.S. at 39. As such, the courts have not had the opportunity to explore the contours of how *Jacobson* applies across a swath of different scenarios. However, the ongoing pandemic is undeniably one of the extraordinary circumstances contemplated by *Jacobson*, and the Supreme Court has provided clear guidance as to how *Jacobson* should be applied as it relates to COVID-19. *See South Bay*, 140 S. Ct. at *1 (Roberts, C.J., concurring). In his concurrence in *South Bay United Pentecostal Church*, where the Court denied a request for injunctive relief related to religious gatherings, Chief Justice Roberts illustrated the ultimate significance of *Jacobson*, which is to recognize that during a public health crisis it is imperative that State officials have wide

latitude to take action designed to protect the public health. *Id.* at *1. Specifically, the Chief Justice stated that State officials "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.*

Plaintiff's position that *Jacobson* does not apply to the ADA and the Rehabilitation Act ignores the purpose of *Jacobson*, as clearly explained in *South Bay*. Plaintiff focuses on the lack of an exception for "clear textual requirements" of the ADA and Rehabilitation Acts. Transcript at 11:25-12:4. But *Jacobson* did not contemplate statutes that had not yet been written, or even contemplated by the legislature, when it issued this opinion. *Jacobson* addressed fundamental rights, the most significant rights afforded by the Constitution, and recognized that even those rights can be curtailed when necessary to protect the public health. *Jacobson*, 197 U.S. at 38. The reasonable reading of *Jacobson*, as illustrated by *South Bay*, is that the required deference to the executive branch applies to state decisions across the board during a public health emergency, not only those that may impact a fundamental right. As the COVID-19 pandemic is exactly the type of extraordinary public health situation contemplated by *Jacobson,* the courts should give significant deference to state decisions as to how to address COVID-19, including the decision to temporarily close certain IDHS programs and how best to reopen them. *Cassell*, No. 20 C 50153, 2020 WL 2112374, at *7.

To combat a virulently infectious disease in an emergency pandemic, the State must be able to take swift and decisive action. *Cf. Chalk*, 441 F.2d at 1281. The court's review of temporary measures during such an emergency is therefore "limited to a determination of whether the [State's] actions were taken in good faith and whether there is some factual basis for [the State's] decision that the restrictions [it] imposed were necessary to maintain order." *Id.*; *see also Jacobson*,

197 U.S. at 29 ("reasonable regulations" may be implemented in the face of an infectious disease epidemic). This deferential standard recognizes that, in a public health crisis, "it is no part of the function of a court . . . to determine which one of two modes was likely to be the most effective for the protection of the public against disease," *Jacobson*, 197 U.S. at 30, and that "governing authorities must be granted the proper deference and wide latitude necessary for dealing with . . . emergenc[ies]." *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).

Here, there is no question that IDHS's actions were taken in good faith. Notwithstanding Plaintiff's baseless, ridiculous, and insulting allegations of bigotry and cruelty, the Division and its staff are dedicated to serving the interests and meeting the needs of individuals with intellectual and developmental disabilities. Employees like Director Stark and many others have dedicated their lives to that mission, and certainly have no wish to cause anyone harm. On the contrary, IDHS's decisions regarding when and how to reopen the CDS program are based, fundamentally and completely, on the best interests of the individuals with intellectual and developmental disabilities that they serve. Additionally, the good faith of the Division in suspending CDS programs and postponing reopening until tools and appropriate guidance are in place is supported by the fact that Illinois is not the only state to take such action. As previously noted, New York and New Jersey's CDS programs also remain closed [Stark Decl. ¶21], and Connecticut and Minnesota (a state with a far lower infection rate than Illinois[18]) are only now partially opening their CDS programs, but only to those who live at home and not in congregate settings.

_____

[18] Per the website for Minnesota's Department of Public Health, as of June 28, 2020, Minnesota has had a total of 35,549 COVID-19 infections, compared to Illinois' 141,723. *Compare* https://www.health.state.mn.us/diseases/coronavirus/situation.html with http://dph.illinois.gov/covid19.

