# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| John McDonald, | ) | |
| | ) | |
| Plaintiff, | ) | No. 20 CV 3653 |
| | ) | |
| v. | ) | Chief Judge Rebecca R. Pallmeyer |
| | ) | |
| JB Pritzker, in his official capacity as | ) | |
| Governor of Illinois, and Grace B. Hou, | ) | |
| in her official capacity as Secretary of | ) | |
| the Illinois Department of Human Services, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ALLISON STARK

I, Allison Stark, state that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

**Background on the Division**

1. I am the Director of the Division of Developmental Disabilities ("DDD" or "the Division") of the Illinois Department of Human Services ("IDHS"). I have held that position since September 23, 2019. Prior to that, I was employed at Orchard Village, a nonprofit social service agency serving children and adults with intellectual and developmental disabilities for 12 years, holding the positions of Director of Intermittent Services, Vice President of Programs, and ultimately, President & CEO. While at Orchard Village, I was personally responsible for the opening of a Community Day Services program that was funded by IDHS. Prior to my position at Orchard Village, I worked as a Service Facilitator for individuals and families with intellectual and developmental disabilities and as a Case Manager helping determine eligibility for state-funded services in Colorado. I have spent my entire career working with individuals with

1

disabilities to support them to live self-determined lives in their communities with the right supports and services.

    2.      The DDD is the division of IDHS responsible for providing services to approximately 30,000 Illinois residents with intellectual or developmental disabilities ("I/DD"). The Division provides direct services to approximately 1,650 individuals in seven (7) State Operated Developmental Centers ("SODC"), which are residential, congregate settings that serve between 100 to close to 500 individuals with intellectual and developmental disabilities. SODCs are regulated by the Illinois Department of Public Health ("IDPH"). While the Division does not provide services directly in a community-based setting, it provides guidance, funding, licensure and regulatory oversight of the provision of community-based services. In my role as Director of the Division of Developmental Disabilities, I am responsible for the overseeing all of the Division's programs, including the Community Day Services ("CDS") program. The main residential and day services include the following:

    a. Intermediate Care Facilities for the Developmentally Disabled ("ICF/DD"): larger congregate residential facilities, ranging in size from 6 to over 200 individuals (approximately 3,600 individuals reside in ICF/DDs). ICF/DDs are regulated by the IDPH.

    b. Community Integrated Living Arrangement (CILA): group homes ranging in size from one to eight individuals (approximately 12,000 individuals currently receive CILA services);

    c. Community Living Facilities: group homes for up to twelve individuals (36 individuals currently receive CLF services in three settings). CLFs are regulated by IDPH.

    d. Home-Based Services ("HBS"): provides funding for services and supports for individuals who reside at home with a loved one (approximately 8,000 individuals receive HBS); and

    e. Community Day Services Programs ("CDS"): day services for individuals with I/DD from various residential settings (described above), where supervision and support are provided generally on weekdays (Monday through Friday) from 9 a.m. to 3 p.m. CDS programs serve an average of 100 individuals per location, with a range of 30 to 500 individuals. There are approximately 21,000 individuals who currently receive CDS through DDD funding. Of these 21,000 individuals, approximately 11,000 individuals are from CILAs, 3,600 from ICF/DDs, 800 from SODCs, and 33 from CLFs.

**CDS Services**

3. CDS assists individuals with developing skills, engaging in appropriate behavior, increasing independence, and further assists with development of employment skills through a focus on compliance, attendance, and task completion. Services provided by CDS range from recreational and educational programming to sub-minimum wage skill development programs in which participants perform "piece work" for manufacturers with the goal of eventually obtaining competitive integrated employment.

4. In order to be eligible for Home and Community Based Waiver Funded Services, including those provided under the CDS program, an individual must meet the following criteria:

    a. An IQ of below 70 (significantly sub-average) or related condition such as cerebral palsy or epilepsy, or another condition closely related to mental

    retardation that similarly impairs general intellectual functioning or adaptive behavior;

  b. Substantial limitations in three or more major life skills areas as identified below:

    i. Self-care;
    ii. Language;
    iii. Learning;
    iv. Mobility;
    v. Self-Direction; and/or
    vi. Capacity for Independent Living.

**COVID Restrictions and Risks**

5. Due to the COVID-19 pandemic, DDD has had to enact significant restrictions in its programs to ensure the safety of both participants and staff. All SODCs and ICF/DDs stopped all in-facility visitation and outside movement, under the direction of IDPH, which remains in effect as of the date of this declaration. Less than two weeks ago, IDPH began to permit limited, socially distanced, visitation just outside the facility. CILA providers enacted similar restrictions, many of which are still in effect to varying degrees.

