UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

---

John McDonald,

  Plaintiff,

 v.

J.B. Pritzker, in his official capacity as Governor of Illinois, and Grace B. Hou, in her official capacity as Secretary of the Illinois Department of Human Services,

  Defendants.

Case No. 1:20-cv-03653

Chief Judge Pallmeyer

---

**PLAINTIFF'S REPLY IN SUPPORT OF EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION**

---

## INTRODUCTION

  Defendants' opposition brief misstates the nature of their discriminatory policy. Defendants, of course, shuttered Community Day Services ("CDS") programs in March, just as they shuttered comparable programs for persons without disabilities. But when Defendants began to reopen programs for everyone else, the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), and the Equal Protection Clause *required* Defendants to reopen programs for disabled persons on the same basis, and under the same timetable, with additional special limitations and delays tailored *only* for *individual* disabled persons and their individual conditions, not to the disabled as an undifferentiated group. That non-discriminatory approach would have involved Defendants issuing guidelines to CDS programs for their reopening in *May* to permit CDS reopening at the start of phase 3 on June 3.

Defendants violated that federal statutory and constitutional obligation, announcing that they would not give CDS services for *any* disabled person equal treatment until September, *nearly three months later*. What Defendants now propose—to possibly permit *some* CDS programs to reopen on August 1—does not remedy that plainly unlawful discrimination. Notably, not a single word in Defendants' brief or declarations even attempts to explain why they did not take steps to facilitate reopening many weeks ago, to permit a non-discriminatory reopening in early June.

One need only consider how the courts would react if Defendants had similarly slow-walked reopening for just minorities or a particular gender, because of claimed special vulnerability of COVID-19, a point that this Court specifically raised at last week's hearing and which Defendants ignore entirely in their 42-page brief.

This Court should not permit Defendants to continue their discriminatory regime through bureaucratic delay. Plaintiff should be permitted to return to his job on Wednesday, as discussed at the June 25 hearing. Community Workshop and Training Center ("CWTC") addressed a letter to Plaintiff's sister this weekend, explaining that CWTC can gladly accommodate his safe, *gradual* return this Wednesday, with his long-time supervisor there, thereby addressing this Court's concern. Second Declaration of Sean T.H. Dutton ("Second Dutton Decl.") Ex. 1. As for relief beyond CWTC, Defendants falsely claim that Plaintiff asked this Court for immediate reopening of all CDS programs. In stark contrast, what Plaintiff has actually asked this Court to do is to invalidate Defendants' *blanket* CDS closure policy, and, as a remedy, to require that Defendants permit reopening on the same

basis that they have permitted reopening of services for people without disabilities. That means that Defendants cannot impose *blanket* conditions on the reopening of CDS programs that they have not imposed on the reopening of services for persons without disabilities, and can deny services only upon an individualized inquiry, for a particular disabled person's limitations or situation.

## ARGUMENT

### I. Plaintiff Has Prevailed Under All Of The Preliminary Injunction Factors

Plaintiff is likely to succeed on the merits and has satisfied the equitable aspects of the injunction inquiry. As to the ADA and Rehabilitation Act, Plaintiff is likely to succeed on three independent bases: (1) Defendants intentionally discriminated because they based their blanket closure policy on unfounded stereotypes and paternalistic concerns about disabled individuals, such as their claimed inability to wash their hands; Dkt. 7 at 8–10; *see School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 278-88 (1987); *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 851 (7th Cir. 1999); (2) Defendants denied Plaintiff any reasonable accommodations that would have enabled him to continue participating in CWTC; *see* Dkt. 7 at 10–11; and (3) Defendants' shuttering of CDS programs imposes a disparate impact on the disabled, like Plaintiff, as compared to the able-bodied. Dkt. 7 at 11–12. Plaintiff's Equal Protection claim is similarly strong, for much the same reasons. *See City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 446 (1985); Dkt. 7 at 12–13. Plaintiff satisfied the other preliminary injunction factors because he is experiencing irreparable injury, given his grave physiological

and emotional harm from Defendants' actions, as well as loss of federal statutory and constitutional rights. Dkt. 8 ¶¶ 6–9, 12–13 ("broken down in tears"); Dkt. 7 at 14–15.

Defendants' arguments to the contrary all fail.

*First*, Defendants' extensive reliance on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), Dkt. 16 at 22–26, is misplaced for two independently sufficient reasons.

