UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

John McDonald,

    Plaintiff,

  v.

J.B. Pritzker, in his official capacity as Governor of Illinois, and Grace B. Hou, in her official capacity as Secretary of the Illinois Department of Human Services,

    Defendants.

Case No. 1:20-cv-03653

Chief Judge Pallmeyer

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF EXPEDITED RENEWED MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Plaintiff's lawsuit exposed Defendants' unlawful discriminatory regime, which would have kept services and jobs for disabled individuals closed for *three months longer than comparable services and jobs for able-bodied persons*. Faced with having to defend their discriminatory actions in federal court, Defendants conceded that Plaintiff could return to his Community Day Services ("CDS") program two months earlier than they previously told him, upon order of this Court, while moving the timeline for reopening at least some CDS programs up by a month.

Through this renewed motion, Plaintiff asks that this Court order Defendants to conduct their reopening in as non-discriminatory a manner as is practical, now that Defendants have revealed how they intend to conduct this reopening. Plaintiff requests an immediate order requiring that Defendants: (1) not mandate disabled

individuals like Plaintiff answer intrusive questions about their and their families' health as part of the CDS reopening, which questions Defendants have not required for able-bodied persons; (2) not use the COVID-19 crisis to "reinvent" services to disabled individuals, by fundamentally altering the eligibility criteria and rules for CDS programs—including Community Workshop and Training Center ("CWTC")—whereas Defendants have "restored" services for able-bodied persons without such criteria and rules; and (3) permit all CDS programs, including CWTC, to reopen on August 1 at the same capacity limits applicable to services and jobs for the able-bodied. **Plaintiff respectfully requests that this Court enter an order no later than July 17, so that all CDS programs—including CWTC—can plan a non-discriminatory reopening by August 1**. While such a reopening would come two months later than Defendants *should* have done under federal law, it is the best that federal courts can order under the situation that Defendants created with their discriminatory delay.

## BACKGROUND

On March 9, Defendant Governor Pritzker declared a statewide emergency because of COVID-19, and imposed numerous closures and restrictions on businesses and programs within the State. Dkt. 9-1. On May 5, the Governor announced his five-phase reopening plan for "[r]estor[ing]" State services and the economy. Dkt. 9-2. By June 3, the entire State entered phase 3 of that plan, allowing manufacturing and non-essential businesses to reopen so long as they comply with social distancing and safety guidance. *Id.*; Dkt. 9-3; Dkt. 9-4. Non-overnight recreational day camps for children could operate again, and public and private schools serving pre-

kindergarten through 12th grade in the State opened for summer school. Dkt. 9-2; Dkt. 9-5; Dkt. 9-16. Since June 26, when the State entered phase 4 of the plan, *all* manufacturing, non-essential businesses, outdoor recreation, bars, restaurants, health and fitness clubs, and movie theaters can open with safety guidance and some capacity limits, and public gatherings of 50 or fewer people can resume. Dkt. 9-2; Dkt. 9-6. Schools, higher education institutions, summer programs, and childcare facilities also reopened under phase 4. Dkt. 9-2.

Plaintiff, a 46-year-old man with the intellectual capacity of a 7-year-old, who is also deaf and legally blind, has participated in CDS programming for over 20 years. Dkt. 8 ¶¶ 3–4, 6–7, 9; *see* Dkt. 8-1. This ended on March 17, when Defendants prohibited disabled individuals from returning to CDS programs because of the COVID-19 pandemic, which shuttering Defendants subsequently extended until at least August 31, 2020. Dkt. 8 ¶ 10; Dkt. 9-10; Dkt. 9-11; Dkt. 9-15.

On June 17, undersigned counsel sent a letter to Defendants, voicing concern about their discriminatory shuttering of CDS programs. Dkt. 9-12. In response, General Counsel to the Illinois Department of Human Services ("DHS") explained the basis for Defendants' decision: "CDS . . . operations are tailored to individuals with intellectual and developmental disabilities, many of whom have incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to wear masks in enclosed environments." Dkt. 9-13. Defendants also claimed, contrary to present scientific consensus, that the disabled, as a class, are more susceptible to COVID-19. *Id.*; *see* Dkt. 9-17.

Plaintiff filed this lawsuit and immediately moved for an emergency temporary restraining order. Dkt. 1; Dkt. 6. In response, Defendants permitted Plaintiff to return to CWTC under the CDS program, Dkt. 25, and this Court entered an order formally adopting the parties' agreement. Dkt. 27.

