**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

John McDonald,

      Plaintiff,

  v.

Governor JB Pritzker and Grace B. Hou,

      Defendants.

No. 20 C 3653

Hon. Rebecca R. Pallmeyer

**STATE DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S RENEWED MOTION FOR
<u>A PRELIMINARY INJUNCTION</u>**

KWAME RAOUL
Attorney General of Illinois

Amanda L. Kozar
Mary A. Johnston
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601

July 14, 2020

# INTRODUCTION

Plaintiff John McDonald filed his initial motion for a temporary restraining order and preliminary injunction in this matter on June 23, 2020. [ECF# 6 & 7]. Through that motion, Plaintiff sought an order compelling the Illinois Department of Human Services ("IDHS") not only to permit him to immediately return to his work training program at the Community Workshop and Training Center, Inc. ("CWTC"), but also to immediately reopen all of its Community Day Services ("CDS") programs across the state of Illinois. These programs were suspended at the onset of the ongoing COVID-19 pandemic for health and safety reasons, and Defendants have been working diligently to develop plans to reopen them safely. As of now, the programs are on track to reopen by September 1, 2020, with a "soft" reopening planned for August 1, 2020. [Stark Decl., ECF# 16-1, at ¶ 28.]

Plaintiff's initial motion has been resolved. First, as far as Defendants are aware, Plaintiff has returned to the CWTC work training program; all necessary parties executed waivers absolving IDHS from liability for any negative outcomes resulting from potential exposure to COVID-19 [ECF# 25 at ¶ 4.] Second, the Court rejected Plaintiff's request that it order an immediate statewide reopening of the CDS program. [6/30/2020 Hrg. Tr. at 4-5 ("I'm not seriously entertaining entry of an order that would do that, that would reopen the program immediately statewide."); *id.* at 21 ("I'm not contemplating reopening an entire program statewide, facility wide. I am not contemplating doing that. I know that's one way of looking at the relief that has been requested, but I have no intention of doing that, particularly not where the State itself says it expects to get things rolling by August 1st. I see no reason for the Court to inject itself.")]. The Court terminated Plaintiff's motion for a temporary restraining order and preliminary injunction on July 2, 2020. [ECF # 27].

Now, despite having returned to the CWTC program as requested, Plaintiff has filed a second, "renewed" motion for a preliminary injunction, again inviting this Court to "inject itself" into IDHS's administration of the CDS program. This time, Plaintiff takes issue with the tools, guidelines, and protocols that IDHS developed to assist providers and help ensure a safe reopening of the program. [ECF# 29.] Plaintiff's motion should be denied. *First*, Plaintiff's Complaint does not challenge the IDHS guidance and tools, and he has not amended his Complaint to challenge these documents. *Second*, Plaintiff, who has already returned to the CDS program, has no standing to request relief on behalf of other program participants; moreover, the relief he seeks runs afoul of principles of federalism. *Third*, Plaintiff's ADA, Rehabilitation Act, and equal protection claims have no likelihood of success on the merits. As discussed below, his claims are predicated on a serious misunderstanding of the tools, guidelines, and protocols that he challenges. *Finally*, balance of harms considerations weigh strongly against Plaintiff's requested relief. This Court should deny Plaintiff's renewed motion.

## BACKGROUND

Since the end of 2019, the deadly and highly infectious coronavirus disease, or COVID-19, has swept across the world with astonishing speed, altering the reality of daily life for millions in fundamental and unprecedented ways. In response to this public health crisis, the Governor of Illinois, along with many others across the United States, implemented numerous restrictions on the residents of his state. As part of the State's efforts to battle this pandemic, IDHS was required to suspend many of its programs for the safety and health of not only the participants in those programs, but also their families, roommates and friends, and the public in general. One of the programs that was suspended was the CDS program, which provides day-time activities,

recreational programming, outings, and skill building activities for individuals with intellectual and developmental disabilities.

