UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

---

John McDonald,

    Plaintiff,

  v.

J.B. Pritzker, in his official capacity as Governor of Illinois, and Grace B. Hou, in her official capacity as Secretary of the Illinois Department of Human Services,

    Defendants.

Case No. 1:20-cv-03653

Chief Judge Pallmeyer

---

### PLAINTIFF'S REPLY IN SUPPORT OF EXPEDITED RENEWED MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

Through this lawsuit, Plaintiff asked this Court to remedy Defendants' discriminatory treatment of disabled persons, both for himself and for other disabled Community Day Services ("CDS") participants. In asking for relief beyond only himself, Plaintiff followed carefully the Seventh Circuit's decision in *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020), which Plaintiff respectfully submits articulates reasoning applicable to cases just like this one. That is, the government has adopted a uniform and unlawful policy such that it would be impractical for all vulnerable individuals harmed by the policy to each find their own lawyer to fight against the State's broad-based illegality, and proceeding as a class action is impractical due to the length of time needed to certify a class and the immediacy and ongoing nature of the discriminatory conduct. If this Court denies the type of relief that *City of Chicago*

envisions, as Defendants urge, this would consign many disabled persons to the type of suffering that Plaintiff labored under until this Court's intervention. Plaintiff submits that federal courts would not allow such a blanket discriminatory reopening policy to stand against a minority group or a gender, and disabled persons deserve no less. And while Defendants blithely assert that the disabled should not receive the same respect in court because they are not a suspect class under the Equal Protection Clause, Dkt. 32 at 14, Congress has afforded the disabled capacious protection under the Rehabilitation Act and the Americans with Disabilities Act ("ADA"), making the analogy—which this Court referenced at the first preliminary injunction hearing, Transcript of June 25, 2020 Hearing at 23:8–15—entirely apt.

In structuring his request for relief in his Renewed Motion, Plaintiff has taken special and careful cognizance of this Court's concerns at previous preliminary injunction hearings, and has not asked this Court to "reopen the [CDS] program immediately statewide." Transcript of June 30, 2020 Hearing ("6/30/20 Tr.") at 4:23–5:2. Rather, Plaintiff only asks this Court for tailored, limited relief, which follows from the logic of the Rehabilitation Act, the ADA, and the Equal Protection Clause: requiring Defendants to conduct the August 1 reopening—*which is Defendants' own, new reopening date, in response to this lawsuit*—in a way that does not continue to place disabled individuals into second-class citizenship status. That is, when Defendants reopen CDS programs starting on August 1—which, it bears emphasis, is occurring two months after Defendants reopened comparable programs for able-bodied persons—Defendants cannot impose special, blanket limitations and rules on

such reopening that Defendants have not imposed on able-bodied persons. Plaintiff has standing to request such relief for himself because Defendants intend to impose those discriminatory conditions on him and Community Workshop and Training Center ("CWTC") in just over two weeks, and *City of Chicago* explains why this Court can and should extend such relief more broadly to all disabled CDS participants.

ARGUMENT

## I. Defendants Are Continuing To Make Disabled Persons Second-Class Citizens As Part Of Their Reopening

The primary issue for purposes of this Renewed Motion is whether Defendants are still excluding Plaintiff and other disabled individuals from a nondiscriminatory reopening. Defendants have no serious answer to Plaintiff's argument that their reopening plan is discriminatory in at least three respects.

### A. Discriminatory Timing And Capacity Limits

Defendants continue to discriminate against the disabled as to the timing and capacity of their reopening. Defendants have barred CDS programs from reopening until at least August 1, and will not permit most CDS programs to reopen until September 1. *See* Dkt. 16 at 13–14; Dkt. 26-3; 6/30/20 Tr. at 5:12–24. And, most importantly for present purposes, even these plans for reopening restrict CDS programs to mere fractions of their prior occupancy—25% for any program opening in August, and 50% in September. Dkt. 26-3. In contrast, *all* manufacturing and non-essential businesses can open without any limits on participants and workers. Dkt. 9-2; Dkt. 9-6. Furthermore, State guidance for childcare facilities, schools, and workplaces does not impose anything like 25%/50% limits. Dkt. 20-2; Dkt. 20-3.