Moreover, IDHS's decisions regarding reopening the CDS program are supported by evidence. As discussed above, IDHS has been developing its reopening plan in consultation with the infectious disease experts at IDPH. [Bleasdale Decl. ¶¶ 2, 6; Stark Decl. ¶¶ 19-26] In addition both IARF and the ARC are in agreement with the Division's decisions on both closing CDS programs, and the need for tools, guidance, and time to implement safety procedures. [Evans Decl. ¶5-7; Cooch Decl. ¶3] For these reasons, IDHS's decision regarding the timetable for reopening the CDS program is entitled to deference, and Plaintiff's motion should be denied for this reason alone.

> **D.     Plaintiff is not likely to succeed on the merits of his claims.**

In addition to failing under the deferential standard afforded to emergency public health and safety measures taken by the State, Plaintiff's claims also fail under the usual statutory and constitutional framework.

> **1.     ADA/Rehabilitation Act**

Plaintiff alleges that IDHS's decision to temporarily suspend the CDS program violates his rights under the ADA and the Rehabilitation Act. Title II of the ADA states that "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. § 12132. The Rehabilitation Act provides almost identical antidiscrimination provisions for any program that receives federal funding; as such, courts use the same analysis for claims under both Acts. *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 607 (7th Cir. 2004). Here, Plaintiff is unlikely to succeed on his statutory claims[19] as he cannot show that IDHS discriminated against him on the basis of his disability.

---

[19] To avoid unnecessarily duplicitous references to both Acts, IDHS shall refer to both the ADA and Rehabilitation Act claims as Plaintiff's statutory claims.

To succeed on his statutory claims, Plaintiff must show that: (1) he is a "qualified individual with a disability;" (2) IDHS denied Plaintiff the "the benefits of the services, programs, or activities of a public entity;" and (3) Plaintiff was discriminated against "by reason of" his disability. *Money*, 2020 WL 1820660 at *18. Defendants do not dispute that Plaintiff meets the first prong of this analysis – he is a qualified individual with a disability for purposes of the ADA. However, Plaintiff cannot show that he was denied the benefits of a public entity's services or otherwise discriminated against by reason of his disability.

### a. The benefit in question–the Division-funded CDS program–is currently unavailable to everyone.

Plaintiff alleges that he has been discriminated against because a program he was recently admitted to for Division funding, in which he wishes to participate, CDS, has been temporarily suspended. However, not being provided a non-existent service is not discrimination. The statutes prohibit an individual from being denied the ability to participate in or benefit from a service, program, or activity of a public entity. 42 U.S.C. § 12132. The logical reading of this portion of the Act requires that the service, program, or entity actually exists. Here, it is undisputed that the Division-funded CDS program is not currently active. *No* individuals are currently able to receive benefits through the program. IDHS is currently working on tools and guidance to assist providers and families in ensuring the program is able to restart with the use of proper safety protocols; however, for all intents and purposes, the Division-funded program simply does not exist at this time. The statutes do not require that IDHS provide access to a non-existent government program.

Plaintiff disagrees with IDHS's decision to temporarily suspend the program, but this disagreement does not give Plaintiff the ability to demand that IDHS immediately reopen the CDS program. States are empowered to administer and run government programs, including ones that receive federal funding. Inherent in that authority is the ability to exercise discretion related to

27

programs and services. *See Section I.B., infra.* This encompasses decisions as to what services to provide and whether a program should be suspended or discontinued. *See U.S. v. Loria*, No. 3:08CR233–2, 2010 WL 1779998, at *1 (W.D.N.C. April 30, 2010) (discussing how court did not have authority to order the Bureau of Prisons to make certain types of programs available).

### b. *Plaintiff cannot establish any discrimination on the basis of his disability.*

Plaintiff also cannot establish that IDHS's decision to delay the reopening of the CDS program is based on his disability. To make such a showing, Plaintiff must demonstrate at least one of the following three things: (1) IDHS's intentional action on the basis of the disability, (2) IDHS's refusal to provide Plaintiff with a reasonable modification, or (3) a showing that IDHS's rule disproportionally impacts disabled people." *Money*, 2020 WL 1820660 at *18. Plaintiff cannot establish any of these factors, and his statutory claims fail accordingly.