6. Specific to CDS, all programs were closed effective March 17, 2020. In the interim, CDS providers have received retainer payments from DDD to support staffing and other costs during the closure, and therefore have not lost any revenue as a result.

7. In order to support individuals who have lost CDS programming, DDD has funded additional support hours in individuals' residential homes. In addition, the Division made it easier for families to enroll as Personal Support Workers for their loved ones. The Division

also encouraged creative virtual programming for those individuals who could benefit from this option.

8. One of the primary concerns in reopening CDS is the potential of spreading the virus from one congregate setting to another. As previously stated, 70% of individuals who attend CDS programs come from a congregate residential setting.

9. The rate of COVID-19 in individuals with intellectual and/or developmental disabilities in congregate settings is significant. As of June 26, 2020, there were 396 reported COVID-19 infections in five of the seven SODCs. Out of the approximately 1,650 SODC residents, this represents an overall infection rate, over time, of approximately 25.8%. In addition, there have been 10 resident deaths. Of note, there have also been 270 staff infections and 4 deaths of SODC staff (see https://www.dhs.state.il.us/page.aspx?item=125170).

10. Based on the most recent data for CILA providers (self-reported), there have been 331 confirmed cases among 64 separate providers, with cases per provider ranging from one to 20. This represents 28% of providers of CILA residential services self-reporting at least one positive case in one of their facilities. There have been 25 self-reported deaths of CILA residents due to COVID-19, which is a fatality rate of approximately 7.55% (compared to 4.87% for the State overall per IDPH's website) (see https://www.dhs.state.il.us/page.aspx?item=125170 ).

11. Any infection from attendance at a CDS has the potential to spread to other residents of the SODC, CILA, ICF/DD, CLF or even the family home, including to those who do not attend the CDS themselves either by choice or to protect themselves from infection.

12. I can also report that our earliest case of a reported COVID-19 spread within our funded programs was the direct result of infection through participation in a CDS program. One CDS site was responsible for the spread to two separate ICF/DD residences, one CILA residence

and an individual's home (HBS program) due to the CDS participants riding together on transportation to the CDS location where the driver was infected with COVID-19. Two of these individuals passed away as a result. Considering that the level of virus is roughly the same in those who are symptomatic and those who are asymptomatic, the risk of further infection by individuals in a similar circumstance is significant (see https://www.washingtonpost.com/news/powerpost/paloma/the-health-202/2020/06/26/the-health-202-the-trump-administration-is-eyeing-a-new-testing-strategy-for-coronavirus-anthony-fauci-says/5ef4f629602ff1080718f308/ ).

        13.     The risk of infection for individuals residing in congregate care settings is compounded by the fact that many of these individuals have significant co-occurring health conditions. For example, of the approximately 12,000 CILA residents (who are the most independent of our congregate care population), per our Health Risk Screening Tool, 23% have pre-existing medical conditions recognized as having a higher risk of COVID complications. Many CILA residents are of an advanced age as well: 26% are over 50 years of age, and an additional 16% are over the age of 65. In addition to age and pre-existing conditions, another 4% of CILA residents have a "Q" score on their Health Care Screen that indicates a significant medical complication that would place them at a much higher risk of death should they become infected. Individuals with a high Q score include those with tracheotomies, ventilators, and other serious conditions.

        14.     Beyond Illinois-based data, there is significant data from other parts of the country that demonstrate that individuals with I/DD have twice the risk of infection from COVID-19, and are up to four times more likely to die as a result of the infection. *See* Margaret A. Turk, Scott D. Landes, Margaret K. Formica, Katherine D. Goss, "Intellectual and

developmental disability and COVID-19 case-fatality trends: TriNetX analysis," *Disability & Health Journal*, May 2020, available at https://www.sciencedirect.com/science/article/pii/S1936657420300674?via%3Dihub (finding those with intellectual or developmental disabilities have a 4.5% fatality rate compared to 2.7% for the general population; Shaun Heasley, "People with Developmental Disabilities More Likely to Die From COVID-19," Disability Scoop (June 8, 2020), available at https://www.disabilityscoop.com/2020/06/08/people-with-developmental-disabilities-more-likely-to-die-from-covid-19/28434/; Joseph Shapiro, "COVID-19 Infections and Deaths Are Higher Among Those With Intellectual Disabilities," NPR (June 9, 2020), available at www.npr.org/2020/06/09/872401607/covid-19-infections-and-deaths-are-higher-among-those-with-intellectual-disabilities.html (identifying infection rate as up to four times higher, and death rate of twice the general population for individuals with intellectual disabilities).