As a threshold matter, *Jacobson* is a case about the proper interpretation of the open-ended guarantees in the Constitution, such as the Due Process Clause, where courts must make substantial common law. *See Elim Romanian Pentecostal Church v. Pritzker*, ___ F.3d ___, 2020 WL 3249062 (7th Cir. June 16, 2020) (discussing *Jacobson* in context of constitutional rights only); *In re Rutledge*, 956 F.3d 1018 (8th Cir. 2020) (same); *In re Abbott*, 954 F.3d 772 (5th Cir. 2020) (same). In cases of anti-discrimination statutes, like the Rehabilitation Act and the ADA, the Court's duty is simply to follow the statutory text, as the Supreme Court explained in its recent ruling in *Bostock v. Clayton County*, ___ S. Ct.___, 2020 WL 3146686 (2020): a court "interprets a statute in accord with the ordinary public meaning of its terms," because "only the words on the page constitute the law." *Id.* at *4. Just as States cannot discriminate based upon sex under Title VII, *id.*, they cannot discriminate against disabled individuals under the Rehabilitation Act and the ADA.

In any event, *Jacobson* does not authorize governments to use emergencies as an excuse for discrimination. Had Defendants dared launch their *Jacobson* argument in support of excluding minorities or a specific gender from their reopening plan, based on group-based COVID-19 concerns, the courts' rebuke would surely have been

swift and harsh. That is because *Jacobson* merely holds that laws that are *equally applicable* deserve more deference in times of crises, 197 U.S. at 26–29, which is obviously not what is occurring here. Only *Korematsu v. United States*, 323 U.S. 214 (1944), held that the government has special license to discriminate in times of crises, and the Supreme Court has rightly repudiated that decision, *see Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018). Defendants did not cite any legal support applying *Jacobson* to claims based on anti-discrimination statutes or the Equal Protection Clause's prohibition against discrimination. *See generally* Dkt. 16 at 22–25.

*Second*, Defendants make the risible argument that their own temporary suspension of CDS programs negates Plaintiff's statutory claims. Dkt. 16 at 27–28. The CDS program obviously exists: Defendants just "temporarily suspend[ed]" it. Dkt. 16 at 9. Plaintiff's nondiscrimination claims are that Defendants must reopen this program consistent with their reopening of comparable programs for the able-bodied, not that Defendants must create a "non-existent government program." Dkt. 16 at 27. Under Defendants' unprecedented logic, they could shutter *any* program for disabled individuals and evade any liability under the Rehabilitation Act and the ADA, no matter how egregious their discriminatory reason for their closure or refusal to reopen, without recourse under the Rehabilitation Act or the ADA.

*Third*, Defendants claim that they have not engaged in "intentional" discrimination "[b]ecause the entire program exists to provide services for the developmentally disabled community of Illinois," meaning that consideration of "participants' disabilities" when ordering the CDS program closed was inevitable.

Dkt. 16 at 28–30. This misunderstands the purpose of the Rehabilitation Act and the ADA: the prohibition of government policymaking based on "unfounded . . . stereotyp[ing]" of, or "paternalistic concern[ ]" for, disabled individuals as a group. Dkt. 7 at 8 (citations omitted). As this Court noted on June 25, an "individualized determination" is "precisely the point" under the ADA. Transcript of Hearing, June 25, 2020 ("Tr."), at 21. Defendants cannot keep the CDS program closed for *all* disabled individuals based on the concern that *some* of those individuals may have difficulties complying with certain safety guidelines or may have other issues. Dkt. 7 at 9–10. Notably, Defendants no longer defend even their offensive hand-washing rationale, but rather claim that "the developmental disabilities of every client are considered in virtually every decision related to the CDS program." Dkt. 16 at 30. Their use of "virtually" gives the game away. *Such individualized consideration did not happen at all when Defendants opted not to reopen CDS programs.* Instead, Defendants relied entirely upon offensive stereotypes of individuals with disabilities, which, again, they do not even attempt to defend now. This is why the CDS program remains closed to *anyone* with a disability, including Plaintiff, regardless of their abilities to comply with relevant safety protocols. *See* Dkt. 7 at 11.

And Defendants' new rationale—that those with disabilities may live in "group homes" and so suffer from heightened susceptibility to COVID-19—fares no better. Dkt. 16 at 11–12, 21–22. That too is an unjustifiable generalization, not a considered, individualized assessment, which does not satisfy Defendants' federal obligations. Plaintiff, like many other disabled people, does *not* reside in a group-home setting.