Defendants also filed with the Court two "tools" intended for use by CDS programs. *See* Dkt. 26-1; Dkt. 26-2. Defendants made clear that disabled-participant and CDS compliance with the requirements in both of these "tools" is necessary for any CDS program that wishes to participate in a soft reopening in August, or even the tentative statewide plan to reopen CDS programs on September 1. Dkt. 26-3.

The first tool is a "COVID-19 Risk Benefit Discussion Tool." Dkt. 26-1. Disabled participants must describe why they want to return to CDS, possible "Individual Situational Risks," "Individual Health Related Risks" they face, including particular health conditions, and "Home & Related Parties Risks," *which asks about the age and health of a participant's roommates and family*, including obesity, respiratory issues, serious heart conditions, HIV, diabetes, and pregnancy. *Id.* (citing Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html). The "tool" then requests a recommendation as to whether the disabled participant should return to CDS. *Id.* An incorporated chart provides that there is no situation in which DHS *would* recommend any CDS participant return to services. *Id.* The chart explains that DHS only "[m]ight recommend" that a disabled person return to CDS programming if they are low risk

- 4 -

and have moderate or high interest in doing so. *Id.* The chart contemplates "not recommend[ing]" a participant return even in some situations where the participant has low risk from COVID-19. *Id.*

The second tool is a "COVID-19 Provider Self-Assessment Preparedness Tool," which purports to "[r]einvent" CDS programming. Dkt. 26-2. This "tool" requires CDS providers to answer questions addressing dozens of topics and provide DHS with supporting paperwork, including imposing numerous requirements that Defendants have not imposed on services and jobs for able-bodied individuals. *Id.* This tool expressly references the risk/benefit "tool" discussed above, and encourages the CDS provider to discuss how it plans to use that tool in all conversations with participants and their families about returning to CDS programming. *Id.*

Finally, for CDS providers that wish to participate in the soft reopening before September 1, Defendants have set maximum program capacity at the lesser of 25 individuals or 25% room capacity. Dkt. 26-3. The statewide reopening starting on September 1, moreover, limits CDS providers to serving the lesser of 50 participants or 50% capacity, with encouragement to start more gradually. *Id.*

## ARGUMENT

To obtain a preliminary injunction, a plaintiff must show that: "(1) without such relief, [he] will suffer irreparable harm before final resolution of [his] claims; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of success on the merits." *Courthouse News Serv. v. Brown,* 908 F.3d 1063, 1068 (7th Cir. 2018) (citations omitted). If a plaintiff makes this showing, the court weighs the

harm the plaintiff will suffer if an injunction is denied against the harm the defendant will suffer if one is granted. *Id.* Finally, the court asks whether the injunction serves the public interest, "which entails taking into account any effects on non-parties." *Id.* Plaintiff has carried these burdens here.

I. **Plaintiff Has A High Likelihood Of Success On The Merits**

A. A plaintiff alleging a claim under Section 504 of the Rehabilitation Act must prove four elements: "(1) the plaintiff must be a handicapped individual as defined by the Act; (2) the plaintiff must be otherwise qualified for participation in the program; (3) the program must receive federal financial assistance[1]; and (4) the plaintiff must have been denied the benefits of the program solely because of his handicap." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 484 (7th Cir. 2019) (citations omitted). Similarly, an ADA claim requires a plaintiff to prove that he "is a 'qualified individual with a disability,' that he was denied 'the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was 'by reason of' his disability." *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132). The "because of" disability element requires no proof of discriminatory intent. *See McWright v. Alexander*, 982 F.2d 222, 228–29 (7th Cir. 1992); *accord Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir. 1999). A plaintiff will succeed on this claim on any of three independent showings: (1) "the defendant

---

[1] Defendants do not contest that DHS receives federal financial assistance, part of which is applied toward the CDS programs. *See* Dkt. 16 at 26–35.

intentionally acted on the basis of the disability," (2) "the defendant refused to provide a reasonable modification" to accommodate a disabled person, *or* (3) "the defendant's rule disproportionally impacts disabled people." *Washington*, 181 F.3d at 847.

A State may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To enact and enforce laws and policies that differentiate on the basis of intellectual or developmental disability, a State is generally required to show at least a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366–67 (2001) (citation omitted). The intellectually and developmentally disabled are not left "entirely unprotected from invidious discrimination," and a "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985).