Illinois is currently in Phase 4 of the Restore Illinois Plan.[1] This Phase permits all gatherings of up to 50 people, subject to social distancing and the use of face coverings, and permits – but does not mandate – the reopening of the following establishments: all health care providers, P-12 schools, higher education, all summer programs, child-care, manufacturing, non-essential businesses, bars and restaurants, personal care services and health clubs, entertainment, and retail. Important to note is the caveat included beside every establishment permitted to reopen – **with IDPH-approved safety guidance.** Restore Illinois at 9. In keeping with this plan, IDHS has been, and continues to work with the Illinois Department of Public Health ("IDPH") to safely reopen programs, including CDS, that were temporarily suspended due to the threat of COVID-19.[2] Absent any recurrent spike in COVID-19 cases requiring Illinois to move backwards in the Restore Illinois phases, the CDS program is on track for a "soft" reopening on August 1, 2020, followed by a full reopening – with adequate safety measures implemented – by September 1, 2020. [Stark Decl. at ¶¶ 22, 24.]

## LEGAL STANDARD

"The standards for granting a temporary restraining order and a preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d

---

[1] Office of the Governor, "Restore Illinois: A Public Health Approach to Safely Reopen Our State," https://coronavirus.illinois.gov/sfc/servlet.shepherd/document/download/069t000000BadS0AAJ?operationContext=S1 ("Restore Illinois").

[2] Defendants have already discussed at length the complexities inherent in reopening the CDS program in the time of COVID-19, as well as the efforts being undertaken to safely reopen the program beginning August 1, 2020. [ECF # 16]. Defendants incorporate all information, including declarations, previously submitted with their response to Plaintiff's original motion for a temporary restraining order and preliminary injunction.

427, 433 n.5 (N.D. Ill. 2019). Each is an "extraordinary and drastic remedy," *Checker Car Club of Am., Inc. v. Fay*, 262 F. Supp. 3d 621, 626 (N.D. Ill. 2017), that is "never awarded as of right" and "never to be indulged in except in a case clearly demanding it," *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). Injunctive relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); *see also Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). To determine whether a situation warrants such a remedy . . . [the movant] must show that: (1) absent a preliminary injunction, he will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) his claim has some likelihood of succeeding on the merits. *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018). If the moving party satisfies each of these requirements, the court will weigh the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. *Valencia*, 883 F.3d at 965. "[T[his balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Id.* The court should pay "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

## ARGUMENT[3]

As a threshold matter, Plaintiff's renewed motion challenges guidance and tools that are not mentioned in his Complaint—indeed, these documents were not issued until early July, following consultation with IDPH. (*See* ECF # 26-1, 26-2, 26-3.) It is inappropriate for Plaintiff to

---

[3] Defendants fully incorporate all arguments made in their Response in Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, ECF # 16.

4

seek injunctive relief for a claim that is not included in his operative complaint, and his renewed motion should be dismissed for this reason alone. *W. A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) ("In any event, a preliminary injunction should not have been issued unless the complaint can be construed to make out a prima facie case.") Additionally, as discussed further below, Plaintiff's renewed motion has no likelihood of success on the merits, and the balance of harms weighs heavily against granting any relief.

## I.     Plaintiff has no standing and ignores principles of federalism.

Plaintiff's motion also fails because he lacks standing. Through his renewed motion, Plaintiff requests an order from this Court requiring "that Defendants: (1) not mandate disabled individuals like Plaintiff answer intrusive questions about their and their families' health as part of the CDS reopening; (2) not use the COVID-19 crisis to 'reinvent' services to disabled individuals by fundamentally altering the eligibility criteria and rules for CDS programs; and (3) permit all CDS programs to reopen on August 1 at the same capacity limits applicable to services and jobs for the able-bodied." [ECF# 29 at 1-2.]

But Plaintiff has *already* returned to his CDS program, and he has no standing to request relief on behalf of other program participants. The sort of relief that Plaintiff requests would only be appropriate in the context of a class action suit after class certification, once there has been a finding that the named plaintiff "fairly and adequately protect[s] the interests of the class." *Ploss as Trustee for Harry Ploss Trust DTD 8/16/1993 v. Kraft Foods Group, Inc.*, 431 F.Supp.3d 1003, 1011 (N.D. Ill. 2020). However, to be an adequate representative, the named plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (citing *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017). Here, Plaintiff neither purports to bring this suit as a class action nor attempts to establish that he represents the