In their opposition, Defendants fail to provide *any* nondiscriminatory justification for their capacity and timing restrictions on CDS programs. Defendants, instead, claim that these limits are not discriminatory because "businesses permitted to reopen under Phase 4 are subject to a capacity limit ranging from 25 percent to 50 percent capacity." Dkt. 32 at 12 (citing Restoring Illinois – Protecting Our Communities FAQs, https://dph.illinois.gov/restore/restore-faqs). This is misleading, to put it generously. The guidance Defendants cite explains that "non-essential stores," such as "[r]etail stores," "shopping malls," "movie theatres," and restaurants are subject to 25% and 50% restrictions *for customers coming and going*, see Restoring Illinois – Protecting Our Communities FAQs, *supra*, which is obviously a different issue from limits on workers and program participants as it relates to the spread of COVID-19. That is why the State does not impose 25%/50% limits for any able-bodied *workers in any workplaces*, or for any able-bodied *participants in any other programs*, such as daycares, schools, day camps and the like. Dkt. 29 at 8-9. Instead, "*[a]ll* manufacturing [can] open with IDPH approved safety guidance," such as social distancing and masking rules, "*[a]ll* employees" may "return to work with IDPH approved safety guidance," Dkt. 9-2, and *all* daycare and summer camps can reopen without any 25% or 50% limits, Restoring Illinois – Protecting Our Communities FAQs, *supra*. Thus, so far as the record reflects, *the only workplaces and services in this State that will be subject to strict 25%/50% worker/participant limits come August 1 and September 1 are those for disabled individuals.*

### B. Questions About The Health Of Disabled Persons And Their Families

Defendants' "COVID-19 Risk Benefit Discussion Tool" requires CDS participants and their families to submit to invasive questioning about their medical histories before disabled persons can return to CDS programming. *See* Dkt. 26-1. This line of questioning is not present in the State's generally applicable reopening plans for the able-bodied. *See* Dkt. 9-16; Dkt. 20-2; Dkt. 20-3.

Defendants' efforts to show that these questions are nondiscriminatory fail. They assert that these questions are not targeted only at the disabled because of an online survey apparently circulated by schools, *see* Dkt. 32 at 11 n.6, but that survey only asks whether anyone in a student's household has any "health *concerns*," and does not require the disclosure of any family members' medical conditions. Defendants also reference "information all state-funded CDS participants already provide during development of their Person-Centered planning documents," *see id.* at 9, but that information does not include any questions about family health, *see* Dkt. 8-1. And while Defendants argue that these invasive, discriminatory questions are proper "in light of similar restrictions being implemented in other states, including New York, New Jersey, and others," Dkt. 32 at 9, Defendants have not placed any document in the record suggesting that these States ask such questions. Furthermore, two wrongs do not make a right and this case is not about the restrictions being implemented in New York or New Jersey, but only Illinois.

Defendants now claim that these questions are only intended to "guide" discussions and that disabled individuals can refuse to answer these questions without *any* consequence to their CDS participation. Dkt. 32 at 8. Given that

Defendants are representing to this Court that no disabled person will suffer any consequence whatsoever for declining to answer these discriminatory questions, Defendants should have no objection to this Court memorializing that concession in an order, and stating that fact in bold print at the beginning of the questionnaire.