### i. *Plaintiff cannot establish intentional action on the basis of disability.*

Plaintiff asserts that because the developmental disabilities of the clients serviced by the CDS programs were considered in developing IDHS's reopening strategy, the decision to delay reopening is necessarily and impermissibly based on Plaintiff's disability. ECF 7 at 8. This argument ignores the reality of this situation. The developmental disabilities of the CDS program's participants *were* considered as IDHS developed the plan for reopening the CDS program. Because the entire program exists to provide services for the developmentally disabled community of Illinois, there is no way *not* to consider the participants' disabilities when developing safe, quality programming for them. To ignore the participants' disabilities would be to eviscerate the purpose of the program in the first place.

Here, all of IDHS's decisions have revolved around COVID-19 – specifically, IDHS's legitimate concerns regarding the impact that COVID-19 may have on the CDS program participants. [Bleasdale Decl. ¶¶ 4-6; Stark Decl. ¶¶ 19-26] As discussed, COVID-19 is a highly contagious virus with no vaccine and no reliable or widely available treatment. Plaintiff disagrees with IDHS's position related to the potentially heightened dangers that COVID-19 presents to individuals with intellectual and/or developmental disabilities, but that does not mean that IDHS should not consider federal guidelines and recommendations from public health experts when determining how COVID-19 may impact the CDS program and its participants. This is especially evident in light of similar restrictions being implemented in other states, including New York, New Jersey, and others.

The interplay between COVID-19 and the statutes was addressed in the *Money* case which concerned a group of inmates' requests for medical leave or furlough because of COVID-19. *See Money*, 2020 WL 1820660. There, the court recognized that the plaintiffs did not have a statutory claim, as they were not discriminated against because of their disability. *Id.* at n. 14. The Court further noted that "[t]he fact that disabled persons may be more susceptible to contract or suffer serious consequences from COVID-19 is not disputed, *but that disparate impact is not a consequence of "Defendant's rule" or any action by Defendants*." *Id.* (emphasis added). Similarly, IDHS has not made decisions based on Plaintiff's disability; IDHS has made decisions based on the public health risks of COVID-19. As such, Plaintiff cannot show that he was discriminated against because of his disability.

In making his arguments, Plaintiff focuses extensively on a letter from IDHS that discussed concerns with immediately reopening the CDS program. *See* ECF# 9-15. However, Plaintiff once again misrepresents the facts regarding this letter. Through that communication, IDHS's General

Counsel highlighted the unique considerations that come into play related to providing programing for large numbers of individuals with intellectual and developmental disabilities given the current prevalence of COVID-19. Because the program at issue only serves individuals with disabilities, a second level of analysis is required to pinpoint the determinative factor guiding IDHS's decisions. As discussed, the developmental disabilities of every client are considered in virtually every decision related to the CDS program. This alone does not mean that every decision IDHS makes about the CDS program is *because of* the client(s) disability. As such, while IDHS considered the developmental disabilities of its clientele when making its reopening decisions, the decisions were made *because of* the public health risks of COVID-19, not *because of* its clients' disabilities.

#### ii. *Plaintiff's requested "accommodations" are not reasonable.*

Plaintiff could also support his statutory claims by showing IDHS refused to provide him with a reasonable accommodation. *Money*, 2020 WL 1820660 at *18. As previously noted, it is unclear whether Plaintiff is requesting that IDHS reopen the CDS program solely for him, or if he is requesting an immediate reopening of all CDS programs throughout the state. Regardless, the government is required only to provide accommodations that are "reasonable," and neither of Plaintiff's suggested accommodations is reasonable. 28 C.F.R. § 130(b)(7).