**CWTC/Plaintiff's Services**

15. CWTC alleges that Plaintiff participates in their "Behavioral Health Employment Skills Training" in which he engages in piecework, assembling materials for distribution for sub-minimum wage. Plaintiff alleges that he has attended CWTC for twenty years, but none of his prior participation was done via DDD's CDS program, as he was not approved for funding until after CDS was suspended due to COVID-19.

16. Plaintiff first requested services from the Division via his Independent Service Coordination agency ("ISC") on March 18, 2019, when he was placed on the PUNS waiting list (the wait list for DDD services in Illinois). Plaintiff was approved for HBS on March 26, 2020, *after* CDS had already been temporarily closed due to COVID-19. To date, the Division has never paid for Plaintiff to attend any CDS program, including CWTC. However, Plaintiff has

7

been receiving funding under the Home-Based Services program, with his sister having received approximately $5,284 as his caregiver for April, May, and June 2020.

17. CWTC serves approximately 100 individuals in their DDD-funded CDS program. The Division pays approximately $12.79 per hour for individuals to attend the program at CWTC. Of those individuals, 33 live in CLF, and 16 live in a CILA. Nearly half of the participants thus live in congregate settings which have a higher risk of the spread of COVID-19 should a resident or staff become infected.

18. The Division cannot speak to the programming that the Plaintiff has participated in, including if he participates in CWTC's CDS program, or how this programming was paid for, although as he did not have Division funding, it is assumed Plaintiff has privately paid to participate. Under rules of the Medicaid waiver program that governs all CDS programs across the state, the Division's payment for CWTC's CDS program specifically requires programming to be written into the individual's Personal Plan by the ISC Case Manager and for CWTC to create an Implementation Strategy with goals outlined for an individua's participation. This would need to be completed prior to the individual's attending the CWTC CDS program for the ability of CWTC to bill for his programming. While the Division is not paying for individuals to attend CDS programs at this time, there is nothing that would prohibit Plaintiff from returning to CTWC in the same capacity as he did prior to March 26, 2020 (via private pay or other arrangements). The DDD, however, would not recommend anyone returning to a program that has not adequately assessed individual participation and their risks/benefits and had not put new policies and procedures in place to support individuals in response to the COVID-19 pandemic.

**Reopening Guidance and Risks**

19. Throughout the COVID-19 pandemic, the DDD, in conjunction with IDPH, has produced extensive guidance for its SODCs as well as for the programs and services that it funds and/or regulates. This has been memorialized on its COVID-19 specific webpage: https://www.dhs.state.il.us/page.aspx?item=123451.

20. The DDD has been monitoring the spread of infection of COVID-19 since the closure of CDS on March 17, 2020. The DDD has continued to extend the date for reopening CDS based on analysis of the spread within the I/DD community, national data, feedback and best practices from other states, as well as based on feedback from individuals, associations, providers and families.

21. Many states have closed and/or drastically altered their CDS programs. New York and New Jersey, both with spread similar to Illinois, are still closed. Many others have drastically limited the attendance numbers of their CDS programs. The DDD has not taken lightly the continued closure of CDS and has been working to create reopening guidance in conjunction with IDPH. In addition, DDD has worked to create alternative options for individuals who do not wish to return to CDS due to health, safety, or just personal choice, including the continued ability to receive services in small groups or individually.

22. The DDD has studied other states' activities and guidance in regard to CDS. We also consulted with the National Association of State Developmental Disability Directors (NASDDD) on best practices and participated in a workgroup on reopening CDS. As Division Director, I have personally met with groups and individual CDS-only providers, residential providers, associations, family members, and individuals to hear and understand their concerns. The DDD issued a CDS provider survey to gauge CDS readiness and provider concerns, and has

also used the Restore Illinois Plan, as well as IDPH and CDC Guidance. Finally, the Division has worked closely with the Department on Aging as they are one of the few departments in Illinois that also operates a congregate day program for people with increased risks. The Department on Aging is currently planning to reopen its day programs in September 2020.