*See* Dkt. 8 ¶¶ 2, 16; Dkt. 8-1. Notably, while Defendants try to hide behind Minnesota's approach to CDS, that State has *ended* its blanket ban on disabled citizens' participation in CDS programs and, instead, allows the participation of all disabled individuals who do not live in group-home settings, like Plaintiff. *See* Dkt. 16 at 9–10, 25. Similarly, Connecticut has currently enacted plans for reopening CDS programs "as soon as the provider is able to provide the service needed," consistent with its reopening plans for non-disabled citizens. Dkt. 16 at 10 & n.14.

*Fourth*, Defendants claim that ordering them to end their blanket CDS closure policy would "fundamentally alter" this program, meaning that this is not a reasonable accommodation under the ADA. Dkt. 16 at 30–33. But neither "logic" nor the case law "dictates" that allowing individuals into a government program for the very purpose that the program was designed is unreasonable. Dkt. 16 at 31; *compare Valencia v. City of Springfield*, 883 F.3d 959, 968 (7th Cir. 2018). Rather, Defendants *admit* that Plaintiff qualifies for the CDS program and they are willing to reopen it in the coming months, thus ordering them to reopen now would not be a "substantial modification[ ]." *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 881 F.3d 587, 595 (7th Cir. 2018). As for Defendants' concerns with various "administrative burdens," Dkt. 16 at 31–32, those can all be worked out in due course—after Plaintiff returns to work—and are solely the result of Defendants' own discriminatory delay. Indeed, Defendants cannot provide any rational explanation for why they have not prepared safety guidelines for reopening CDS programs in conjunction with those for able-bodied persons and businesses, such as bars, day care centers, and children's camps.

Defendants offer of "alternative programming" for Plaintiff to complete at home, instead of allowing Plaintiff to return to work at CWTC, does not amount to a reasonable accommodation. Dkt. 16 at 33. This "alternative programming"—largely one-on-one activities in Plaintiff's own home, *id.*—is not a genuine substitute for Plaintiff's employment at CWTC, which provides his life with critically important structure, a sense of purpose, and the ability to earn an income. *See* Dkt. 7 at 3.

*Fifth*, Defendants take the position that Plaintiff cannot advance a disparate-impact argument because Defendants have withheld access to CDS programs from *all* disabled people. Dkt. 16 at 34. That is, of course, wrong. The basis of Plaintiff's disparate impact claim is that *all individuals with disabilities* were treated worse than *similarly situated non-disabled individuals*—such as those individuals in manufacturing, non-overnight day camps, and pre-kindergarten—and that "but for" their disabilities, these individuals too would have been able to return to their similar places. Dkt. 7 at 11–12. This is a textbook disparate-impact showing.

*Sixth*, as to Plaintiff's Equal Protection claim, Defendants argue that Plaintiff failed to carry his burden of "negat[ing] every conceivable basis for the [Defendants'] decision" under *Cleburne*. Dkt. 16 at 36. This ignores the fact that Defendants, in their own words, *already admitted* that their decision was based on their discriminatory belief that disabled individuals lacked the ability to abide by basic hygiene protocols. Dkt. 9-13. That admission is sufficient to prove that Defendants "rel[ied] on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446.

*Finally*, on the equities, Defendants claim that Plaintiff is not sufficiently harmed because his caretakers or guardians could simply pay for this state program themselves, but this completely undermines the entire purpose of the Rehabilitation Act: States like Illinois that accept federal funds must treat disabled individuals equally. Dkt. 16 at 38–39; *see* Dkt. 7 at 6 n.1. It also overlooks the fact that CWTC shuttered all services to disabled people under the State's blanket reopening ban. *See* Dkt. 8 ¶ 10–11. Dkt. 9-10. In any event, "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm," *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1978), as does severe emotional harm, which Defendants do not dispute, *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045–46 (7th Cir. 2017); Dkt. 7 at 13–14. As for the public interest, Defendants claim that it tips in their favor because COVID-19 is a serious illness. Dkt. 16 at 39–41. Yet, the State is well on its way to reopening, allowing bars, restaurants, day camps, gyms, and pre-kindergarten programs to begin normalized operations again. Excluding those with disabilities—*and only those with disabilities*—from this return to some normalcy cannot and does not serve the public interest. Dkt. 7 at 14–15.