B. Plaintiff has a high likelihood of success on his claims of discrimination relating to Defendants' "tools" and delaying policies recently filed with the Court. Notably, Defendants do not contest that Plaintiff is disabled and qualified to participate in CDS programs. Dkt. 16 at 27; Dkt. 25 at 1–2.

i. *Intentional Discrimination*. To prove that a "defendant intentionally acted on the basis of the disability," *Washington*, 181 F.3d at 847, a plaintiff can show that the policy was enacted based—in whole or in part—upon "unfounded . . . stereotypes" about, or "paternalistic concerns" for, individuals with disabilities. *See Knapp v. Nw. Univ.*, 101 F.3d 473, 485–86 (7th Cir. 1996); *Siefken v. Vill. of Arlington Heights*, 65

F.3d 664, 666 (7th Cir. 1995). Defendants have made their discriminatory intent plain throughout. Defendants admitted in an official letter that the State's decision to prohibit disabled individuals from participating in CDS programs was based upon paternalistic stereotyping of disabled individuals, such as their claimed inability to comply with basic hygiene requirements and their alleged susceptibility, as an undifferentiated class, to COVID-19. Dkt. 9-13. Defendants' blanket reliance on an "unfounded . . . stereotype[ ]," asserted out of "paternalistic concerns," is a classic example of intentional discrimination. *See Knapp*, 101 F.3d at 485–86.

Defendants have continued this intentionally discriminatory treatment with invasive "tools," rules, and capacity limits for reopening, consistent with the discriminatory, unfounded stereotypes that Defendants expressed in their letter. Defendants' reopening approach is discriminatory in three independent respects.

*First*, Defendants' "COVID-19 Risk Benefit Discussion Tool" requires CDS participants and their families/roommates to submit to invasive questioning about their medical histories, in a manner Defendants have not applied to able-bodied persons returning to jobs and program participation. *See* Dkt. 26-1. This "tool" requires family members, caregivers, and roommates to tell unidentified persons whether they or others who live with a disabled person suffer from any number of conditions, including obesity, respiratory issues, serious heart conditions, HIV, diabetes, and pregnancy. *See supra* p. 4. So far as Plaintiff has been able to determine, this invasive line of questioning has no analogue in Defendants' generally applicable reopening plans, including for children who attend day camps, daycare, or

schools (including state-run programs), or able-bodied adults who are allowed to return to the workplace.  *See* Dkt. 9-16; Dkt. 20-2; Dkt. 20-3.

*Second*, Defendants intend to use these tools to "[r]einvent" CDS programming, inconsistent with the State's treatment of programs and services for its able-bodied citizens, where the State is "[r]estor[ing]" pre-COVID-19 services.  Dkt. 26-2.  The risk/benefit "tool" allows unidentified persons to recommend that certain disabled participants "[d]elay [their] return to CDS," based on a vague chart for interpreting risk/benefit levels, Dkt. 26-1, *which were never qualifications for participating in these programs before now* and have no analogue in services and jobs for able-bodied persons.  For example, the chart allows unidentified persons to preclude a disabled participant from returning to CDS programming based upon a subjective belief about the "benefit" to or "interest" of the disabled person, *wholly unrelated to COVID-19 risks*.  Dkt. 26-1.  Defendants have also decided that a potentially relevant risk factor for whether a disabled individual can and should return to CDS programming is if "[t]he individual has habits or behaviors such as putting his/her hands in their mouth, eyes or face," or "requires physical prompting/assistance to complete . . . toileting, eating or mobility."  *Id.*  The State does not impose any such bright-line requirement on children attending daycare.  Dkt. 20-2.

CDS programs also must now provide the State with evidence of a "written procedure for wearing face coverings and gloves in alignment with CDC guidelines and strategies [that] have been identified to ensure adherence to procedures." Dkt. 26-2.  But at daycare centers, the State does not even require children to wear a cloth

face covering "[i]f the child cannot tolerate" it, and there is no mention of gloves. Dkt. 20-2. State guidance for child day camps does not mention gloves, requires face masks only "when within 6-ft. of others," and explicitly notes that "[e]xceptions may be made where accommodations are appropriate." Dkt. 9-16. And State guidance for workplaces similarly requires face masks (but not gloves) just "when it is not possible to maintain at least 6 feet of space between you and another person." Dkt. 20-3.