intellectually and developmentally disabled persons involved in the CDS program as a whole. It is thus wholly inappropriate for him to demand such far-reaching relief, which would affect the rights of thousands of unrepresented individuals.[4] *See* Stark Decl. at ¶¶ 2, 7-13, 20, 25, 27. As Plaintiff notes, the Seventh Circuit recently held that in certain circumstances a court may issue an injunction that applies to non-parties. (ECF # 29 at 14, *citing City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020). But Plaintiff neglects to mention the Seventh Circuit's caution that "[s]uch injunctions present real dangers, and will be appropriate only in rare circumstances." *City of Chicago*, 961 F.3d at 916. And even if such an injunction may be appropriate in rare cases, the plaintiff seeking such relief must have standing to seek it. Here, Plaintiff's request for relief on his own behalf is moot. In addition, Plaintiff's request that this Court inject itself into a State agency's management of its own programming offends the principles of federalism, which counsel against federal interference in the State's administration of its own affairs, especially during a public health emergency. "One of the most important considerations governing the exercise of equitable power is a proper respect for the integrity and function of local government institutions." *Money v. Pritzker*, Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660, at *15 (N.D. Ill. Apr. 10, 2020) (citing *Missouri v. Jenkins*, 495 U.S. 33, 51 (1990)). When a plaintiff seeks to enjoin the activity of a government agency, "his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976).

---

[4] Moreover, any attempt to bring this matter as a class action would fail at the outset, because each class member would need to be individually assessed in order to determine whether it appropriate for him or her to return to a CDS program, precluding any finding of commonality. *See Money v. Pritzker*, Nos. 20-cv-2093 & 20-cv-2094, 2020 WL 1820660, at *15 (N.D. Ill. Apr. 10, 2020) (noting that in instances where each putative class member comes with a unique situation – whether it be age, medical history, proximity to others who may be infected, likelihood of transmitting the virus to someone else, etc. – the "imperative of individualized determinations . . . makes [such a] case inappropriate for class treatment").

Courts within the Northern District of Illinois have acknowledged that the judiciary is ill-equipped to manage decisions regarding programs and/or populations that are generally left to the State executive branch. *See, e.g., Money*, 2020 WL 1820660, at *16 ("The judiciary is ill-equipped to manage decisions about how best to manage any inmate population – let alone a statewide population of tens of thousands of people scattered across hundreds of facilities. And the concern about institutional competence is especially great where, as here, there is an ongoing, fast-moving public health emergency.").

Here, Plaintiff improperly seeks relief that would override the judgment of both IDHS and IDPH officials, and the position of the association of the very providers who operate these services and those that receive them. [Stark Decl. ¶¶ 19-28, 32; Bleasdale Decl., ECF# 16-2, at ¶¶ 2-6; Evans Decl., ECF# 16-3, at ¶¶ 5-7; Cooch Decl., ECF# 16-4, at ¶ 3.] Plaintiff's requested relief, especially his request for a sweeping injunction mandating the statewide reopening of a State-administered program with higher capacity limits that IDHS and IDPH believes is safe, ignores principles of federalism and should be denied.

## II. Plaintiff's claims have no likelihood of success on the merits.

### A. ADA/Rehabilitation Act

Turning to the merits, Plaintiff cannot succeed on his ADA/Rehabilitation Act claims. Through his renewed motion, Plaintiff asserts that the tools and guidance disseminated to CDS providers by IDHS to facilitate the safe reopening of CDS programming (*see* ECF# 26-1, 26-2, 26-3) are discriminatory in violation of the ADA and the Rehabilitation Act in three distinct respects. [ECF# 29 at 7-10.] However, as discussed below, Plaintiff's misplaced concerns demonstrate a misunderstanding of both the tools themselves and their intended purpose.

To succeed on this claim of intentional discrimination under Title II of the ADA, Plaintiff must show at least one of the following three things: (1) IDHS's intentional action on the basis of the disability, (2) IDHS's refusal to provide Plaintiff with a reasonable modification, or (3) that IDHS's rule disproportionally impacts disabled people. *Money*, 2020 WL 1820660 at *18. Plaintiff cannot establish any of these factors, and his statutory claims fail accordingly.