### C. "Reinventing" Services For The Disabled, While "Restoring" Services For The Able-Bodied

Defendants stated on the face of their official documents that they intend to "[r]einvent[ ]" CDS programming come August 1, Dkt. 26-2, inconsistent with the State's treatment of programs and services for its able-bodied citizens, where the State is "[r]estor[ing]" pre-COVID-19 services. Dkt. 9-2. This "reinvention" includes the application of new qualifications for participating in these programs not found in the requirements for participation in services and jobs for able-bodied persons. *See* Dkt. 29 at 4–5. For example, Defendants have decided that a potentially relevant risk factor for whether a disabled individual can and should return to CDS programming is if "[t]he individual has habits or behaviors such as putting his/her hands in their mouth, eyes or face," or "requires physical prompting/assistance to complete . . . toileting, eating or mobility." *Id.* The State does not impose any such requirement on children attending daycare. Dkt. 20-2. CDS participants also must "wear[ ] face coverings and gloves in alignment with CDC guidelines" Dkt. 26-2. But at daycare centers, the State does not even require children to wear a cloth face covering "[i]f the child cannot tolerate" it, and there is no mention of gloves. Dkt. 20-2. Similarly, State guidance for child day camps makes no mention of gloves, requires face masks only "when within 6-ft. of others," and allows exceptions "where

accommodations are appropriate." Dkt. 9-16. And State guidance for workplaces similarly requires face masks only "when it is not possible to maintain at least 6 feet of space between you and another person." Dkt. 20-3.

While Defendants claim that these "[r]einvent[ion]" tools are not mandatory on any CDS programs, Dkt. 32 at 8–10, it beggars belief that if a CDS program refused to comply with these requirements—and merely said that it will reopen consistent with Defendants' generally applicable reopening guidelines for able-bodied persons—that Defendants would approve that CDS reopening on August 1. One need only look at how Defendants have treated CWTC in this litigation—repeatedly disparaging its safe reopening plan and forcing it to sign a waiver to have Defendant return to programing (*even though CWTC had already safely returned charity-based disabled persons, consistent with all state guidelines*), Dkt. 20-2; Dkt. 22-1—to see how Defendants would deal with any CDS program that decided that Defendants' discriminatory "[r]einvent[ion]" tools should not be applied to disabled individuals.

Finally, although Defendants now submit that multiple government programs are facing "*changes* upon reopening in this new era of COVID-19," Dkt. 32 at 11 (emphasis added), they can point to no other programs for able-bodied persons for which the State intends to adopt the widespread transformation applicable to CDS programs. Plaintiff does not contest that "changes" abound in light of COVID-19; indeed, new mask requirements, social distancing rules, and increased sanitation practices are across-the-board changes to nearly every facet of society. But these

generally applicable rules are *non-discriminatory*, as compared to the wholesale "[r]einvent[ion]" that Defendants envision only for CDS programming. Dkt. 26-2.

## II. Plaintiffs' Reopening Plan Remains Unlawfully Discriminatory

Defendants' opposition shows that they are still unable to grapple with the basic requirements of this Nation's nondiscrimination laws, meaning that Plaintiff has succeeded on all three independent bases for Rehabilitation Act and ADA liability (and, for some of the same reasons, under the Equal Protection Clause).[1]

As to intentional discrimination, Dkt. 29 at 7–10, Defendants still have no lawful explanation for the fact that they admitted, in an official letter, that their decision to treat disabled individuals as second-class citizens in their reopening was made based upon what can only be described as "unfounded . . . stereotypes" about, or "paternalistic concerns" for, individuals with disabilities. *See Knapp v. Nw. Univ.*, 101 F.3d 473, 485–86 (7th Cir. 1996); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995). Their opposition offers no explanation whatsoever as to why disabled persons, as a class, must continue to suffer this second-class status in this reopening, leaving no doubt that the discriminatory explanation that Defendants offered in their official letter to Plaintiff's counsel continues to govern their conduct.