This Court has previously held that typically a public entity should strive to provide the accommodation that a plaintiff requests; however, the public entity is not obligated to do so when the requested accommodation is not reasonable. *Novak v. Hall*, 139 F. Supp. 3d 901, 914 (N.D. Ill. 2015) (Pallmeyer, J.). "Whether a requested accommodation is reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F. 3d. 775, 784 (7th Cir. 2002) To determine if an

accommodation is reasonable, courts look to whether the requested accommodation is effective and proportional to the costs required to implement the accommodation. *Id.* at 784. An accommodation is unreasonable if the accommodation would "fundamentally alter the nature of the service, program, or activity." *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 968 (7th Cir. 2018).

Here, Plaintiff is requesting that IDHS reopen the CDS program for him alone, that IDHS reopen the entire CDS program statewide, or both. In any event, the request is unreasonable. As an initial matter, the Division-funded CDS program is not currently in operation. Consequently, either "accommodation" requested by Plaintiff would require IDHS to restart a program that has been suspended. On its face, the demand is unreasonable, as logic dictates that reinstating a program that is not currently in operation is a fundamental alteration of the nature of the program. *See Valencia*, 883 F.3d at 968. Even if one assumes that Plaintiff seeks a limited restart of the program only for him at the CWTC site, such a request is still unreasonable. Plaintiff asserts that his supervisors are ready and able to resume their positions at CWTC, and that there is consequently not a significant administrative burden associated with his request. [Transcript at 17:17-22, 26:20-25 – 27:1-17]. However, while administrative and financial concerns are factors that the court considers when weighing whether an accommodation is reasonable, they are not the only considerations. Furthermore, as he has not received Division funding before, he will be attending the program as a new participant. As such, IDHS will need to work with his ISC agency to modify his Personal Plan to include support from CWTC in order for CWTC to be able to bill

for his attendance. In addition, CWTC will need to develop an Implementation Strategy and goals for his participation.[20] [Stark Decl. ¶ 31]

In *A.H. by Holzmueller*, plaintiff requested that the Illinois High School Association lower the qualifying times required to participate in the state track and field finals. *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 263 F. Supp. 3d 705, 723 (N. D. Ill.) (Jul. 7, 2017). The court determined that while the financial or administrative burdens of altering the qualifying times would not be unreasonable, the request to amend the qualifying times was still unreasonable as it would alter the fundamental nature of the program. *Id.* at 726. Here, Plaintiff has requested that an entire, currently suspended, State program be reinstated for his individual use. Administrative concerns aside, the request to reinstate a program, even on an individual basis, is a fundamental alteration of the program and is thus, by default, not a reasonable accommodation.

If one views Plaintiff's request as one to reopen the entire CDS program statewide, the analysis is even more straightforward, and Plaintiff's requested accommodation is even more unreasonable. Plaintiff glosses over the substantial safety considerations that IDHS has considered in creating its plan to safely reopen the CDS programs starting on August 1, 2020. Instead, Plaintiff attempts to portray the process as a simple one that IDHS refuses to explore because of its alleged biases. Once again, Plaintiff ignores the realities of the situation. The CDS program serves approximately 21,000 individuals across the State. [Stark Decl. ¶ 2] Reinstating this program, especially in a responsible manner that adequately considers legitimate safety concerns of the clients and other personnel, is a substantial undertaking that requires significant planning. Plaintiff's naive request to reopen the program in a manner of days is untenable and does not

---

[20] Both the Personal Plan and Implementation Strategy are required as part of the person-centered planning process for all individuals participating in Division-funded programs under the Home and Community-Based Services Medicaid Waiver. *See* https://www.IDHS.state.il.us/page.aspx?item=100040

qualify as a reasonable accommodation under the statutes. Therefore, Plaintiff cannot show that he has been denied a "reasonable" accommodation.

> ### iii. Plaintiff fails to address the accommodations that have been offered to him by IDHS.