23. The DDD has developed an Individual Benefit/Risk Tool for discussions on individual readiness based on a tool that was developed in Ohio. This assessment includes the leading of a discussion weighing the desires, benefits and choice of the individual with their individual risk, situational risk, health risk and the impact of participation on the household where the individual resides.

24. The DDD has also developed a Provider Readiness Tool based on a tool that was developed by the Division of Developmental Disabilities in Hawaii. This tool walks providers through the process of developing strategies to mitigate risks within their facilities to safely address the COVID-19 pandemic.

25. Finally, the DDD has used all of its learnings from other states and worked in conjunction with IDPH to issue guidance to CDS providers to provide specific guidance on: group sizes, space requirements, and social distancing; routine use of PPE, disinfection schedules and policies to mitigate infection spread; safe transportation and programming suggestions, and other aspects of a CDS program operation.

26. These tools and guidance have been developed in conjunction with IDPH to ensure that they address the public health concerns surrounding the COVID-19 pandemic in Illinois. The DDD anticipates being able to release this guidance on, or around, July 1, 2020.

27. Once guidance is released, it is expected that providers will engage with their provider assessment, develop policies and procedures, and work with individuals, their families

and their regional ISC Agency (that assists individuals in the planning of their services) to determine if returning to CDS is the best choice for each individual participant at this time. This process should take at least one month to ensure that there is a coordinated reopening.

28. As a result, while a widespread reopening of the CDS program during the month of August is not anticipated, a number of providers who are able to complete the steps identified in Paragraphs 23-25 may be able to open as early as August 1, 2020, which the DDD will permit, subject to review of the provider's reopening plans and strategies.

29. I have reviewed the submission from CWTC that outlines the steps they claim will allow them to safely reopen (See ECF #9-15). I do not find that this submission meets the criteria contained in either the Individual Benefit/Risk Tool, the Provider Readiness Tool, or that it addresses other important aspects of the forthcoming guidance for reopening. The Individual Benefit/Risk Tool will help the provider understand the specific and detailed needs of each of their participants and steps they plan to put in place to mitigate those risks. CWTC has submitted nothing that shows this has been completed for the Plaintiff. As Plaintiff is legally blind and profoundly deaf, typical social distancing measures will be difficult, yet there is nothing identifying what measures will be taken to ensure his safety and the safety of those around him.

30. In addition, there is very little in the way of detail of CWTC's reopening plan (what would be the Provider Readiness Tool), and the document contains nothing on policies or protocols should a participant or staff become infected with COVID-19, or how to properly support individuals while maintaining social distance both on site and on transportation to and from the program. In addition, both our Bureau of Accreditation Licensure and Certification, which regulates CDS programs, and our Bureau of Quality Management, which assesses the quality of CDS programs, will need documentation of appropriate policies, procedures and

11

measures agencies are taking to ensure that individuals are safe, participating in programming they desire and meeting their outlined goals. There is also no individualized assessment of other participants based on their own benefit/risk tool and identification of their individual needs, risk factors and risk of spread to other high-risk persons, which is important for a global picture of the CDS program and how CWTC intends to operate under COVID-19. Without this detailed understanding of the risks inherent to each individual at CWTC in context with the broader population it is serving, CWTC could put everyone at risk.

31. In addition, as previously stated, the Division has never paid for Plaintiff to attend CWTC's CDS program, and his participation will require him to work with his ISC Case Manager to amend his Personal Plan to include attendance at CWTC's CDS program. Per the Division's requirements for all providers, CWTC must also complete an Implementation Strategy that identifies goals and outcomes for Plaintiff's participation in the CDS program. As with all other recipients and providers, billing for services cannot begin until the Personal Plan and Implementation Plan documents are completed.

32. The DDD has been thoughtful, scientific, data driven and cautious in the reopening of CDS programs. The DDD has worked diligently to put together a plan that will reopen CDS with a deep appreciation and understanding of the risks while also balancing the desire for individuals with I/DD to get back to programs they enjoy. There is a risk of further harm to individuals with intellectual and/or developmental disabilities across the State of Illinois if reopening is rushed or done too quickly. Individuals with intellectual and/or developmental disabilities, and their families, must be made aware of the risks of participation in CDS programs and providers must take steps to mitigate their risks. The Division has tried to balance the desire

of individuals to return to CDS programs if they choose, create alternatives to this programming to support individuals and to put tools and guidance in place to support providers to operate programs that mitigate the inherent risks these programs pose.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on June 28, 2020.

_____
Allison Stark