## II. Plaintiff Can Safely Return To Work On Wednesday, Consistent With The Proceedings Before This Court Last Week

The undisputed evidence is that both Plaintiff and CWTC are well-prepared for his immediate, safe return to work, as part of CWTC's gradual reopening plan for disabled individuals. Defendants conceded as much at last week's hearing when they noted that they had no concerns with Plaintiff returning to CWTC, so long as a

private party, not the government, foots the bill. Tr. at 6, 8–10. After this hearing, the Executive Director of CWTC wrote to Plaintiff's sister and explained that CWTC is ready to bring him back to work, "taking into consideration the health and safety of our consumers and staff" and after having "implement[ed] increased hygiene, cleaning and safety practices to minimize risk to all individuals." Second Dutton Decl. Ex. 1. Plaintiff's longtime case manager continues to work at CWTC and is personally prepared to help Plaintiff safely return. *Id.* Plaintiff can begin working only on Mondays and Wednesdays, from 8:00 a.m. to 12:15 p.m., so that CWTC can abide by social-distancing and capacity limits. *Id.* Thus, CWTC is ready to provide Plaintiff with the services and sense of purpose he so desperately requires, so long as this Court provides the relief that Plaintiff is entitled to under the law. Dkt. 8 ¶¶ 8–9; Second Dutton Decl. Ex.1.

Now attempting to walk back their concession from last week, Defendants claim that they object to Plaintiff returning to work because CWTC has not sufficiently established safe means to allow him to do so. Dkt. 16-1 at ¶ 29. CWTC's gradual reopening plan is consistent with the Illinois Department of Public Health's COVID-19 guidance for workplaces and daycares, and the Governor's guidance for pre-kindergarten summer classes, which require monitoring participants for illnesses, excluding sick individuals from group programs, reinforcing hygiene and safety practices, providing options for frequent handwashing and use of hand sanitizer, and the like. *Compare* Second Dutton Decl. Exs. 2 & 3, *with* Dkt. 9-15 *and* Dkt. 9-5.

In a particularly Kafkaesque passage, Defendants fault CWTC for noncompliance with a forthcoming, *undisclosed* set of reopening parameters. Dkt. 16-1 at ¶¶ 29–30. CWTC should be commended for taking affirmative steps to ready itself to provide services to its disabled participants, while Defendants engaged in discriminatory delay that led to this litigation. Contrary to Defendants' suggestion that Plaintiff's benefits will necessarily be delayed while on-boarding paperwork is completed, Dkt. 16-1 ¶ 31, CWTC and Plaintiff have together completed state-required documentation in the past, including his Individual Service Plan, even before he received guaranteed state funding for CDS program services. Dkt. 8-1.

While Defendants "assume[ ]" that Plaintiff has been a private-pay participant in CWTC's program for years, Dkt. 16 at 11, this is both unsupported by any record evidence and legally irrelevant. Defendants admit that Plaintiff is "approved" for state aid *now*, Dkt. 16 at 11, and do not dispute that CWTC shuttered all services to disabled people under the State's blanket closure policy, see Dkt. 8 ¶ 10–11. Dkt. 9-10. Although Plaintiff was cut from state benefits and forced to rely on the charity of others at one point in the past—a decision that Plaintiff got overturned under State law, Dkt. 16 at 11—this is no excuse to deny the benefits Defendants admit that he is entitled to now. Notably, it is undisputed that Plaintiff will return to CWTC on Wednesday only if this Court enters the order this Court discussed last week. *See* Second Dutton Decl. Ex. 1; Dkt. 8 ¶ 10–11. Dkt. 9-10.

Finally, Defendants' claim that Plaintiff may return to work immediately—but only under a "private-pay" agreement—defeats their public-safety argument. Dkt. 16

at 17–18. Defendants' purported safety concerns surrounding disabled individuals returning to work at CWTC appear only to exist if the State has to expend funds. Defendants claim that there is a "vast difference" between private-pay and state-pay arrangements because "Plaintiff and his caregivers w[ould] mak[e] a decision to allow him back to work under private pay." Dkt. 16 at 39 n.22. Yet, a disabled person would make that decision for himself under either arrangement, thus, as this Court previously noted, Defendants have failed to explain how their allowance for work under private pay does not refute their purported safety concerns. *See* Tr. at 9–10.

### III. Plaintiff Has Standing To Seek Relief To Block Defendants' Discriminatory Policy Statewide And This Court Should Invalidate That Policy

Contrary to Defendants' legally foreclosed arguments, *see* Dkt. 16 at 18–19, Plaintiff has standing to seek equitable relief that would prevent Defendants from enforcing their discriminatory policy of shuttering CDS programs until September against all disabled citizens in Illinois, *rather than requiring each such individual to obtain a lawyer to bring a lawsuit just like this one*. The Seventh Circuit has recently held, consistent with decades of caselaw, that "both historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before the court," which includes "extend[ing] injunctive relief to non-parties." *City of Chicago v. Barr*, ___ F.3d ___, 2020 WL 3037242, at *25, 27 (7th Cir. June 4, 2020). This is both necessary and important because, without this tool, "courts will have little ability to check the abuse of power that presents the most serious threat to the rule of law—such as that which is swift in implementation, widespread in impact, and targeted toward those with the

least ability to seek redress." *Id.* at *26. Defendants inexplicably failed to mention that this recent, binding precedent foreclosed their standing argument.