*Third*, Defendants discriminate against the disabled as to the timing and capacity of this already unlawfully delayed reopening. Even if another CDS program is as ready and able to presently reopen as CWTC, Defendants will not allow them to reopen until August 1 at the earliest, and *most* CDS programs will not be permitted to open until September 1. *See* Dkt. 16 at 13; Dkt. 26-3; Transcript of June 30, 2020 Hearing ("Tr.") at 5:12–24. And even these plans for reopening restrict CDS programs to mere fractions of their prior occupancy—25% for any program opening in August, and 50% in September. Dkt. 26-3. State guidance for childcare facilities, schools, and workplaces does not impose strict occupancy limits, but simply require persons to abide by social distancing as much as possible. Dkt. 20-2; Dkt. 20-3; *see also* Dkt. 9-2 (Phase 4 allows "*[a]ll* employees [to] return to work with IDPH approved safety guidance" (emphasis added)). This discrimination against participants in CDS programs, without any individualized approach to determine which participants can presently participate, plainly violates the ADA and Rehabilitation Act.

ii. *Failure to Accommodate.* Plaintiff is also likely to prevail because Defendants failed to provide a reasonable accommodation, *Washington*, 181 F.3d at

847, which includes "making changes in rules, policies, practices or services, when necessary." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001). States must change or waive a rule for a disabled person unless doing so "would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change." *Id.* at 838–39. Here, Defendants have not even *attempted* to implement or offer any reasonable accommodations for disabled individuals who are presently able to resume participation in their CDS programs. Rather, Defendants have barred all disabled individuals, as a class, from taking part in these critical programs until at least August 1—a new date that was only recently announced—but more likely September 1, and then imposed discriminatory questions, unequal "reinvent[ion]" burdens, and severe occupancy and participation limits that Defendants have not imposed upon services and jobs for able-bodied persons. Dkt. 26-3; *see* Dkt. 26-2. To the extent that Defendants believe that *some* disabled individuals cannot return to their CDS programs on conditions comparable to those with able-bodied persons, Defendants have not limited their special conditions and restrictions to *those* individuals, or provided accommodations for such individuals.

iii. *Disparate Impact.* Plaintiff also has a high likelihood of success because these challenged policies disproportionately impact disabled people. *Washington*, 181 F.3d at 847. Just as before with their decision to outright shutter CDS programs, Defendants continue to single out disabled individuals' participation in CDS programs for disfavored treatment. Disabled CDS participants and their families must answer invasive questioning not required for childcare, schools, or workplaces.

*Supra* pp. 8–9. Further, Defendants are "reinvent[ing]" CDS programming by adding additional requirements on participation, while "restor[ing]" programs and businesses for the able-bodied. *Supra* pp. 2, 9. And businesses and programs for the able-bodied that are able to comply with public-health guidance are *presently* able to open, even as other CDS programs like CWTC that can comply with all public health guidance remain closed for *at least* another month or more, and can only reopen with capacity limits not applicable to services for able-bodied persons. *Supra* p. 10.

    iv. *Equal Protection Clause*. Defendants seek to justify their actions with an invidiously discriminatory belief that disabled individuals are unable to abide by basic hygiene protocols, and the erroneous assertion that all disabled persons are more susceptible to COVID-19 than able-bodied persons, as a general class. Dkt. 9-13. These same beliefs are prevalent in the new "tools" where Defendants claim that CDS programs "can be a vector (path) for the spread of illness," Dkt. 26-2, apparently in greater rates than pre-kindergarten classes, childcare facilities, manufacturing, non-essential businesses, outdoor recreation, bars, restaurants, health and fitness clubs, and movie theaters, Dkt. 9-2; Dkt. 9-5; Dkt. 9-6, all of which are presently open. The Equal Protection Clause does not permit Defendants to exclude the disabled from public services based on this "arbitrary," "irrational," and "invidious discrimination." *Cleburne*, 473 U.S. at 446.

## II.   Defendants' Continued Discrimination Irreparably Harms Plaintiff

Absent preliminary injunctive relief, Plaintiff will suffer irreparable harm with no adequate legal remedies. While Plaintiff is back at CWTC on a limited schedule,

Dkt. 27, this is a limited solution, a stopgap until CWTC can actually open for CDS services, and then only under onerous conditions, no sooner than August 1. Starting on August 1, the State will force *every* CDS participant—as well as their families, caretakers, roommates, etc.—to answer invasive and discriminatory medical questions that will further stigmatize and embarrass them, while also delaying and otherwise limiting reopening in ways not applicable to services for able-bodied persons.