       *i.*     *Intentional Discrimination*

       a.     <u>The COVID-19 Risk Benefit Assessment Tool</u>

Plaintiff first argues that the COVID-19 Risk Benefit Discussion Tool ("Discussion Tool") that was developed for use by CDS program participants and their family members "requires CDS participants and their families/roommates to submit to invasive questioning about their medical histories" in a manner not required of "able-bodied persons" returning to their jobs. [ECF# 29 at 8.] This is incorrect. The Discussion Tool was designed to assist CDS program participants and their family members in weighing the unique risks and benefits inherent in the decision to return to participation in CDS programming, which is programming meant to provide vocational support and training. While it is true that the Discussion Tool includes a section in which the medical conditions of both participants and family members can be listed, it is not true that this Tool *requires* the disclosure of any health conditions. In fact, it is not a requirement that the particular Discussion Tool developed by IDHS be utilized at all. IDHS, in tandem with IDPH, developed the Discussion Tool to provide CDS participants and their families and providers with a decision-making framework to determine whether they wish to return to CDS programs given the risks created by COVID-19. The Discussion Tool is a guide for the types of discussions that should take place before an individual returns to their CDS program. In addition, the Tool is meant to give providers a way to discuss the mitigation of risks to actually *enable* individuals to return. The

questions are by no means mandatory, and an individual may choose to not disclose the health concerns of either themselves or their family/household. The Discussion Tool is not submitted to IDHS for review, nor is completion of the Tool a prerequisite for an individual's return to CDS programming. Furthermore, the information identified in the Discussion Tool is not dissimilar to the information all state-funded CDS participants already provide during development of their Person-Centered planning documents. During the development of each individual participant's Personal Plan document, health concerns are identified. The Tool is meant to spur a meaningful discussion about how to mitigate the risks posed by these already-identified health concerns.

In this case, all of IDHS's decisions have revolved around COVID-19 – specifically, IDHS's legitimate concerns regarding the impact that COVID-19 may have on the CDS program participants. [Bleasdale Decl. ¶¶ 4-6; Stark Decl. ¶¶ 19-26.] COVID-19 is a highly contagious virus with no vaccine and no reliable treatment. Plaintiff disagrees with IDHS's position related to the potentially heightened dangers that COVID-19 presents to individuals with intellectual and/or developmental disabilities, but that does not mean that IDHS should not consider federal guidelines and recommendations from public health experts when determining how COVID-19 may impact the CDS program and its participants. This is especially evident in light of similar restrictions being implemented in other states, including New York, New Jersey, and others.

### b. The alleged "reinvention" of CDS programming

Plaintiff asserts that Defendants intend to use the Discussion Tool to "reinvent" CDS programming. [ECF# 29 at 9.] Specifically, Plaintiff asserts that the Discussion Tool "allows unidentified persons to recommend that certain disabled participants delay their return to CDS based on a vague chart for interpreting risk/benefit levels which were never qualifications for participating in these programs before now and have no analogue in services and jobs for able-

bodied persons." *Id.* This assertion again demonstrates a fundamental misunderstanding of the purpose of the Discussion Tool. As noted above, the Discussion Tool is to facilitate discussions regarding the risk and benefit of an individual returning to their CDS program. However, the decision to return to a CDS program is up to the individual (or individual's guardian) and the CDS provider. The Discussion Tool recommends that participants consider information, but never precludes any individual from returning to participation in CDS programs; rather, it encourages participants to make an informed decision that weighs the benefits and risks. As the Discussion Tool explains, it "should be used to weigh the benefits and risks of return. [The Discussion Tool] is solely for use as a planning tool and does not determine eligibility to return to CDS."