As to failure to provide reasonable accommodations, Dkt. 29 at 10–11, Defendants did not "mak[e] changes in rules, policies, practices or services," *Dadian*

---

[1] Defendants wisely do not mention their prior argument that *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), gives them license to discriminate because of COVID-19. Dkt. 16 at 22–25. As Plaintiff has explained, that decision says nothing about the non-discrimination requirements of the Rehabilitation Act and the ADA, and, in any event, does not countenance the government using a public-health crisis as a basis for discrimination. *See* Dkt. 19 at 4–5.

*v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir. 2001), to permit disabled individuals to return to work in the same manner and timeframe as able-bodied individuals. While Defendants point out that they allowed Plaintiff to return to work under a stopgap arrangement, in response to this lawsuit, Dkt. 32 at 12, they concede by silence that come August 1, Defendants will subject Plaintiff (and other disabled individuals) to discriminatory capacity limits, reopening rules, and questions not applicable to able-bodied individuals, Dkt. 29 at 7–11.

As to disparate impact resulting from the fact that Defendants are continuing to impose special, discriminatory conditions on reopening *only* for disabled persons, Dkt. 29 at 11–12, Defendants merely repeat their false assertion that the reopening rules they are imposing on the disabled are comparable to those that they have imposed on the able-bodied, Dkt. 32 at 11–12. As explained above, that is simply untrue, *see supra* Part I.A., and provides an independently sufficient basis for the conclusion that Defendants continue to violate the Rehabilitation Act and the ADA.

Turning to the Equal Protection Clause, while Defendants contend that their discrimination is unproblematic because it arises out of a desire "to provide safe programs to approximately 21,000 [disabled] participants" of CDS programs, Dkt. 32 at 14, the disabled are not, as a class, more susceptible to COVID-19, Dkt. 9-14, and the State cannot rely on such an irrational classification under the Constitution, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446 (1985).

Finally, *Money v. Pritzker*, ___ F. Supp. 3d ___, 2020 WL 1820660 (N.D. Ill. Apr. 10, 2020), on which Defendants repeatedly rely, Dkt. 32 at 6, 7, 8, 13, does not

support their position. There, disabled prisoners argued that the ADA required *special* treatment for the disabled in state custody, permitting them to be released from prison to avoid contracting COVID-19, and thus getting treatment different from the general prison population. *Money*, 2020 WL 1820660, at *18–19. Here, Plaintiff seeks only *equal* treatment with the able-bodied, requiring Defendants to conduct their reopening in a nondiscriminatory manner regardless of disability.

### III. This Court Should Order Relief For Both Plaintiff And Non-Parties, Including For The Same Reasons The Seventh Circuit Articulated In *City of Chicago*

This Court should grant Plaintiff the requested preliminary injunction because he will suffer irreparable harm again on August 1, when Defendants will apply their discriminatory reopening rules against all disabled persons and CDS programs, including Plaintiff and CWTC. This will subject Plaintiff to irreparable psychological harm, including through limiting the number of days he can otherwise attend CWTC, *see* Dkt. 8 ¶¶ 12–13; *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045–46 (7th Cir. 2017), as well as imposing on him irreparable deprivation of his statutory and constitutional rights, *see Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011); *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 709 (9th Cir. 1988). And this Court should extend this injunction more broadly, under a straightforward application of the Seventh Circuit's recent decision in *City of Chicago*, which explains that relief benefiting nonparties is *particularly* important in cases such as this one: when the government's illegal actions are "swift in implementation, widespread in impact, and targeted toward those with the least ability to seek redress." 961 F.3d at 918.

Defendants' various arguments to the contrary are legally insufficient.

First, Plaintiff's claim for relief is plainly not moot. *See* Dkt. 32 at 6. While Plaintiff has returned to CWTC, Defendants concede by silence that he will be subject to the discriminatory rules applicable to general reopening of CDS programs come August 1. The law does not require a Plaintiff to wait until his imminent harm has occurred before seeking preliminary injunctive relief: "[i]njunctions issue to curtail palpable risks of future injury; it is not essential to establish that the worst has come to pass." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006). Further, even if Defendants now say that Plaintiff can refuse to answer the discriminatory questions about his and his family's health without any consequence, *see* Dkt. 32 at 8–9; *see also supra* p. 6, they concede by silence that they will apply their unequal reopening rules on CWTC itself—including the 25%/50% worker/participant capacity limits—which would necessarily limit the number of days Defendant will be able to attend CWTC after August 1, Dkt. 29 at 10.