In making his arguments, Plaintiff would lead this Court to believe that IDHS has made no effort to assist and accommodate him during this difficult time. Once again, this misrepresents the facts. As an agency dedicated to serving individuals with intellectual and developmental disabilities, IDHS's Division of Developmental Disabilities is acutely aware of the uncertainty and distress that the COVID-19 pandemic has had on many of the individuals under its care, as it has had on the general population at large. While it does not believe it can safely reopen the CDS program right now, IDHS does realize that structure, socialization, and a sense of purpose are crucial to the health and happiness of its program participants. As such, IDHS is actively coordinating alternative programming for CDS participants who have expressed the desire to continue with programs during the pandemic. [Stark Decl. at ¶¶ 6, 19, 27]. Upon being made aware of Plaintiff's distress, IDHS promptly offered this alternate programming to Mr. McDonald as well. *See* ECF 9-13.

As part of this alternate programming, Mr. McDonald could be provided one-on-one time with a Personal Support Worker who would provide him with personal support and engage him in activities. Mr. McDonald could also be provided with behavioral therapy and counseling services to assist him with any elevated anxiety levels he is experiencing. Inexplicably, rather than exploring the contours of IDHS's offered alternate programming accommodation, this lawsuit was filed within days of the offer being made. Plaintiff has provided no reasons indicating why, particularly in the face of a deadly pandemic, this alternate programming is unsuitable. Rather, he

simply insists that the only appropriate course is an immediate and unsafe reopening of a state-wide program.

<em>iv.     Plaintiff has not established that a disparate impact exists.</em>

Finally, Plaintiff is unable to show that IDHS's decision has a disparate impact on individuals with intellectual and/or developmental disabilities. To establish a disparate impact, Plaintiff must show "but-for" causation. *A.H. by Holzmueller*, 263 F. Supp. 3d at 722. In *A.H. by Holzmueller*, the plaintiff was a high school runner with cerebral palsy who sought to participate in the state finals. *Id.* at 710. Specifically, he requested that IHSA establish realistic qualifying times for para-ambulatory athletes to compete in the state finals and that IHSA establish a para-ambulatory division in its annual 5K "Road Race" event. *Id.* In evaluating plaintiff's claim, the court applied "but-for" causation, which requires a plaintiff to show that but-for their disability, they would be able to participate in the program, service, or event at issue. *Id.* at 722.

Here, Plaintiff cannot meet this burden. To establish but-for causation, Plaintiff would have to show that but for his disability he would be able to return to CWTC's work training program through the Division-funded CDS program. "[T]he ADA and the Rehabilitation Act are addressed to rules that hurt people with disabilities by reason of their handicap, rather than that hurt them solely by virtue of what they have in common with other people." *Wisconsin Comm. Serv., Inc. v. City of Milwaukee*, 465 F.3d 737, 748 (7th Cir. 2006). Here, the comparable group that Plaintiff should be compared to is other CDS clients or even other individuals with developmental disabilities, not the population at large. Accordingly, Plaintiff's argument fails, as but for Plaintiff's disability he would not be eligible for participation in any CDS program, as developmental disability is a pre-requisite to program eligibility. [Stark Decl. at ¶ 3]. Further, evidence demonstrates that individuals with developmental disabilities are often more severely

34

impacted by COVID-19. [Stark Decl. at ¶¶ 12-13]. This does not amount to a disparate impact *because of* IDHS's decisions or actions, rather it is based on the nature of COVID-19. As Plaintiff cannot show that IDHS discriminated against him because of his disability, that IDHS refused to provide a reasonable accommodation, or that IDHS's actions or decisions have disparately impacted the disabled, Plaintiff's statutory claims are is unlikely to succeed on the merits.

### 2. Equal Protection

Plaintiff alleges that the decision to temporarily suspend the CDS Program, and by extension Plaintiff's ability to have his participation at CWTC paid for by the IDHS, violates the Equal Protection Clause. ECF 7 at 12. As IDHS's actions are rationally related to a legitimate government interest, namely the safe reopening of the CDS program during this global pandemic, Plaintiff is unlikely to succeed on this claim.