Defendants' argument that vague federalism concerns require this Court to withhold relief to the disabled who have not found their own lawyer, Dkt. 16 at 19–22, also fails. Defendants principally rely on *Money v. Pritzker*, ___ F. Supp. 3d ___, 2020 WL 1820660, at *15–16 (N.D. Ill. Apr. 10, 2020), which discusses federalism only in the context of prisons. The Supreme Court has concluded that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 (1973). That prisons provide special contexts does not undermine the federal courts' duty to ensure that States administer programs fairly and accessibly for individuals with disabilities under the Rehabilitation Act, the ADA, and the Equal Protection Clause.

In this case, Plaintiff has presented uncontroverted evidence that Defendants' decision to shutter CDS programs, even as programs for able-bodied people reopened, is based on general *class-based discrimination* about the capabilities and attributes of disabled persons, rather than individualized determinations about each disabled person's actual abilities and risks. Dkt. 9-13. Allowing this discrimination to stand as to the thousands of other similarly situated disabled persons in Illinois who cannot find their own lawyer asks this Court to turn a blind eye to the widespread effects of Defendants' illegality. *See City of Chicago*, 2020 WL 3037242, at *25 (noting the

necessity of broad injunctive power "to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions").

Defendants mention draft documents such as a "Provider Readiness Tool" and an "Individual Benefit/Risk Tool," Dkt. 16-1 at ¶¶ 22–25; Dkt. 16-2 at ¶¶ 4, 6; *see also* Dkt. 16 at 13–14, but refuse even to provide this Court with any of these "tools" to evaluate their merits. This is impermissible stalling, contrary to this Court's prior statement that they "need to put a program in place" to allow disabled persons to return to work. Tr. 24. Defendants' contention that *some* CDS programs *might* be able to open by August 1, Dkt. 16 at 14, is, of course, entirely insufficient and ignores the instructions this Court provided on June 25, Tr. 24.

Finally, to the extent that Defendants are concerned that Plaintiff seeks an order mandating the immediate opening of all CDS programs statewide, Dkt. 16 at 20–21, they need not worry. Plaintiff only seeks to remove Defendants' discriminatory *blanket* barriers keeping all CDS programs closed, and to permit those programs to reopen on the *same footing* as services for persons without disabilities. *See supra*, pp. 2–3. CWTC's measured plan is consistent with all of the public-health requirements for similar programs and businesses, *see supra* pp. 9–10, and Defendants offer no reason that other CDS programs that meet these guidelines should remain closed. If certain disabled persons—unlike Plaintiff—have an increased risk of harm because of particular medical characteristics or living situations, the State need not allow all such persons to participate on the same terms or mandate that all CDS programs open without consideration of present ability to

safely do so, as even Defendants admit. Dkt. 16 at 21 ("Of course, an order compelling [Defendants] to restart the CDS program immediately is not coterminous with an order mandating that all CDS participants immediately return to participating in the program."). As this Court explained last week, the touchstone under federal law, including the ADA, is *individualized* considerations for disabled individuals, Tr. 21, which the State's current blanket ban plainly violates.

## CONCLUSION

This Court should grant Plaintiff's Emergency Motion for a Temporary Restraining Order or Preliminary Injunction.

Dated this 29th day of June, 2020.

Respectfully submitted,

/s/ Misha Tseytlin
MISHA TSEYTLIN
SEAN T.H. DUTTON
TROUTMAN SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
Telephone: (608) 999-1240
Facsimile: (312) 759-1939
misha.tseytlin@troutman.com
sean.dutton@troutman.com

BLAKE T. HANNAFAN
HANNAFAN & HANNAFAN, LTD.
180 N. Lasalle Street
Suite 3700
Chicago, IL 60601
(312) 527-0055
(312) 527-0220 (fax)
bth@hannafanlaw.com

*Attorneys for Plaintiff John McDonald*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of June, 2020, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

/s/ Misha Tseytlin
Misha Tseytlin
Troutman Sanders LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com