This will cause Plaintiff irreparable harm, starting on August 1. Absent relief from this Court, Plaintiff will be forced to answer questions about his own health and the health of his family, including his caretaker sister, that no able-bodied person must answer as part of the general reopening of the State. Dkt. 26-1. Defendants' discriminatory "reinventing" of CDS programs and discriminatory capacity limits, including those imposed on CWTC, will limit the number of disabled persons who can participate at CWTC, which will necessarily reduce the number of days per week that Plaintiff can work at CWTC. *See supra* p. 9. These discriminatory questions and special rules, applicable only to services for disabled individuals, will impose irreparable psychological harm on Plaintiff, *see* Dkt. 8 ¶¶ 12–13; *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045–46 (7th Cir. 2017), while also irreparably harming him by depriving him of his statutory and constitutional rights, *see Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011); *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988).

### III. The Remaining Equitable Factors Strongly Favor Relief

Defendants will suffer no prejudice if enjoined to stop their discriminatory treatment of the disabled, especially considering that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7). There is no public interest in Defendants unlawfully forcing disabled persons to expose the private medical information of themselves and their family, face special reopening rules not directed at the able-bodied, or abide by occupancy limits not found in other settings for the able-bodied. *See Whole Woman's Health All. v. Hill*, 937 F.3d 864, 874–75 (7th Cir. 2019).

Given the alignment of Plaintiff's and the public's interests, this Court can and *should* enter an injunction that benefits not just Plaintiff but also all other similarly situated disabled CDS participants in Illinois, for the same reasons the Seventh Circuit recently explained in *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020). *City of Chicago* explained that courts have the "authority to extend injunctive relief to non-parties" when the case merits it. *Id.* at 918 (emphasis omitted). The use of that authority is *essential* in cases just like this one: a "most serious threat to the rule of law" that "is swift in implementation, widespread in impact, and targeted toward those with the least ability to seek redress." *Id.* This Court explained at last week's hearing that the irreparable harm any disabled person will suffer from an additional one month, or more, delay, is "significant." Tr. at 17:6–7. And allowing this harm to continue, widespread across the State, serves no possible equitable

purpose. Defendants' continued exclusion of the disabled from a non-discriminatory reopening "impact[ed] an immense number of people immediately . . . and the ability of persons affected by the ban to access the courts individually for redress was extremely limited." *City of Chicago*, 961 F.3d at 917. In such cases, the "difficulties, expense, and delay inherent in pursuing a class action" make it an unrealistic option. *Id.* Further, as the Seventh Circuit explained, "[t]he class action mechanism is not an adequate substitute for a universal injunction in the proper case." *Id.*

Furthermore, Defendants' unlawful delaying and onerous additional requirements violate the rights of *all* disabled CDS participants, not just Plaintiff, because of the discriminatory, undifferentiated nature of this delay. In such cases, "[t]he remedy is necessarily directed at the [government action] itself and *must* be injunctive and declaratory," as the government action "cannot be applied *to anyone*." *Ezell*, 651 F.3d at 698 (emphases in original). It would be unfair and entirely unrealistic to require every disabled individual affected by this newly adopted regime to obtain his or her own lawyer and attack it individually. If Defendants had engaged in similar discrimination in their reopening plans against a racial minority or gender, which the State said was more susceptible in the aggregate to COVID-19, Plaintiff respectfully submits that no federal court would allow such discrimination to stand against a race or gender, while limiting relief only to an individual plaintiff. Disabled individuals deserve the same respect and equal treatment.

## CONCLUSION

This Court should grant Plaintiff's Renewed Motion.

Dated this 7th day of July, 2020.

                Respectfully submitted,

                /s/ Misha Tseytlin
                MISHA TSEYTLIN
                SEAN T.H. DUTTON
                TROUTMAN PEPPER HAMILTON SANDERS LLP
                227 W. Monroe Street, Suite 3900
                Chicago, IL 60606
                Telephone: (608) 999-1240
                Facsimile: (312) 759-1939
                misha.tseytlin@troutman.com
                sean.dutton@troutman.com

                BLAKE T. HANNAFAN
                HANNAFAN & HANNAFAN, LTD.
                180 N. Lasalle Street, Suite 3700
                Chicago, IL 60601
                Telephone: (312) 527-0055
                Facsimile: (312) 527-0220
                bth@hannafanlaw.com

                *Attorneys for Plaintiff John McDonald*

# CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of July, 2020, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

/s/ Misha Tseytlin
MISHA TSEYTLIN
TROUTMAN PEPPER HAMILTON SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL 60606
Telephone: (608) 999-1240
Facsimile: (312) 759-1939
misha.tseytlin@troutman.com