Plaintiff also takes issue with the Provider Readiness Tool ("Readiness Tool"), which requires CDS providers to submit their COVID-19-specific safety guidelines and protocols to the Division of Developmental Disabilities' Bureau of Quality Management ("BQM").[5] However, Plaintiff again demonstrates a misunderstanding of the Tool at issue. The Readiness Tool is a checklist, adapted from a similar tool used in Hawaii for their day program, that was revised by IDHS and IDPH, intended to assist CDS providers with finalizing their COVID-19 safety protocols. The Readiness Tool does not set forth any specific plan that CDS providers must adopt in order to be permitted to resume operations. In fact, it clearly states that "[p]roviders may need to adapt the checklist to meet the individualized needs and circumstances of their programs and settings." Provider Tool, ECF# 26-2, at ii. Contrary to Plaintiff's assertions, the Readiness Tool

_____

[5] The Tool is submitted to the BQM, but the BQM does not need to "approve" the Tool before a provider reopens their CDS program. However, as the BQM is tasked with overseeing provider quality, the Tool may be reviewed in the context of an outbreak of COVID-19 to identify both the precautions that were identified and implementation of those processes and protocols. In the event of a COVID-19 outbreak at a provider facility, the BQM will review the provider's plan. If a provider failed to take reasonable precautions, any such complaint could be brought to the Office of the Inspector General for investigation.

was designed to give CDS program providers guidance about how they *should* operate, not how they *must* operate.

Moreover, Plaintiff ignores the fact that the CDS program is not the only program facing changes upon reopening in this new era of COVID-19. Plaintiff continually attempts to draw a parallel between CDS and the Illinois school system. While Defendants dispute that this is an appropriate comparison, they do note that the Illinois school system is also implementing significant safety-oriented changes to its day-to-day operations. For example, as just one part of implementing these safety changes, Illinois schools have disseminated surveys to student households inquiring whether there are health concerns for the student or household members that would prevent the student from returning to in-person instruction.[6]

### c. The timing and capacity of the reopening of CDS programs

Finally, Plaintiff argues that the timing of the reopening of CDS programming, as well as the capacity limits imposed upon CDS providers, are discriminatory in nature and violative of the ADA and Rehabilitation Act. [ECF# 29 at 10.] In support of this argument, Plaintiff asserts that "[e]ven if another CDS program is as ready and able to presently reopen as CWTC, Defendants will not allow them to reopen until August 1 at the earliest." *Id.* This argument ignores the fact that Mr. McDonald was permitted to return to the CWTC work training program prior to the August 1 date only after Mr. McDonald, his household members, and CWTC signed waivers indicating that they will not hold IDHS responsible for any adverse outcomes due to COVID-19. IDHS has in no way conceded that CWTC is presently ready and able to reopen its work training program *safely*. There is no indication set forth in Plaintiff's motion as to why a plan intended to gradually and

---

[6] *See* Illinois State Board of Education, "Starting the 2020-21 School Year," https://www.isbe.net/Documents/Part-3-Transition-Planning-Phase-4.pdf, at 15-16; Illinois State Board of Education, "Parent Survey: Planning for 2020-2021," https://www.surveymonkey.com/r/W92BXHC (hit "next" to see health-related questions).

safely reopen a state-wide program involving more than twenty thousand people in the midst of a global pandemic is discriminatory, as opposed to appropriately cautious. Thus, this Court has appropriately declined to order that CDS programming reopen statewide prior to August 1, which is just a few weeks away. [6/30/2020 Hrg. Tr. at 4-5, 21.]

Plaintiff further argues that the capacity limits that will be in place following the reopening of the CDS program are discriminatory. However, under the Governor's Restore Illinois Plan, businesses permitted to reopen under Phase 4 are subject to a capacity limit ranging from 25 percent capacity to 50 percent capacity.[7] Plaintiff has not shown, and cannot show, that the capacity limits for CDS providers reopening during the pandemic amount to intentional discrimination against disabled persons.

### ii.    *Reasonable Accommodations*

Next, Plaintiff cannot show that Defendants failed to provide him with a reasonable accommodation, and his assertion to the contrary is baseless. Plaintiff initially brought this suit seeking the ability to return immediately, with State funding, to his work training program at CWTC. [ECF# 1, 6-7.] For the reasons laid out in Defendants' response brief, such a request hardly qualifies as a reasonable accommodation. [ECF# 16 at 30-33.] However, despite that fact, IDHS agreed to allow Plaintiff to return to the CWTC work training program, with State funding, provided that he, his household members, and CWTC sign a waiver. All necessary parties have signed, and as far as IDHS is aware, Plaintiff is again attending the CWTC program. Plaintiff has not established that he is being denied a reasonable accommodation, and he has no standing to assert claims on behalf of other program participants. And in any event, Plaintiff has not established that *anyone* is being denied a reasonable accommodation.