Second, Defendants' contention that only a class-action lawsuit would permit the relief that Plaintiff seeks is obviously foreclosed by *City of Chicago*. *See* Dkt. 32 at 5. There, the Seventh Circuit acknowledged that in cases in which "the ability of persons affected by the ban to access the courts individually for redress [i]s extremely limited," the "difficulties, expense, and delay inherent in pursuing a class action" often make it an unrealistic alternative to broader injunctive relief. 961 F.3d at 917.

Third, Defendants are incorrect in claiming that Plaintiff is asking this Court to "inject itself into a State agency's management of its own programming." Dkt. 32

at 6. All Plaintiff asks is that this Court enforce the clear, nondiscrimination rule embodied in the Rehabilitation Act, the ADA, and the Equal Protection Clause: the State can create whatever otherwise lawful reopening rules it wants for its citizens, it just cannot create *different* rules for the disabled without good reason. *See* Dkt. 29 at 7–12. Put another way, so long as Defendants act otherwise lawfully, they can impose any *generally applicable* reopening rules that they want. What they cannot do is impose one special set of reopening rules on disabled persons (or minorities or a particular gender), while imposing more favorable rules for everyone else. That is why Defendants' citation of *Money* is particularly inapt. *See* Dkt. 32 at 6. There, granting injunctive relief would have required the court to "run[ ]" and "oversee[ ]" the prison at issue, in order to direct "decisions about how best to manage [the] inmate population." *Money*, 2020 WL 1820660, at \*16. Here, the Court need only order Defendants to *stop discriminating*, and then allow Defendants to choose whatever nondiscriminatory rules for reopening the State that they deem advisable.

Finally, Defendants' federalism and equities arguments miss the mark. Dkt. 32 at 15–16. While Defendants claim that this Court must afford them "appropriate deference and flexibility" in the operations of State programs, *id.* at 16 (citations omitted), the purpose and design of this Nation's nondiscrimination laws and the Equal Protection Clause is that States do not have such broad flexibility when imposing discriminatory rules on protected classes of persons. In that context, the overriding interest is "the Nation's proper goals regarding individuals with

disabilities . . . to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7).

IV.  **Plaintiff's Complaint Asks This Court To Enjoin Defendants' Months' Long Discriminatory Shuttering Of CDS Programs, And His Renewed Motion Here Seeks Only A Limited Subset Of That Relief**

Defendants' assertion that this Court cannot grant the limited preliminary injunctive relief that Plaintiff now seeks because that specific request for injunctive relief is "not included in his operative complaint," Dkt. 32 at 4–5, is baseless.

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for the relief sought, which may include relief in the alternative." Fed. R. Civ. P. 8(a)(2)–(3). Regarding claims for injunctive relief, which are "not subject to heightened Rule 9(b) pleading standards," *Specht v. Google, Inc.*, 805 F. Supp. 2d 551, 559 (N.D. Ill. 2011), the complaint need only allege facts that: "1) no adequate remedy at law exists; 2) the moving party will suffer irreparable harm absent injunctive relief; 3) the irreparable harm suffered absent injunctive relief outweighs the irreparable harm the respondent will suffer if the injunction is granted; 4) the moving party has a reasonable likelihood of prevailing on the merits; and 5) injunctive relief will not harm the public interest." *U.S. ex rel. Walner v. NorthShore Univ. Healthsystem*, 660 F. Supp. 2d 891, 899–900 (N.D. Ill. 2009).