The Equal Protection Clause was designed to ensure that similarly situated people are treated the same, but it "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Here, as recognized in the Motion, Plaintiff's equal protection claim is subject to rational basis review, as mental disability is not a suspect class. *See* ECF 7 at 12; *City of Cleburne, Tex. V. Cleburne Living Ctr.* ("*Cleburne*"), 473 U.S. 432, 442 (1985) (holding that mental disability is not a suspect class).[21] Under the rational basis standard, the courts are required to uphold the government's actions unless there is no rational relationship between that action and a legitimate government purpose. *St. Joan Antida High Sch. Inc.*, 919 F. 3d at 1010. "This standard of review is a paradigm of judicial

---

[21] At the June 25, 2020, hearing, Plaintiff insinuated that the State's decision should be reviewed as if it related to race or gender – in other words, that strict scrutiny applies. [Transcript 12:13-20]. This assertion is incorrect. *See St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019) (explaining that strict scrutiny only applies when a suspect class or fundamental right is at issue).

restraint," and judicial inquiry ends as soon as a plausible reason for the action is found. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313-14 (1993) (internal citations omitted); *St. Joan Antida High Sch. Inc.*, 919 F.3d at 1011 ("We need only identify a legitimate end and ask whether the means – the classification – bears a rational relationship to the end.").

This incredibly deferential standard recognizes that courts "are required to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 946-7 (7th Cir. 2009) (quoting *City of Chicago v. Shalala*, 189 F.3d 598, 606 (7th Cir. 1999)). Under this standard, which gives a "strong presumption of validity" to IDHS's decisions, IDHS is not required to justify its actions. Instead, the burden is on Plaintiff to negate every conceivable basis for the decision. *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1053 (7th Cir. 2018) (internal citations omitted). Plaintiff cannot meet this burden and has not even attempted to do so.

IDHS has compelling reasons to cautiously approach reopening the CDS program using a comprehensive plan that considers the particular challenges associated with running statewide programs for approximately 21,000 individuals with intellectual and/or developmental disabilities. [Stark Decl. at ¶¶ 2, 12-13, 20-25; Bleasdale Decl. ¶¶ 2-6]. Plaintiff may disagree with IDHS's decision and dispute the validity of the reasoning behind that decision, but a disagreement as to whether a government decision is appropriate does not establish that there was no rational basis for the decision. *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 77 (2001) ("The fact that other means are better suited to the achievement of governmental ends . . . is of no moment under rational basis review.") The Division's actions are also clearly in line with other states who have similarly

suspended CDS services, which is further evidence of a clear rational basis. As such, there is no basis for judicial interference with IDHS's decision-making process.

Plaintiff relies on *Cleburne* to argue that IDHS's decision does not survive a rational basis review. ECF 7 at 12. Plaintiff's attempt to equate IDHS's actions here with those of the City in *Cleburne* is not only wrong, but offensive. In *Cleburne*, the Supreme Court determined that a city law that required additional zoning requirements in order to build a home for individuals with developmental disabilities did not survive a rational basis analysis, as the irrational prejudice against such individuals was the *only* justification for the law. *See Cleburne*, 473 U.S. at 450. The irrational, prejudice-driven bias present in *Cleburne* makes the case highly distinguishable, and its analysis is rarely applicable in other circumstances. *Monarch Beverage Co., Inc. v. Cook*, 861 F.3d 678, 685 (7th Cir. 2017) (discussing how *Cleburne* is an "extraordinary rather than exemplary" rational-basis case). As such, the Seventh Circuit has "cautioned against overly-broad readings of [*Cleburne*]. *Minerva Diary, Inc.*, 905 F.3d at 1057-8.

*Cleburne* stands for the proposition that:

> If a law is challenged as a denial of equal protection, and all that the government can come up with in defense of the law is that the people who are hurt by it happen to be irrationally hated or irrationally feared by a majority of voters, it is difficult to argue that the law is rational.

*Minerva Diary, Inc.*, 905 F.3d at 1058 quoting *Milner v. Apfel*, 148 F.3d 812, 817 (7th Cir. 1998). Plaintiff's attempt to compare the motivations present in *Cleburne* to IDHS's public health-based actions is unfounded and unreasonable. The Division of Developmental Disabilities works to provide community-based programs for individuals with intellectual and developmental disabilities. These programs are designed to provide enrichment, services and supports to these individuals in a safe environment. IDHS is not driven by irrational "fear" or "hatred" of individuals

with intellectual and/or developmental disabilities, as demonstrated by the very existence of programs designed and run by dedicated civil servants to benefit these individuals.