---

[7] Restoring Illinois – Protecting Our Communities FAQs, https://dph.illinois.gov/restore/restore-faqs.

*iii.      Disparate Impact*

Finally, Plaintiff cannot make a showing of disparate impact. As noted previously, CDS does not provide services to the non-disabled. Throughout his renewed motion, Plaintiff makes vague allusions to non-disabled CDS program participants in an attempt to show that Defendants have treated Plaintiff differently because of his disability. As Defendants have already indicated, this is a faulty comparison because there are no non-disabled CDS program participants. Plaintiff also seems to argue that the capacity limits that will be in place once CDS programming reopens effectively constitute a disparate impact because these same capacity limits are not applicable to services for able-bodied persons. [ECF# 29 at 12.] But again, Plaintiff is incorrect: under the Governor's Restore Illinois Plan, businesses permitted to reopen under Phase 4 are subject to a capacity limit ranging from 25 percent capacity to 50 percent capacity. Moreover, Plaintiff has cited no authority suggesting that the ADA or Rehabilitation Act requires that the capacity limits for the CDS program must be identical to limits imposed on businesses or all other activities.

The interplay between COVID-19 and the statutes at issue here was addressed in the *Money* case, which concerned a group of inmates' requests for medical leave or furlough because of COVID-19. *See Money*, 2020 WL 1820660. There, the court recognized that the plaintiffs did not have a statutory claim, as they were not discriminated against because of their disability. *Id.* at n. 14. The Court further noted that "[t]he fact that disabled persons may be more susceptible to contract or suffer serious consequences from COVID-19 is not disputed, *but that disparate impact is not a consequence of "Defendant's rule" or any action by Defendants*." *Id.* (emphasis added). Similarly, IDHS has not made decisions based on Plaintiff's (or anyone's) disability; IDHS has made decisions based on the public health risks of COVID-19. As such, Plaintiff cannot make a showing of disparate impact due to discrimination of the basis of disability here.

Plaintiff cannot establish any of the elements of his ADA claim, and is therefore unlikely to succeed on the merits.

## B.    Equal Protection

Plaintiff's renewed arguments with regard to his equal protection claim offer nothing new. Because Plaintiff is not a member of a suspect class, IDHS's actions will be evaluated under a rational basis standard.[8] *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985). DHS's program-related decisions will thus be upheld unless there is no rational relationship between its actions and a legitimate government purpose. *F.C.C. v. Beach Comm'cns Inc.*, 508 U.S. 307, 313-14 (1993) (stating that the rational basis standard of review "is a paradigm of judicial restraint"); *see also St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1011 (7th Cir. 2019). As Defendants have previously asserted, IDHS's actions are rationally related to a legitimate government interest, namely the safe reopening of the CDS program during this global pandemic. Plaintiff is consequently unlikely to succeed on this claim.

Through his renewed motion, Plaintiff attempts to paint the State's decision to create a thoughtful and safe reopening plan as an "arbitrary" and "irrational" sign of "invidious discrimination." [ECF# 29 at 12.] These assertions are meritless. IDHS's decisions are based on the knowledge and experience of various experts and are designed to provide safe programs to approximately 21,000 participants. *See* Stark Decl. at ¶¶ 2, 12-13, 20-25; Bleasdale Decl. at ¶¶ 2-6. Implementing safeguards to protect public health and create safe State-funded programs undoubtedly relates to a legitimate public purpose. Plaintiff's dissatisfaction with IDHS's

---

[8] Plaintiff has repeatedly attempted to draw a parallel between the instant case and those dealing with discrimination on the basis of race or gender. [*See*, *e.g*., ECF # 29 at 14.] As Defendants have pointed out numerous times, the standard of review for cases of alleged discrimination on the basis of protected characteristics is substantially higher than that applicable in this case; consequently, such a comparison is inapposite. Defendants remain unsure of why Plaintiff determinedly continues to bring up this point.

decisions does not render them arbitrary, irrational, or discriminatory. To the contrary, IDHS's decisions are rationally related to a legitimate government purpose, and follow both the CDC and IDPH guidelines and, therefore, Plaintiff cannot succeed on his equal protection claim.