Plaintiff's Complaint here alleges that Defendants have shuttered CDS programs statewide since March 17, and that their closure would extend until at least September 1, three months after similar businesses and programs for the able-bodied

reopened under Defendant Governor's Restore Illinois Plan. Dkt. 1 ¶¶ 20, 22, 28, 32–33. The Complaint alleges that Plaintiff has suffered, and will continue to suffer, irreparable emotional and mental harms from Defendants' discriminatory treatment, *id.* ¶¶ 47–48, 63, 73, 84, that he has no adequate legal remedy, that Defendants would suffer no harm if the Court issued an injunction, and that the public interest falls in Plaintiff's favor, *id.* ¶¶ 64, 75, 85. The Complaint also makes clear that Plaintiff is seeking relief from Defendants' "statewide closure of all Community Day Services programs through at least August 31, 2020." *Id.* at 23 ¶ a.ii, b.ii.

Plaintiff's Renewed Motion here merely asks for a *subset* of the broader relief that the Complaint seeks. In response to Plaintiff's Complaint and Emergency Motion for a Temporary Restraining Order & Preliminary Injunction, Defendants have given Plaintiff partial relief by permitting him to go back to work, under a limited, stopgap arrangement, as well as permitting a partial reopening of CDS programing one month earlier than August 31. But Plaintiff's Complaint sought a full, nondiscriminatory reopening of CDS programs. Dkt. 1 at 23–24. Plaintiff's limited requests for relief in their present, Renewed Motion—that this Court order, as a remedy for Defendants' unlawful discrimination, that Defendants' August 1 reopening be conducted in a nondiscriminatory manner—is thus merely a subset of the full reopening request sought in the Complaint.

Plaintiff also notes that he believed that he was proceeding in the manner that this Court envisioned at the July 2 hearing, which is to review the tools that the State has submitted and to ask for renewed injunctive relief if those tools did not provide a

nondiscriminatory reopening. *See* July 2, 2020 Hearing. Indeed, during the hearing on July 2, Plaintiff's counsel informed this Court that they would review the tools Defendants had just filed and this Court stated that it would allow Plaintiff to brief any issues he had with those tools. *Id.* Having said that, if this Court has concerns on this front, Plaintiff is happy to file an Amended Complaint very promptly—which he can do as a matter of right, Fed. R. Civ. P. 15(a)—and the arguments in this fully briefed Renewed Motion will be ripe for resolution immediately thereafter.

## CONCLUSION

This Court should grant Plaintiff's Expedited Renewed Motion For A Preliminary Injunction.

Dated this 15th day of July, 2020.

                                               Respectfully submitted,

                                               /s/ Misha Tseytlin
                                               MISHA TSEYTLIN
                                               SEAN T.H. DUTTON
                                               TROUTMAN PEPPER HAMILTON SANDERS LLP
                                               227 W. Monroe Street, Suite 3900
                                               Chicago, IL 60606
                                               Telephone: (608) 999-1240
                                               Facsimile: (312) 759-1939
                                               misha.tseytlin@troutman.com
                                               sean.dutton@troutman.com

                                               BLAKE T. HANNAFAN
                                               HANNAFAN & HANNAFAN, LTD.
                                               180 N. Lasalle Street
                                               Suite 3700
                                               Chicago, IL 60601
                                               (312) 527-0055
                                               (312) 527-0220 (fax)
                                               bth@hannafanlaw.com

                                               *Attorneys for Plaintiff John McDonald*

# CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of July, 2020, a true and accurate copy of the foregoing was served via the Court's CM/ECF system upon all counsel of record.

<pre>
                                        /s/ Misha Tseytlin
                                        Misha Tseytlin
                                        Troutman Pepper Hamilton Sanders LLP
                                        227 W. Monroe Street
                                        Suite 3900
                                        Chicago, IL 60606
                                        (608) 999-1240
                                        (312) 759-1939 (fax)
                                        misha.tseytlin@troutman.com
</pre>