IDHS has made decisions as to how to safely reopen its programs during a global pandemic; decisions based on their expertise, taking into consideration the specific needs of the program participants, and guidance from the CDC and IDPH and IDHS. At this time, IDHS has determined that the Division's CDS programs should be temporarily suspended due to public health concerns, and not reopened until it can be done in as safe a manner as practicable under these extraordinary circumstances. Given the undeniable public health risks associated with COVID-19, and especially the risks associated with congregate settings, in which the majority of the Division's program participants live, Plaintiff cannot show that this decision is unrelated to a legitimate government purpose. As such, Plaintiff cannot succeed on his Equal Protection claim.

## II. Plaintiff Has Not Shown That He Will Be Subjected to Irreparable Harm Absent Judicial Intervention.

Plaintiff also fails to establish that he will suffer irreparable harm if the Court denies his request for an injunction. Irreparable harm is "harm that cannot be prevented or fully rectified by the final judgment after trial." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). "[I]f the only injury from the defendant's alleged wrongdoing is reparable by relief offered by a final judgment should the plaintiff prevail, the plaintiff must wait." *BRK Brands, Inc. v. Nest Labs, Inc.*, 28 F. Supp. 3d 765, 769 (N.D. Ill. 2014). This is exactly such a case. Plaintiff's alleged harm is the mental and emotional distress he allegedly suffered as a result of not being able to participate in the work training program offered at CWTC. [ECF 1 at ¶¶ 47-48]. However, as discussed above, Plaintiff is and has been free to return to the CWTC work training program under

a private-pay agreement.[22] Plaintiff participated in CWTC's work training program for roughly 20 years under just such an agreement and is therefore well aware of the availability of this option, as he was not awarded funding under the IDHS CDS program until March 26, 2020, *after* the CDS program had been suspended. [Stark Decl. ¶1, 6] Returning under such an agreement would cost Plaintiff approximately $1,300 for the month of July,[23] until IDHS moves forward with its planned "soft reopening" scheduled for August 1. As such, if this Court were to eventually find that IDHS violated Plaintiff's rights in not fully reopening the CDS program until September 1, 2020, Plaintiff could be made whole at that time via an award of money damages to compensate him for the amount paid to return to the CWTC program prior to the reopening of the Division-funded CDS program. Thus, Plaintiff, if successful, has a remedy at law, has not shown irreparable harm, and his motion should be denied for this reason as well.

### III.     The Balance of Interests Weighs Heavily in Favor of the State.

Under the "balance of harms" portion of the analysis, Plaintiff must establish that "the harm [he] would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants." *Mich. v. U.S. Army Corps of Eng'g*, 667 F.3d 765, 769 (7th Cir. 2011). Because a movant need not establish that it is more likely than not that they will succeed on the merits to obtain injunctive relief, a movant "must compensate for the lesser likelihood of prevailing by showing the balance of harms tips decidedly in favor of the movant." *Boucher*, 134 F.3d at 826

---

[22] At the hearing, the Court expressed concern that if Plaintiff can go back to work under a private pay arrangement, then the CDS program could also be reopened. But there is a vast difference between Plaintiff and his caregivers making a decision to allow him back to work under private pay, and making their own judgments regarding the associated health risks, and requiring the opening of a state sponsored program that would send vulnerable individuals into a potentially dangerous setting, especially when the State's public health experts have determined that reopening the program at this time is ill advised.

[23] This figure is based on the $12.79 per hour that IDHS pays for CDS participants to participate in CWTC's program (Stark Decl. ¶ 17), a 4½ hour day (*see* ECF 9-15 at 2, stating that participants should arrive no earlier than 7:45 a.m. and depart by 12:15 p.m.), for 22 working days.

n. 5 (emphasis in original). The court also should consider whether a preliminary injunction would cause harm to the public interest. *Platinum Home Mort. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998).