## III. The "balance of harms" weighs against Plaintiff's requested relief.

Under the "balance of harms" portion of the analysis, Plaintiff must establish that "the harm [he] would suffer without the injunction is greater than the harm that preliminary relief would inflict on the defendants." *Mich. v. U.S. Army Corps of Eng'g*, 667 F.3d 765, 769 (7th Cir. 2011). Because a movant need not establish that it is more likely than not that they will succeed on the merits to obtain injunctive relief, a movant "must compensate for the lesser likelihood of prevailing by showing the balance of harms tips decidedly in favor of the movant." *Boucher*, 134 F.3d at 826 n. 5 (emphasis in original). The court also should consider whether a preliminary injunction would cause harm to the public interest. *Platinum Home Mort. Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998). When this Court balances the hardships where "the Government is the opposing party, the final two factors in the temporary restraining order analysis—the balance of the equities and the public interest—merge." *See, e.g., Planned Parenthood of New York City, Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).

Here, as discussed above, Plaintiff will suffer no harm whatsoever absent entry of an injunction by this Court. Mr. McDonald has already returned, with IDHS funding, to the CWTC work training program. The only relief he requests through this renewed motion is that this Court effectively interfere with a State agency's decisions regarding how best to administer one of its programs for other individuals. The granting of such relief would have no effect upon him, but would have an effect upon thousands of other individuals across Illinois, none of whom are

represented in this lawsuit. It is thus wholly inappropriate for Plaintiff to seek such relief, especially when such programs will be able to reopen in two weeks.

Moreover, Plaintiff's assertion that "[t]here is no public interest in Defendants unlawfully forcing disabled persons to expose the private medical information of themselves and their family, face special reopening rules not directed at the able-bodied, or abide by occupancy limits not found in other settings" evidences a serious misunderstanding IDHS's plan to reopen the CDS program. As outlined *supra*, there is no requirement that anyone disclose any private medical information, there are no "special reopening rules" specifically targeted at individuals with intellectual and developmental disabilities, and any occupancy limits imposed are the same as those imposed state-wide via the Restore Illinois Plan.

Plaintiff has offered no evidence whatsoever that the injunction he seeks is necessary or advisable; however, there is ample indication that such relief is not in keeping with the public interest, not least because it would drastically interfere with the State's ability to manage its own programs. *Rowe v. Finnan*, No. 11-CV-524, 2013 WL 74609, at *2 (S.D. Ind. Jan. 4, 2013). As discussed above, the Court should "afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.* (quoting *Sandin v. Conner,* 515 U.S. 472, 483 (1995)). Thus, an injunction issued against state officials "dealing with the day-to-day operation" of State programs "may cause substantial harm to both public and private interests." *Id.* The injunction sought here, which would interfere with IDHS's control over its own programs and its authority to determine when it may safely resume programming, would cause substantial harm to the public interest. Plaintiff's request that the Court substitute Plaintiff's judgment for IDHS's in determining when IDHS may safely resume its programs is not responsible or in keeping with the public interest.

**CONCLUSION**

Plaintiff is not likely to succeed on the merits of his claims, and he has not shown that he will be subject to any harm, let alone irreparable harm, absent court intervention. Moreover, the public interest will suffer if IDHS is compelled to reopen the CDS program before being able to ensure that all program participants will be adequately protected from infection by COVID-19. The Court should deny Plaintiff's renewed motion for a preliminary injunction.

Dated: July 14, 2020                                Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

*/s/ Amanda L. Kozar*
Amanda L. Kozar
Mary A. Johnston
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601

*Counsel for JB Pritzker and Grace B. Hou*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 14, 2020, I caused a copy of the foregoing *Defendants' Memorandum in Opposition to Plaintiff's Renewed Motion for a Preliminary Injunction* to be filed electronically on CM/ECF, which will cause a notice of filing to be sent to all counsel of record who have entered appearances.

<em>/s/ Amanda L. Kozar</em>