When this Court balances the hardships where "the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018); *Trump v. Int'l Refugee Assistance*, 138 U.S. 353 (2017) ("As the district court did, we consider the balance of the equities and the public interest factors together."); *see also Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("The government's interest is the public interest.") (emphasis in original).

The federal courts recognize that public health is a significant public interest. *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005). It is with that significant public health interest in mind that this Court should balance the public's interest in avoiding being exposed to a virus, where many members of that public are at higher than average risk for contracting COVID-19 and/or suffering complications therefrom, with Plaintiff's interest in being provided with an IDHS subsidy, via the CDS program, to return to his CWTC work training program.

The Court can be confident that the sweeping injunction requested by Plaintiff could unleash tragic consequences across Illinois. Plaintiff does not and cannot deny the public health crisis resulting from the COVID-19 pandemic. As the Seventh Circuit recognized earlier this month, the virus has infected millions of people all over the world and claimed the lives of hundreds of thousands. *Elim Romanian Pentecostal Church v. Pritzker*, No. 20-1811, 2020 WL 3249062, at *1 (7th Cir. June 16, 2020). As of today, more than 140,000 people in Illinois have

been infected, and almost 7,000 of those have died. Despite these stark facts, Plaintiff is asking that the CDS program be broadly and universally re-opened approximately two months earlier than is safe, solely for his benefit. If that were to happen, there is the potential for thousands of people (including other recipients of CDS services, staff, and family members) to contract COVID-19, with potentially fatal effects. The realities of this scenario have already played out, as the first known COVID-19 transmission involving the Division's programs occurred as a result of transportation of individuals to a CDS program by driver infected with COVID-19. The virus spread to two ICF/DD residences, one CILA residence and one individual's home, ultimately resulting in two deaths. [Stark Decl. ¶ 12] Any of the alleged harms Plaintiff may suffer due to the CDS program not fully reopening until September 1, 2020 (a *maximum* of two months, with at least some providers likely opening *one* month from now) are relatively slight compared to the devastation that could result if IDHS were compelled to reopen the program immediately.

Finally, Plaintiff's proposed relief is not in the public interest because it would drastically interfere with the State's ability to manage its own programs. *Rowe v. Finnan*, No. 11-CV-524, 2013 WL 74609, at *2 (S.D. Ind. Jan. 4, 2013). As discussed above, the Court should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 483 (1995)). Thus, an injunction issued against state officials "dealing with the day-to-day operation" of State programs "may cause substantial harm to both public and private interests." *Id*. The injunction sought here, which would strip IDHS of the most basic control over its own programs—the power to determine when it may safely resume programming—would cause substantial harm to the public interest. Plaintiff's request that he and the Court substitute his judgment for IDHS's in determining when IDHS may safely resume its programs, is not responsible or in keeping with the public interest.

41

## CONCLUSION

Plaintiff is not likely to succeed on the merits of his claims, and he has not shown that he will be subject to irreparable harm absent court intervention. Moreover, the public interest will suffer immensely if IDHS is compelled to reopen the CDS program before being able to ensure that all program participants will be protected to the fullest extent possible from infection by COVID-19. The Court should deny Plaintiff's motion for a temporary restraining order and preliminary injunction.

Dated: June 29, 2020                    Respectfully submitted,

                                        KWAME RAOUL
                                        Attorney General of Illinois

                                        _/s/ Amanda L. Kozar_
                                        Amanda L. Kozar
                                        Mary A. Johnston
                                        Sarah Newman
                                        Michael Dierkes
                                        Office of the Illinois Attorney General
                                        100 West Randolph Street
                                        Chicago, Illinois 60601

                                        *Counsel for JB Pritzker and Grace B. Hou*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 29, 2020, I caused a copy of the foregoing *State Defendants' Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction* to be filed electronically on CM/ECF, which will cause a notice of filing to be sent to all counsel of record who have entered appearances.

*/s/ Amanda L. Kozar*