**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KAREN HANEY, in her capacity as** | ) | |
| **John McDonald's guardian,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 20 C 3653** |
| | ) | |
| **GOVERNOR J.B. PRITZKER, in his official** | ) | **Judge Rebecca R. Pallmeyer** |
| **capacity as Governor of Illinois, and** | ) | |
| **GRACE B. HOU, in her official capacity as** | ) | |
| **Secretary of the Illinois Department of** | ) | |
| **Human Services,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises out of restrictions imposed by Governor J.B. Pritzker on various state programs in response to the COVID-19 pandemic. John McDonald, a developmentally disabled Illinois citizen, filed this action on June 23, 2020, challenging the pandemic-related closure of all Community Day Services ("CDS") programs that the State makes available to persons with developmental disabilities. Specifically, he alleged that Defendants Pritzker and Grace B. Hou—the Secretary of the Illinois Department of Human Services—discriminated against him because of his disabilities by keeping CDS programs temporarily closed while permitting allegedly comparable businesses, programs, and activities to reopen. Among other things, McDonald sought a temporary restraining order prohibiting Defendants from keeping CDS programs (including the program he attended) closed. He also requested a declaratory judgment that the challenged conduct violated his rights under the Americans with Disabilities Act, the Rehabilitation Act, and the Equal Protection Clause of the U.S. Constitution. After the parties reached a voluntary agreement that permitted McDonald to return to his CDS program in early July 2020, the court terminated McDonald's motion for emergency injunctive relief without prejudice.

Months later, a state court declared McDonald incompetent and appointed McDonald's

sister and caretaker, Karen Haney, as his legal guardian.  (*See* Second Karen Haney Decl. [57]; Nov. 2020 State Court Order [57-1].)  This court then granted Haney's motion to substitute as Plaintiff under Federal Rule of Civil Procedure 25(b).  (Order [58].)[1]  Before the court is Defendants' renewed motion to dismiss Plaintiff's Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  As explained here, Defendants' motion is denied.

## BACKGROUND

### A.    Community Day Services Programs

The Illinois Department of Human Services ("IDHS") regulates and administers CDS programs for intellectually and developmentally disabled adults in Illinois.  (Compl. [1] ¶¶ 2, 27.) Both the State and IDHS receive federal funding for assistance with those programs.  (*Id.* ¶ 27.) CDS programs offer disabled adults "assistance in gaining and improving self-help, socialization, and adaptive skills in a non-residential setting, with a particular emphasis on training in quantitative skills and enhancement of productive work activities."  (*Id.* ¶ 25.)  They also offer disabled adults "opportunities to work both in the community and at the CDS program's building," and in so doing "provid[e] many [program] participants with their only opportunities to hold a job and earn income."  (*Id.* ¶ 26.)

The Community Workshop and Training Center, Inc. ("CWTC") is a CDS program in Peoria, Illinois.  (*Id.* ¶¶ 9, 38.)  It has "long-term contracts with essential private firms" and "employ[s] roughly 170 disabled workers to process and package products for these companies." (*Id.* ¶ 40.)  CWTC provides "attendant care and supervision" for disabled workers while they are on the job.  (*Id.* ¶ 39.)  It also provides "community programming" for them, "such as an art show, annual awards dinner, and more."  (*Id.* ¶ 43.)  Plaintiff alleges that participation in the CWTC program affords "personal satisfaction and a sense of purpose" to disabled persons.  (*Id.*)

McDonald is unable to hear or see, and communicates "primarily with sign language."

---

[1]    For ease of reference, the court calls Plaintiff "Haney" or "she" in this opinion.

(*See id.* ¶ 9.)  His intellectual and developmental disabilities "leav[e] him with the intellectual capacity of a 7-year-old."  (*Id.* ¶ 36.)  Before the COVID-19 pandemic, McDonald attended CWTC's program on weekdays for more than 20 years.  (*Id.* ¶ 38.)  He worked there, "packaging construction hardware like nuts and bolts for a large manufacturing company."  (*Id.* ¶ 39.)

## B.     The COVID-19 Pandemic

In early March 2020, public health officials noted concerns about the spread of the COVID-19 virus in Illinois.  (*Id.* ¶ 16.)  Defendant Pritzker declared a statewide emergency on March 9, 2020.  (*Id.* ¶ 17.)  To halt the spread of the virus, Defendant Pritzker issued a series of orders that prohibited public gatherings, closed all bars and restaurants to in-person dining, closed schools and non-essential businesses, and  entered a statewide stay-at-home order for all people who were  not  performing essential functions.  (*Id.* ¶¶ 18–19.)  Consistent with those orders, on March 17, 2020, IDHS closed CDS programs statewide.   (*See id.* ¶ 28 (alleging that the "shutter[ing]" of those programs "barred [the] disabled workers from returning to work or receiving services from such programs").)

On May 5, 2020, when the number of COVID-19 transmissions was still climbing but the rate of new infections over time had started to slow (or "flatten"), Defendant Pritzker announced a plan to reopen the State in five phases (the "Restore Illinois" plan).  (*Id.* ¶ 20.)  Under the plan, each of four Illinois regions could "return to non-essential business and other normal operations once they met certain thresholds."  (*Id.*)  The first threshold was a "flattening" of the rate of new transmissions; thus, in the same week that Defendant Pritzker announced the plan, all of Illinois entered Phase 2.  (*Id.* ¶ 21.) In Phase 2, hospitals could conduct certain elective surgeries; "non-essential retail [could] re-open for phone and online orders, as well as pick-up and deliveries"; some state parks could re-open with "strict social distancing"; and individuals were required to wear face coverings in public if they could not maintain a six-foot distance from others.[2]  Illinois

---

[2]     Lecia Bushak, *Gov. Pritzker Announces 'Restore Illinois' Plan to Reopen State in Five  Phases*, Ill. Newsroom  (May  5,  2020)  ("Bushak  'Restore  Illinois'  Article"),

entered Phase 3 of the plan on June 3, 2020, when the rates of new infections, hospitalizations, and filled intensive care unit beds were in decline. (*Id.* ¶ 22.)[3] In Phase 3, Defendants permitted "non-essential manufacturing and non-essential businesses" to reopen, provided that their employees practiced social distancing and followed safety guidance approved by the Illinois Department of Public Health—such as wearing personal protective equipment and using "adequate sanitation practices." (*Id.* ¶¶ 3, 22.) Likewise, Defendants permitted recreational day camps for children and limited child-care services to reopen, "consistent with approved safety guidance and sanitation procedures." (*Id.* ¶ 22.) Defendants did not permit CDS programs to reopen, however. (*See, e.g.*, *id.* ¶ 31.)

On June 4, 2020, Defendant Pritzker announced that "all public and private schools serving pre-kindergarten through 12th grade in the State could open for summer school, following the completion of the regular 2019–2020 school year." (*Id.* ¶ 24.) By contrast, on June 9, 2020, IDHS issued a "guidance letter to CDS providers stating that the prohibition of CDS program operations" would "extend until at least August 31, 2020, to be consistent with the Illinois Department of Aging and their decision to keep Adult Day Sites closed through August 31." (*Id.* ¶ 32 (internal quotation marks omitted).)

Progress continued, and Illinois was on track to enter Phase 4 around June 26, 2020. (*See id.* ¶ 23.) Phase 4 contemplated allowing "all manufacturing, non-essential businesses, outdoor recreation, bars, restaurants, health and fitness clubs, and movie theaters" to reopen "with approved safety guidance." (*Id.*) It also contemplated permitting public gatherings of up to 50 people to resume, and permitting "all schools, institutes of higher education, summer programs, and child-care services" to reopen "with approved safety guidance." (*Id.*) But Phase 4 did not contemplate reopening CDS programs. (*See, e.g., id.* ¶ 31.)

---

https://illinoisnewsroom.org/gov-pritzker-announces-restore-illinois-plan-to-re-open-state-in-five-phases/ (last visited Sept. 7, 2021); Compl. ¶ 22 (citing same).
1
3      *See* Bushak, "Restore Illinois" Article.

According to Plaintiff, CWTC's contracts with manufacturing businesses made it an "essential business" under Defendant Pritzker's executive orders, meaning that CWTC "continued providing its packaging services" throughout the pandemic-related shutdown. (*Id.* ¶ 41.) During that time, Plaintiff alleges, CWTC's "non-disabled employees" completed the work that disabled persons such as McDonald had been doing before the shutdown. (*Id.*) Plaintiff has not alleged that Defendants played any role in permitting CWTC's non-disabled employees to complete that work, but she does assert that Defendants permitted non-disabled employees *of CDS programs* (presumably including CWTC) to complete tasks "previously assigned to the disabled workers" and used federal funds to pay the CDS program employees for that work. (*Id.* ¶¶ 30, 55.)

Plaintiff alleges that many disabled persons, including McDonald, "are fully capable of following basic sanitation requirements, such as handwashing and mask-wearing, and have no underlying medical conditions that make them particularly susceptible to COVID-19." (*Id.* ¶ 57.) Quoting an April 2020 publication from the Centers for Disease Control (CDC), Plaintiff alleges that intellectually and developmentally disabled persons "are not inherently at higher risk for becoming infected with or having severe illness from COVID-19." (*Id.* ¶ 19.)[4] And she alleges that there is no reason why CDS programs could not have "follow[ed] the same public-health guidelines required of the manufacturing businesses, non-overnight day camps, and child-care services" that Defendants reopened before CDS programs. (*Id.* ¶ 31*; see also id.* ¶ 44.)

On June 17, 2020—before Plaintiff filed this lawsuit—she sent a letter to Defendants in which she argued that their decision to close CDS programs "indefinite[ly]" during the pandemic was unlawful. (*See id.* ¶ 34; June 17 Letter, Ex. B to Compl. [1-2] at 1.) Citing the April 2020

---

[4]     The Complaint quotes the following publication: *People with Disabilities*, CTR. FOR DISEASE CONTROL (Apr. 5, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last visited Sept. 24, 2021) (hereinafter, "April 2020 CDC Publication"). The CDC updated the publication in June 2021 and the language is now slightly different. (*See id.* ("Most people with disabilities are not more likely to become infected with or have severe illness from Covid-19. However, some people with disabilities might be more likely to get infected or have severe illness because of underlying medical conditions, congregate living settings, or systemic health and social inequities.")

CDC Publication, she maintained that disabled persons are not inherently more susceptible to COVID-19 than the general population and that the CDS program closure therefore "ha[d] no COVID-19-related justification, especially when compared to the State's ongoing treatment of facilities and services for able-bodied persons." (June 17 Letter at 1–2.) Plaintiff demanded that Defendants (1) permit McDonald "to attend his CDS program starting on Monday, June 22, [2020]" and (2) "lift immediately the prohibition on CDS operations . . . ." (*Id.* at 2, 9.)

Defendants responded by letter on June 19, 2020. (June 19 Letter, Ex. A to Compl. [1-1].) They argued that according to medical professionals, "individuals with intellectual or developmental disabilities are up to four times more likely to become infected with COVID-19, and are roughly twice as likely to die due to a COVID infection." (*Id.* at 1.)[5] In addition, Defendants observed that the CDC had identified a higher risk from COVID-19 for persons "who have trouble understanding information or practicing preventative measures, such as hand washing and social distancing . . . [and] [p]eople who may not be able to communicate symptoms of illness." (June 19 Letter at 1 (quoting April 2020 CDC Publication).) Defendants noted that CDS programs are "tailored to individuals with intellectual and developmental disabilities, many of whom have incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to wear masks in enclosed environments." (June 19 Letter at 2.) Defendants maintained that "the temporary restrictions on CDS currently in place are not arbitrary or discriminatory, but instead are based on a clear, rational basis to prevent a high-risk population from infection with COVID-19." (*Id.*) Finally, they noted that several states— including New York, New Jersey, Connecticut, Louisiana, and California—had also "restricted

---

[5]    Defendants cited the following online sources for those points: Shaun Heasley, *People with Developmental Disabilities More Likely to Die from COVID-19,* DISABILITY SCOOP (June 8, 2020), https://www.disabilityscoop.com/2020/06/08/people-with-developmental-disabilities-more-likely-to-diefrom-covid-19/28434/ (last visited Sept. 24, 2021); *COVID-19 Infections and Deaths Are Higher Among Those with Intellectual Disabilities,* NAT'L PUBLIC RADIO, (June 9, 2020), www.npr.org/2020/06/09/872401607/covid-19-infections-and-deaths-are-higher-among-those-withintellectual-disabilities.html (last visited Sept. 24, 2021).

[their] CDS operations" and that some of those states' restrictions remained in place.  (*Id.*)[6]

Defendants did not meet Plaintiff's demands.  Rather, they informed her that they "anticipate[d] that CDS providers may be able to resume operations by September 1, 2020 (assuming the Restore Illinois plan does not require moving back to more restrictive phases)." (June 19 Letter at 2.)  Defendants also offered to work with Plaintiff and McDonald "to identify suitable alternate services and/or supports to assist [McDonald] until he can safely return to CWTC." (*Id.* at 3.)  To that end, they stated that IDHS-funded alternative programming—including "telehealth services for behavioral health, which may help address any challenges brought on by the change in [McDonald's] daily routine"—"may" be available.  (*Id.*)  And they noted that although "not funded by [IDHS], some providers are providing remote/virtual programming, which [IDHS] can help [McDonald] to explore." (*Id.*)

According to Plaintiff, Defendants' decision to keep CDS programs closed through at least August 31, 2020 had "devastating effects" on McDonald and other disabled participants. (Compl. ¶ 46.)  McDonald's mental health allegedly "declined as a result of" the closure, "necessitating an increase in his anti-depressant and anti-anxiety medications." (*Id.* ¶ 47.)

**C.    Procedural History**

Plaintiff filed this lawsuit on June 23, 2020.  The complaint sought the following relief: a temporary restraining order or preliminary injunction restraining Defendants from "[m]andating the continued shuttering of CWTC" and "enforcing the statewide closure of all [CDS] programs through at least August 31, 2020"; a permanent injunction restraining the same conduct; a declaratory judgment that the statewide closure of all CDS programs violates McDonald's rights under the Equal Protection Clause of the U.S. Constitution, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132;

---

[6]      For that point, Defendants cited, among other sources, *Division Update on Covid-19*, N.J. DIV. OF DEV. DISABILITIES, https://www.nj.gov/humanservices/ddd/documents/division-update-COVID19-03132020.pdf (last visited Sept. 24, 2021).

compensatory damages under the Rehabilitation Act and the ADA; an award of costs and attorneys' fees under 42 U.S.C. § 1988 and 28 U.S.C. § 1920; and such other relief as the court deems appropriate. Concurrently, Plaintiff filed an emergency motion for a temporary restraining order and preliminary injunction [6].

The court held telephone hearings on the emergency motion on June 25 and 30, 2020. It questioned both sides about whether they could develop a plan that would afford McDonald individual relief by safely returning him to his program before August 1, 2020. (*See, e.g.*, June 30, 2020 Hr'g Tr. [24] at 21:10–25; *see also id.* at 21:10-11 (THE COURT: "I'm not contemplating reopening an entire program statewide, facility wide.")) On July 2, 2020, the parties informed the court that they had reached an agreement in that regard. The court entered the following order memorializing the agreement and terminating Plaintiff's emergency motion without prejudice:

> Telephone motion hearing held. Based on information obtained from the Illinois Department of Human Services (IDHS), Defendants acknowledge that Plaintiff McDonald has completed the Person-Centered planning process necessary for IDHS funding for participation in the CDS program.[7] Accordingly, by agreement, IDHS will allow for funding from the Division of Developmental Disabilities for Plaintiff's immediate return to the CWTC work training program, subject to waivers of liability (to be drafted by IDHS), signed by Mr. McDonald (or his legal representative), adult members of his household, and the CWTC director (or other individual with the legal authority to bind CWTC). Plaintiff's emergency motion for a temporary restraining order [6] is terminated without prejudice. The case remains pending for resolution of other disputed issues.

(July 2, 2020 Order [27].) The court made no determination on the merits.

On July 7, 2020, Plaintiff filed an expedited renewed motion for a preliminary injunction [28], in which she challenged reopening-related guidance and questionnaires that Defendants had developed for CDS programs and disabled participants. The court held a telephone hearing on July 17, 2020 and entered an order denying the motion. (July 17, 2020 Order [38].) The court noted that McDonald had returned to his program at CWTC as contemplated in the parties' agreement and had identified no basis for suspicion that his situation would change as of the date

---

[7]     This is a reference to paperwork that is not material to the motions presently before the court.

Defendants had set for a "soft" reopening of all CDS programs (August 1, 2020). (*See id.*) The court expressed concern regarding McDonald's standing to challenge Defendants' reopening-related guidance; observed that there was little in the record suggesting that Defendants were unwilling to help CDS participants to return to their programs as soon as possible; and stated that if disabled persons other than McDonald believed that Defendants' conduct was unlawful, they were "free to bring appropriate action." (*Id.*)

On August 25, 2020, Defendants filed a motion to dismiss Plaintiff's complaint under Rules 12(b)(1) and 12(b)(6) [40]. Plaintiff filed an opposition [45] and a cross-motion for summary judgment [46]. On February 25, 2021, the court struck Defendants' motion to dismiss without prejudice to renewal. (Feb. 25, 2021 Order [60].) The court expressed concern that Plaintiff's requests for injunctive and declaratory relief were moot and requested further briefing on that and other issues. Defendants filed a renewed motion to dismiss under Rules 12(b)(1) and 12(b)(6) on March 19, 2021 [62].[8] That motion is now before the court.

## DISCUSSION

A Rule 12(b)(1) motion tests the court's subject matter jurisdiction. *See* FED. R. CIV. P. 12(b)(1). To survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing that all jurisdictional requirements are satisfied. *See, e.g.*, *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). Where a plaintiff's jurisdictional allegations are "facially sufficient but external facts call the court's jurisdiction into question," the court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."

---

[8]     In support of their renewed motion to dismiss, Defendants submitted the Declaration of Allison Stark, the Director of the Division of Developmental Disabilities of IDHS [63-1]. That led to further litigation concerning whether the declaration opened the door to jurisdictional discovery. The court granted Defendants' motion to withdraw the Stark Declaration but denied Stark's motion to quash the deposition subpoena that Plaintiff served on her. (Order [71], Order [74].) For the reasons explained on the docket, the court later granted Defendants' motion for reconsideration of the decision denying the motion to quash. (Order [78].) Plaintiff then moved for reconsideration of that order, which the court denied. (Order [80].)

*Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017) (internal quotation marks omitted).

To survive dismissal under Rule 12(b)(6), a complaint must allege sufficient factual matter to state a claim to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also, e.g.*, *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382 (7th Cir. 2016). In considering a motion to dismiss under Rule 12(b)(6), the court accepts all well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Volling*, 840 F.3d at 382. "In addition to the [plaintiff's] allegations," the court "may consider documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *O'Brien v. Vill. of Lincolnshire*, 955 F.3d 616, 621 (7th Cir. 2020) (internal quotation marks omitted).

## A.    Subject Matter Jurisdiction

### 1.    Mootness

When this lawsuit was initiated, the complaint sought an injunction restraining Defendants from enforcing the continued statewide closure of all CDS programs, including the program at CWTC. In their initial and renewed motions to dismiss, Defendants frame this request as having two parts: one, an order requiring Defendants to allow McDonald to immediately return to his program at CWTC, and two, an order requiring an immediate statewide reopening of all CDS programs. (*See, e.g.*, Mem. in Supp. of Renewed Mot. to Dismiss ("Defs.' Br.") [63] at 6, 9.) Defendants argue that the first request is moot because "IDHS voluntarily agreed to allow Mr. McDonald to return to the CWTC program early and he remains free to attend the CWTC program as he wishes." (*Id.* at 6.) Defendants argue that the second request is also moot because IDHS implemented the "soft" reopening of CDS programs on August 1, 2020, and "conducted a full program reopening on September 1, 2020." (*Id.* at 9 (footnote omitted).) Finally, Defendants

10

maintain that there is "nothing to suggest that a second temporary suspension of IDHS programming is likely or imminent." (*Id.*)  In that regard, they observe that IDHS reopened CDS programs months ago and has not suspended them again; McDonald has been attending his program at CWTC since July 2020;[9] COVID-19 cases in Illinois have been declining for months; COVID-19 vaccine distribution is in progress; and Illinois has entered Phase 4 of the Restore Illinois plan.  (*See id.* at 3, 6, 8.)  The court notes that on June 11, 2021—after Defendants' renewed motion to dismiss was fully briefed—Illinois "move[d] to a full reopening, also known as Phase 5."[10]  The State "eliminate[d] all capacity limits on businesses, large-scale events, conventions, amusement parks, and all other venues."  (June 11 Reopening Announcement.)

In maintaining that Plaintiff's claims for injunctive relief are moot, Defendants acknowledge the "general rule" that "in cases between private parties, a defendant's voluntary cessation of challenged conduct will not render a case moot because the defendant remains free to return to his old ways."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020), *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020) (internal quotation marks omitted).  Indeed, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Env'tl Serv. (TOC), Inc.*, 528 U.S. 167, 190 (2000).  Defendants concede that they cannot make promises about the future course of the COVID-19 pandemic, and therefore cannot guarantee that they will never again impose temporary, COVID-19-related restrictions on CDS programs.  But they argue that their inability to make those promises does not on its own sustain a live controversy.  In support, they cite *Speech*

---

[9]     Defendants cite the Stark Declaration for details about McDonald's attendance. (*See id.* at 6.)  The court disregards the Stark Declaration because Defendants have withdrawn it.  The court observes, however, that since July 2020, Plaintiff has never suggested that McDonald has any difficulty attending his program.

[10]     *Gov. Pritzker Announces State of Illinois Will Fully Reopen Tomorrow, June 11*, ILLINOIS.GOV (June 10, 2021) ("June 11 Reopening Announcement"), https://www.illinois. gov/news/press-release.23415.html (last visited Sept. 24, 2021).

*First*, where the Seventh Circuit determined that the plaintiff's request that the court preliminarily enjoin the defendant-university's "since-repealed (and never previously enforced)" rule was moot. *Speech First*, 968 F.3d at 645, 646. The court explained that although the university had not made "a binding promise" that it would never reenact the rule, a "merely theoretical possibility" that the university might do so—"without any evidence" that it intended to—was "not enough to survive a mootness challenge." *Id.* at 647; *see also id.* at 646–47 (noting that the university was a public entity and stating that the court "[has] never required a government actor to issue a promise that it will not return to its prior policy"). Defendants here contend that CDS programs have been open statewide since September 2020, Illinois has made significant progress in combatting COVID-19, and the possibility that the pandemic will once again require temporary closures of CDS programs is therefore theoretical.

*Speech First* provides strong support for Defendants' position, and when the court requested additional briefing on the issue of mootness, it tended to agree that Plaintiff's requests for injunctive relief are moot. In the interim, however, the Seventh Circuit decided *Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021), which concerned a COVID-19-related mootness question. The plaintiffs in *Cassell* sought a preliminary injunction to prevent enforcement of a "ten-person limit on religious and other gatherings that Illinois imposed to curtail the spread of the coronavirus." *Id.* at 542. They argued that the restriction violated their right to exercise their religion under the First Amendment and the Illinois Religious Freedom Restoration Act. *Id.* at 543. The district court denied the preliminary injunction on May 3, 2020. *Id.* Later, on May 29, 2020, Governor Pritzker issued a superseding executive order that "encouraged a ten-person limit on religious gatherings but removed the mandate to that effect." *Id.* By the time the Seventh Circuit heard the plaintiffs' appeal, the plaintiffs "no longer face[d] any live threat of enforcement." *Id.* at 546. They had not faced that threat "for nine months," and during that time, Governor Pritzker issued executive orders that "consistently refrained from limiting the free exercise of religion." *Id.* The pandemic's threat level had also started to drop: the Food and Drug Administration approved COVID-19

12

vaccines in November 2020, Illinois was distributing the vaccines, and Illinois had begun "scal[ing] back its restrictions." *Id.* The Seventh Circuit observed that "Illinois' [pandemic] response since May 2020 shows that the prospect of" the plaintiffs experiencing a renewed threat of enforcement "is minimal." *Id.* Despite those circumstances, the court concluded that the case should not be dismissed; the court explained that "[g]iven the uncertainty about the future course of the pandemic, we are not convinced that these developments have definitively rendered [the case] moot." *Id.* (citing, *inter alia*, *Friends of the Earth*, 528 U.S. at 189–90)).[11]

*Cassell* is closely analogous to the instant case. Unlike *Speech First*—which did not involve a public health crisis and where defendant had never enforced the challenged rule, *see Speech First*, 968 F.3d at 636—*Cassell*, like this case, was a challenge to restrictions that Defendant Pritzker imposed to reduce the spread of COVID-19. And as in *Cassell*, the parties here have continued litigating long after Defendants lifted the restrictions. Furthermore, although Defendants have pointed to evidence tending to show that they are highly unlikely to reimpose CDS program closures because of the coronavirus, the pandemic is not over. The highly contagious Delta variant, for example, has been spreading rapidly, "prompting new lockdowns around the world."[12] Illinois' neighboring state, Missouri, "has reported one of the nation's highest per capita increases in new coronavirus cases in recent weeks."[13] "Nationally, the coronavirus case rate has more than doubled since late June."[14] And although coronavirus vaccines are

---

[11]   The Seventh Circuit in *Cassell* affirmed the district court's denial of the preliminary injunction because, among other things, the developments in Illinois' pandemic response "weigh[ed] against the need for a preliminary injunction even if the plaintiffs may be likely to succeed on the merits." *Cassell*, 990 F.3d at 547, 550–51.

[12]   Emily Anthes, *The Delta Variant: What Scientists Know*, N.Y. TIMES (July 17, 2021) https://www.nytimes.com/2021/06/22/health/delta-variant-covid.html (last visited Sept. 24, 2021).

[13]   Fenit Nirappil, *The Delta Variant Is Ravaging This Missouri City. Many Residents Are Still Wary of Vaccines*, WASH. POST (July 15, 2021), https://www.washingtonpost.com/health/2021/07/15/springfield-missouri-delta-outbreak/ (last visited Sept. 24, 2021).

[14]   *Id.*

widely available, many of Illinois' vaccine-eligible residents have not obtained one.[15] Experts warn that vaccine hesitancy "allows the coronavirus to continue spreading in the community," which in turn allows new variants to emerge.[16] In short, although many factors suggest that McDonald's chance of facing renewed restrictions is "minimal," there is still "uncertainty about the future course of the pandemic." *Cassell*, 990 F.3d at 546. Because of that uncertainty, it is not "absolutely clear" that the restrictions Plaintiff is challenging could not "reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190. Following the guidance of *Cassell,* the court concludes that the progress that Illinois has made in fighting the pandemic—even since the decision in *Cassell*—has not "definitively rendered [Plaintiff's case] moot." *Cassell*, 990 F.3d at 546.

Plaintiff's requests for declaratory relief also continue to present a live controversy. Given the pandemic's unknown course, a declaration regarding the legality of the challenged conduct could still properly define the parties' legal rights and obligations. *See, e.g.*, *Milwaukee Police Ass'n v. Bd. of Fire & Police Comm'rs of City of Milwaukee*, 708 F.3d 921, 930 (7th Cir. 2013) (a controversy is live, and declaratory judgment may be proper, when the challenged action constitutes a "continuing and brooding presence" that "casts . . . a substantial adverse effect on the interests of the petitioning parties"). Moreover, Plaintiff seeks compensatory damages for McDonald's emotional distress caused by Defendants' alleged violations of the ADA and the Rehabilitation Act. Even if Plaintiff's requests for injunctive relief were moot, therefore, her request for a declaratory judgment that Defendants violated those statutes could move forward. *See, e.g.*, *Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004) ("When a claim for injunctive relief is

---

[15]     *Covid-19 Vaccine Administration Data*, ILL. DEP'T OF PUBLIC HEALTH, https://www.dph.illinois.gov/covid19/vaccinedata?county=Illinois (last visited Sept. 24, 2021).

[16]     Sherita H. Golden, *Covid-19 Vaccine Hesitancy: 12 Things You Need to Know*, JOHNS HOPKINS MED. (updated Aug. 19, 2021), https://www.hopkinsmedicine. org/health/conditions-and-diseases/coronavirus/covid19-vaccine-hesitancy-12-things-you-need-to-know (last visited Sept. 24, 2021).

14

barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive.").

The court pauses to note that, according to Plaintiff, her requests for injunctive and declaratory relief *would* be moot if the court's July 2, 2020 order reflecting the parties' voluntary agreement is "judicially enforceable in the future." (Pl.'s Resp. to Defs.' Renewed Mot. to Dismiss ("Pl.'s Resp.") [82] at 9.)  In her view, "[o]nly this level of enforceable guarantee regarding Mr. McDonald's return to CDS programing would be sufficient for Defendants to meet their 'formidable burden' of proof that their 'wrongful behavior could not reasonably be expected to recur.'" (*Id.* at 9–10 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)).  But a determination that the July 2 Order is judicially enforceable would not, on its own, resolve the mootness inquiry.  *Already* illustrates this point.  There, the Supreme Court rejected Nike's argument that because it had made a "judicially enforceable commitment" not to enforce its trademark against petitioner (Already), the Court need not consider whether Nike had satisfied its burden of proof under the voluntary cessation doctrine.  568 U.S. at 92.  Only after examining the terms of Nike's commitment and the petitioner's representations about its business plans was the Court persuaded that Nike could not reasonably be expected to resume the challenged conduct.  *See id.* at 93–95, 102 (district court properly dismissed Already's counterclaim for invalidity as moot where Nike promised not to make *any* claim or demand against Already to enforce its trademark, even against future "colorable imitations" of the disputed designs; the promise was "unconditional and irrevocable"; and "when given the opportunity before the District Court, Already did not assert any intent to design or market a shoe that would expose it to any prospect of infringement liability").

In this case, the court understands the parties' agreement as encompassing only what it said: subject to waivers of Defendants' liability, McDonald could immediately return to his program at CWTC, even as CDS programs remained close statewide.  As far as the court is aware, the parties did not agree that McDonald is entitled to attend his program indefinitely, regardless of

how the pandemic unfolds. So assuming (but not deciding) that the July 2 Order is judicially enforceable, "enforcing" it would not prevent Defendants from resuming the challenged conduct if the pandemic takes a turn for the worse. As already discussed, under *Cassell*, the possibility that the pandemic could take that turn sustains a live controversy.

For the reasons just explained, Plaintiff's claims for injunctive and declaratory relief are not moot.

## 2. Standing

In her complaint, Plaintiff asked the court to enter an injunction that would require Defendants to reopen all CDS programs statewide. Defendants argued in their original motion to dismiss that Plaintiff lacks standing to request a statewide reopening of CDS programs. (*See* Defs.' Mem. in Supp. of Mot. to Dismiss [41] at 7.) Plaintiff did not respond to that argument in her opposition to that motion (*see* Feb. 25, 2021 Order [60] at 2 (noting same)), and the court notes that in her motion for summary judgment—which is not fully briefed and is not before this court—Plaintiff stated that McDonald is "no longer seeking relief beyond himself." (Pl.'s Mem. in Supp. of Cross-Mot. for Summ. J. [47] at 2.) Plaintiff's current contention that she has "maintained such standing . . . throughout this case" appears incompatible with the position in her previously filed summary judgment brief. (Pl.'s Resp. [82] at 10 n.2.) The court is therefore uncertain whether the standing challenge is a live dispute, and addresses it only briefly here.

In support of the argument that she has standing to seek statewide relief, Plaintiff relies on *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020), but that case does not directly resolve the issue. In *Barr*, the City of Chicago sought an injunction prohibiting the Attorney General from enforcing unlawful immigration-related conditions on recipients of federal grants for state and local law enforcement. *See id.* at 886–87. The district court enjoined imposition of the challenged conditions nationwide but stayed the injunction as to grantees other than the City. *Id.* at 886. Addressing the question whether the City had standing to seek such relief on behalf of other grant recipients, the Seventh Circuit confirmed that federal courts have "authority to provide injunctive

16

relief that extends to non-parties" (also called "universal injunctions"), but observed that "[s]uch injunctions present real dangers, and will be appropriate only in rare circumstances." *Id*. at 916. Though there were strong arguments in favor of awarding nationwide injunctive relief, the *Barr* court concluded that a narrower approach would be equally effective given the unique statutory formula for allocating grants among states and localities. *See id*. at 921 (explaining that "because of the statutory structure of the grant calculations, an injunction limited to providing complete relief to the plaintiff alone will have the practical impact of preventing the application of the conditions program-wide"). The Seventh Circuit directed the district court to modify the injunction accordingly on remand. *Id*. at 930. Notably, because a universal injunction was unnecessary to afford complete relief to the City, *Barr* does not stand for the proposition that the City had standing to seek injunctive relief on behalf of other grant recipients.

As Defendants in this case argue, a statewide reopening of CDS programs could affect the health and safety of thousands of Illinois residents who have not come forward to challenge Defendants' behavior. If Plaintiff wanted broader relief, Defendants argue, she should have attempted to bring this lawsuit as a class action. The court largely agrees but recognizes that, as in *Barr*, an order granting relief based on McDonald's own circumstances might have broader implications for CDS programs statewide. At this stage of the litigation, however, Plaintiff has not explained why statewide reopening is necessary to provide McDonald with complete relief.

The court concludes it need not further address the question of Plaintiff's standing. Defendants' Rule 12(b)(1) motion to dismiss Plaintiff's claims for injunctive and declaratory relief is denied.

## B. Deference under *Jacobson v. Commonwealth of Massachusetts*

Before reaching the sufficiency of Plaintiff's allegations, the court will address Defendants' threshold argument that the deferential standard of review articulated in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905) applies to claims asserted under the ADA, the Rehabilitation Act, and the Equal Protection Clause. *Jacobson* involved a compulsory

17

vaccination law that the City of Cambridge, Massachusetts enacted during a smallpox epidemic. *See* 197 U.S. at 12–13. The plaintiff, an adult who did not want to be vaccinated, argued that the law violated his right to liberty under the Fourteenth Amendment's Due Process Clause—specifically, his right "to care for his own body and health." *See id.* at 26. The Supreme Court rejected the challenge. It emphasized that the "liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* Instead, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Id.* at 27. States, therefore, may "enact quarantine laws and health laws of every description," *id.* at 25 (internal quotation marks omitted), and "[i]t is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease." *Id.* at 30. The Court in *Jacobson* made clear that a public health crisis does not suspend the individual rights guaranteed in the Constitution. *See id.* at 28. But it stated that judicial review of a law enacted to protect public health or safety is limited to whether that law "has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law . . . ." *Id.* at 31. The compulsory vaccination law at issue survived that level of scrutiny. *See id.*

During much of the COVID-19 pandemic, federal courts have looked to *Jacobson* in adjudicating a range of constitutional challenges to pandemic-related restrictions. *See, e.g.*, *Democratic Nat'l Comm. v. Bostelmann*, 977 F.3d 639, 643 (7th Cir. 2020) (*Jacobson* instructs that "[d]eciding how best to cope with difficulties caused by disease is principally a task for the elected branches of government," a principle that "has been central to our own decisions that have addressed requests for the Judicial Branch to supersede political officials' choices about how to deal with the pandemic.") (citing cases); *In re Abbott*, 954 F.3d 772, 786 (5th Cir. 2020), *vacated on other grounds sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261, 209 L. Ed. 2d 5 (2021) ("*Jacobson* instructs that *all* constitutional rights may be reasonably

18

restricted to combat a public health emergency.").[17]

The Supreme Court joined the chorus in May 2020. *See South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020). In *South Bay*, the Court denied emergency injunctive relief to places of worship, which brought a First Amendment challenge to the California Governor's executive order restricting attendance at public gatherings, including religious gatherings, to limit the spread of the coronavirus. *See id.* at 1613 (Roberts, C.J., concurring). In his concurring opinion, Chief Justice Roberts stated that the restrictions "appear consistent with" the Free Exercise Clause because, among other things, "[s]imilar or more severe restrictions apply to comparable secular gatherings . . . ." *Id.* He cited *Jacobson* for the principle that the "Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *Id.* (quoting *Jacobson*, 197 U.S. at 38). And he stated that so long as state officials do not exceed "broad limits" in addressing circumstances involving medical and scientific uncertainty, the judiciary should not second-guess their actions. *Id.* at 1613–14.[18]

In November 2020, however, the Supreme Court made no mention of *Jacobson* in determining that the plaintiffs were likely to prevail on their Free Exercise challenge to the New York Governor's executive order placing occupancy restrictions on religious services in

---

[17]    In August 2021, the Seventh Circuit denied a request for an injunction pending appeal of Indiana University's vaccination requirement. *See Klaassen v. Trustees of Indiana Univ.*, 7 F.4th 592, 594 (7th Cir. 2021). Citing *Jacobson*, the court concluded that "there can't be a constitutional problem with vaccination against SARS-CoV-2." *Id.* at 593. Because the plaintiffs in *Klaasen* were bringing a substantive due process challenge to COVID-19 restrictions, rather than a statutory or equal protection challenge, the case does not materially affect the court's analysis here.

[18]    In July 2020, the Supreme Court denied an application for emergency relief prohibiting enforcement of the Nevada Governor's restriction on attendance at religious services to 50 or fewer people. *See Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (2020). The only written opinion was a dissent, which emphasized that *Jacobson* concerned a substantive due process challenge and expressed skepticism that it "establish[es] the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case." *See id.* at 2608 (Alito, J., dissenting).

coronavirus-stricken "zones" of the state; the Court granted the plaintiffs' request for emergency relief barring enforcement of those restrictions pending appellate review. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 65–69 (2020). In his concurring opinion, Justice Kavanaugh stated that the executive order "raises a serious First Amendment issue and triggers heightened scrutiny." *Id.* at 73 (Kavanaugh, J., concurring). He criticized the reference to *Jacobson* in Chief Justice Roberts's *South Bay* concurrence, stating that "judicial deference in an emergency or a crisis does not mean wholesale judicial abdication, especially when important questions of religious discrimination, racial discrimination, free speech, or the like are raised." *Id.* at 73–74.

Justice Gorsuch, for his part, observed in his concurring opinion that *Jacobson* "pre-dated the modern tiers of [constitutional] scrutiny," and argued that the *Jacobson* Court applied what now would be considered the rational basis standard that courts "normally appl[y] to Fourteenth Amendment challenges, so long as they do not involve suspect classifications based on race or some other ground, or a claim of fundamental right." *Cuomo*, 141 S. Ct. at 70 (Gorsuch, J., concurring). Thus, according to Justice Gorsuch, *Jacobson* merely confirms that courts should apply the "traditional legal test associated with the right at issue . . . ." *Id.* In *Cuomo*, Justice Gorsuch stated, the right is the one recognized in the Free Exercise Clause of the First Amendment, and the test is strict scrutiny. *Id.* The Supreme Court has since applied strict scrutiny in reviewing emergency requests to enjoin pandemic-related restrictions on religious gatherings. *See, e.g., Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curium) (granting injunction pending appeal where California's restrictions on at-home gatherings fell more harshly on religious observers than comparable secular activities).

With these cases in mind, the court considers whether *Jacobson* has any application to claims brought under the ADA or the Rehabilitation Act. Relying heavily on *Cuomo*, Plaintiff argues that *Jacobson* deference applies only where litigants seek to enforce unenumerated rights implied in the Due Process Clause. It has no place, Plaintiff contends, where public health

20

measures are challenged as violating "explicit statutory protections." (Pl.'s Resp. at 11.) Plaintiff characterizes *Jacobson* as employing an "interpretive approach" that is inappropriate for adjudicating statutory claims, which require courts "to follow the specific statutory text . . . ." (*Id.* at 11–12.) She also argues that the protections articulated in the ADA and Rehabilitation Act "are clearly 'like' those 'important questions of . . . racial discrimination'" that, according to Justice Kavanaugh, demand heightened scrutiny even during a public health crisis. (Pl.'s Resp. at 12 (quoting *Cuomo*, 141 S. Ct. at 74 (Kavanaugh, J., concurring).)

Defendants, for their part, have not cited a single case in which a court has applied *Jacobson*'s deferential standard to claims asserting that a public health law violates a statutory right. [19] Defendants acknowledge this shortcoming but argue that the fundamental principle underpinning *Jacobson* deference applies no matter the right at issue: state officials are better positioned than courts to decide how to best manage a public health crisis. In any case, Defendants urge, it does not make sense for the court to review interference with statutory rights more searchingly than it would review "State action alleged to run afoul of fundamental rights and privileges secured by the Constitution, which would generally be subjected to strict scrutiny." (Defs.' Br. at 15.) These arguments have some force. Indeed, the Supreme Court in *Jacobson* characterized the plaintiff's right to liberty as "the greatest of all rights," yet applied a deferential standard to the challenged law. *Jacobson*, 197 U.S. at 26–27, 31. Less persuasive is Defendants' contention that the challenged conduct deserves deference because Defendants purportedly undertook it in good faith. Defendants point to nothing in *Jacobson* suggesting that a lawmaker's

---

[19] The closest example they cite is *Brach v. Newsom*, No.2:20-cv-06742-SVM-AFM, 2020 WL 6036764 (C.D. Cal. Aug. 21, 2020). There, the district court denied a temporary restraining order against California's restrictions on in-person learning for K-12 schools, concluding that the restrictions were "entitled to a presumption of constitutionality under *Jacobson*." *Id.* at *3. Although the plaintiffs brought claims under the Due Process Clause, the Equal Protection Clause, the IDEA, the ADA, and the Rehabilitation Act, there is no indication that the court applied *Jacobson* deference to their statutory claims, which were denied on other grounds. *See id.* at *9 (concluding that plaintiffs were unlikely to be excused from the ADA/Rehabilitation Act's exhaustion requirement).

intent affects the level of scrutiny applicable to a public health-related law.

Ultimately, because *Jacobson* discusses only how public health laws conflict with constitutional rights and the court is not aware of any authority applying *Jacobson* beyond that context, the court will not depart from the traditional analysis governing claims asserted under the ADA and the Rehabilitation Act. Whether *Jacobson* deference applies to Equal Protection claims is a closer question, and *Cuomo* does not squarely address it. Defendants argue that several district courts have applied *Jacobson* to Equal Protection claims, but those cases are not binding authority. *See Luke's Catering Serv., LLC v. Cuomo*, 485 F. Supp. 3d 369, 387 (W.D.N.Y. 2020) (holding that event and banquet centers challenging capacity limit on non-essential gatherings failed to show they were likely to succeed on the merits of their equal protection claim); *Vill. of Orland Park v. Pritzker*, 475 F. Supp. 3d 866, 882, 886–87 (N.D. Ill. 2020) (concluding that, even if *Jacobson* did not apply, pandemic restrictions on restaurants survived rational basis review).[20]

The court concludes that it can leave this issue for another day. The deferential standard articulated in *Jacobson* appears to be the same as rational basis review, which would otherwise apply to Plaintiff's Equal Protection claim. *See, e.g.*, *Cuomo*, 141 S. Ct. at 70 (Gorsuch, J., concurring) (the *Jacobson* Court "essentially applied rational basis review"); *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 367 (2001) (state action that differentiates based on disability "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose"). And even if the *Jacobson* standard is more deferential, Plaintiffs have stated an Equal Protection claim under that standard for the reasons discussed below.

Having resolved the myriad threshold issues raised in this case, the court turns to the merits.

---

[20]    It appears that the court in *Lewis v. Walz*, 491 F. Supp. 3d 464 (D. Minn. 2020), Defendants' third cited case, did not apply *Jacobson* because "the Equal Protection Clause does not bestow a fundamental right." *Id.* at 471.

C.    ADA and Rehabilitation Act

To state a claim for violation of Title II of the ADA, Plaintiff must allege facts plausibly suggesting that McDonald is a "qualified individual with a disability," that he was denied "the benefits of the services, programs, or activities of a public entity" or otherwise subjected to discrimination by such an entity, and that the denial or discrimination was "by reason of" his disability. 42 U.S.C. § 12132; *see, e.g.*, *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). The requirements for stating a claim under Section 504 of the Rehabilitation Act—which applies because Defendants receive federal funds for the CDS programs—are "functionally identical": Plaintiff must allege that "(1) [McDonald] is a qualified person (2) with a disability and (3) [Defendants] denied him access to a program or activity because of his disability." *Wagoner*, 778 F.3d at 592 (internal quotation marks omitted). Significantly, although the "Rehabilitation Act expressly incorporates the liability standards of" the ADA, it "has a stricter causation requirement." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021). Under the Rehabilitation Act, "the plaintiff's disability must be the *sole* reason for the alleged discriminatory action," whereas under the ADA, it need only be "*a* reason for the challenged action." *Id.* Plaintiff can satisfy both causation requirements by plausibly alleging any of the following: "(1) [Defendants] intentionally acted on the basis of the disability, (2) [Defendants] refused to provide a reasonable modification, or (3) [Defendants'] rule disproportionally impacts disabled people." *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018) (internal quotation marks omitted).

The parties agree that McDonald is disabled within the meaning of both statutes. In their initial motion to dismiss, Defendants conceded that McDonald is a "qualified individual" for purposes of the ADA. (Defs.' Mem. [41] at 11.) Although the court requested additional briefing on whether McDonald is "otherwise qualified" for a program that was specifically designed for people with disabilities (Feb. 25, 2021 Order at 2), the court is now satisfied that the line of cases forming the basis for that request is either outdated or limited to Section 504 claims asserting unequal treatment of a medical condition that causes a disability. *See Grzan v. Charter Hosp. of*

23

*Nw. Ind.*, 104 F.3d 116, 121 (7th Cir. 1997), *abrogated on other grounds by Amundson ex rel. Amundson v. Wisc. Dep't of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) ("Grzan is not 'otherwise qualified' [for psychiatric treatment] because, absent her handicap, she would not have been eligible for treatment in the first place."); Defs.' Br. at 18 (citing *Mallett v. Wisc. Div. of Vocational Rehab.*, 130 F.3d 1245, 1257 (7th Cir. 1997) ("Mallett was not 'otherwise qualified'" within the meaning of Section 504 to receive the vocational benefits in question because he "would not have been eligible to receive any rehabilitative services in the absence of" his disability)).

Plaintiff alleges that McDonald is qualified under the meaning of both statutes because he meets the eligibility requirements for his CDS program and has been able to participate in the program for years, with or without an accommodation. (*See* Compl. ¶¶ 52, 67; Pl.'s Resp. at 15 (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 406 (1979) ("An otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap."))); *see also, e.g.*, *Wisc. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 748 (7th Cir. 2006) (en banc) ("[T]he Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality that they share generally with the public."). The claim remains an awkward one; Plaintiff is alleging that McDonald meets the CDS program requirements "in spite of" his disability, but the CDS program is itself available only for persons with disabilities. But interpreting Plaintiff's complaint liberally, it plausibly alleges that McDonald is otherwise qualified under Title II and Section 504. For example, one could imagine that some disabled persons have difficulty participating in the CDS program even though it is designed for them, and that McDonald can participate in the program despite his disability.

Defendants reject this theory. They argue that Defendants did not deny McDonald the benefits of his CDS program because at the time he filed this lawsuit, all CDS programs in Illinois were closed and no one could participate in them. Defendants contend that they could not have

denied McDonald the benefits a program of a "non-existent" program. (Defs.' Br. at 18.) But of course, the CDS programs continued to exist and Defendants had no intention of closing them permanently; they were merely closed temporarily to reduce the spread of COVID-19. (*See, e.g.*, *id.* at 8.) By contrast, in the only case Defendants cite on this issue, the defendants had "discontinued" the relevant program and had no further involvement in providing similar services. *Abdul-Matiyn v. Coughlin*, No. 94 CIV. 5649 (SAS), 1996 WL 1089984, at *15 (S.D.N.Y. Nov. 8, 1996), *report accepted*, No. 94 CIV. 5649 SAS, 1997 WL 40939 (S.D.N.Y. Jan. 31, 1997) (granting defendants' motion for summary judgment because the college courses that the plaintiff-inmate wanted to take were "not among the 'services, programs, or activities'" that the correctional facility provided). Defendants' argument also misses the mark because McDonald seeks more than access to an inactive program; he alleges that the decision to keep the program inactive while permitting others to reopen was itself discriminatory.

Defendants may well be correct that states retain the authority to suspend or discontinue federally funded programs, but this does not mean that a specific exercise of that authority will never constitute a violation of the ADA or Rehabilitation Act. Defendants' cited case, which does not involve ADA or Rehabilitation Act claims, does not provide otherwise. *United States v. Loria*, No. 3:08-CR233-2, 2010 WL 1779998, at *1 (W.D.N.C. Apr. 30, 2010) (denying defendant's motion to amend judgment of conviction to provide that "he be housed at a particular facility" where his chances of participating in a drug treatment program might be greater, because although the sentencing court recommended that he be "allowed to participate in any available" drug treatment program, the court has "no authority to order the Bureau of Prisons . . . to have such programs available"). Because Plaintiff alleges that Defendants prohibited McDonald from participating in his CDS program during the pandemic-related closure, she has adequately pleaded that they denied McDonald the benefits of the program. Accordingly, the court considers whether Plaintiff has adequately pleaded that Defendants denied McDonald those benefits because of his disability. As explained below, the court concludes she has done so.

25

### 1. Intentional Discrimination

The ADA and Rehabilitation Act "forbid[] discrimination based on stereotypes about a handicap," but do not "forbid decisions based on the actual attributes of the handicap." *P.F. by A.F. v. Taylor*, 914 F.3d 467, 471 (7th Cir. 2019) (quoting *Anderson v. Univ. of Wisc.*, 841 F.2d 737, 740 (7th Cir. 1988)); *see also Knapp v. Nw. Univ.*, 101 F.3d 473, 485–86 (7th Cir. 1996) (decisions "that certain activities are too risky for a disabled person . . . . cannot rest on paternalistic concerns" or "unfounded fears or stereotypes").  Plaintiff alleges that Defendants intentionally discriminated against McDonald because of his disability by basing their decision to keep CDS programs closed on stereotypes about disabled persons. (*See, e.g.*, Compl. ¶¶ 5, 35, 54, 69; Pl.'s Resp. at 22–23.) Plaintiff points to the June 19 letter in which Defendants rationalized their decision by stating that (1) all disabled persons face increased risks from COVID-19 and (2) many disabled persons "have incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to wear masks in enclosed environments."  (June 19 Letter at 2; *see also* Compl. ¶ 54.)  Plaintiff alleges that Defendants should instead have assessed McDonald's individual circumstances to determine whether he could safely participate in his program.  (*See, e.g.*, Compl. ¶¶ 56–57; Pl.'s Resp. at 23 (citing *Knapp*, 101 F.3d at 485–86).)

Defendants argue that Plaintiff has not plausibly alleged intentional discrimination.  They observe that the CDS program "exists to provide services for" disabled persons and contend that "there is no way not to consider the participants' disabilities when developing safe, quality programming for them." (Defs.' Br. at 20.)  According to Defendants, they based their decision to delay reopening on the then-available judgment of medical professionals about how COVID-19 could affect program participants—not on stereotypes. (*See id.* at 21.)  Defendants contend that their June 19 letter reflects this reasoning and argue that Plaintiff misrepresents it. (*Id.* at 22.)

Plaintiff's allegations are sufficient for present purposes.  The June 19 letter assesses cognitive abilities and COVID-19 susceptibility for disabled persons as a group, and states that

the challenged conduct was based on those assessments. This evidence provides a plausible basis for an intentional discrimination claim. Defendants' cited cases are factually distinguishable and arose in a different procedural posture. *See Anderson*, 841 F.2d at 741 ("Nothing in the record" on summary judgment "suggest[ed] that the [defendant's] decision was based on stereotypes about alcoholism as opposed to honest judgments about how Anderson had performed in fact and could be expected to perform."); *Kasprzyk v. Banaszak*, No. 95 C 2131, 1996 WL 450754, at *4 (N.D. Ill. Aug. 8, 1996) (where the plaintiff (among other things) failed to provide any documents that showed why defendants made the relevant decision, she could not demonstrate as a matter of law that the decision was based on stereotypes about her disability). According to Defendants, new data shows that the concerns Defendants articulated in the June 19 letter "were justified." (Defs.' Br. at 21 & n.12.)[21] Even if the court were to take judicial notice of the new data, it would not change the result. As Plaintiff observes, the new data—like the data cited in the June 19 letter—does not account for McDonald's individual circumstances.

Defendants' reliance on *Money v. Pritzker*, 453 F. Supp. 3d 1103 (N.D. Ill. 2020), for the proposition that they have "not made decisions based on McDonald's disability" is also misplaced. (Defs.' Br. at 22.) The plaintiff and putative class members in *Money* were inmates at Illinois correctional institutions, and the challenged conduct was the State's procedure for determining which inmates were eligible for medical furlough because of vulnerability to COVID-19. *See Money*, 453 F. Supp. 3d at 1111, 1124 (plaintiffs sought injunction requiring court-monitored overhaul of procedure). In the portion of the opinion that Defendants rely on, the court determined that the plaintiffs lacked "plausible allegations that ADA-qualified inmates have been discriminated

---

[21]    Specifically, Defendants point to a recent study finding that "having an intellectual disability was the strongest independent risk factor for presenting with a Covid-19 diagnosis and the strongest independent risk factor other than age for Covid-19 mortality." Jonathan Gleason, Wendy Ross, Alexander Fossi, Heather Blonsky, Jane Tobias, and Mary Stephens, *The Devastating Impact of Covid-19 on Individuals with Intellectual Disabilities in the United States*, NEJM Catalyst (Mar. 5, 2021), https://catalyst.nejm.org/doi/full/10.1056/CAT.21.0051 (last visited Sept. 9, 2021).

27

against *because of* their disabilities." *Id.* at 1133 n.14. The court noted that although the parties agreed that disabled individuals "may be more susceptible to contract or suffer serious consequences from COVID-19," "that disparate impact is not a consequence of [the State's] rule or any action by [the State]." *Id.* (internal quotation marks omitted). In arguing that *Money* shows they did not make decisions because of McDonald's disability, Defendants overlook key features of that case. Namely, the plaintiffs in *Money* did not allege intentional discrimination, which is the causation theory at issue here. *See id.* at 1132. Furthermore, the State's procedure for determining medical furlough eligibility required individualized determinations about every applicant's medical conditions and/or disabilities—and that was why the court concluded that the procedure itself did not impact disabled persons differently. *See id.* at 1114, 1133 n.14. The lack of individualized determinations is precisely what Plaintiff challenges here.

Plaintiff plausibly alleges intentional discrimination.

## 2. Failure to Accommodate

Title II of the ADA and Section 504 of the Rehabilitation Act do not expressly address accommodations, but "their corresponding regulations employ language indicating that entities must provide reasonable accommodations to the disabled." *Holzmueller*, 881 F.3d at 592 (citing 28 C.F.R. § 35.130(b)(7)(i); 28 C.F.R. § 41.53). The Supreme Court has also "recognized a duty to provide reasonable accommodations in Section 504 of the Rehabilitation Act." *Holzmueller*, 881 F.3d at 592 (citing *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). Accommodations are required only "when necessary to avoid discrimination on the basis of a disability." *Wisc. Cmty. Servs.*, 465 F.3d at 751. An accommodation is necessary if it would "affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002) (internal quotation marks omitted). An accommodation also must be "reasonable," meaning that "it is both efficacious and proportional to the costs to implement it." *Id.* If an accommodation would "impose[ ] undue financial or administrative burdens or require[ ] a fundamental alteration in the

28

nature of the program," it is unreasonable. *Id.* Determining whether an accommodation is reasonable "is a highly fact-specific inquiry and requires balancing the needs of the parties." *Id.*

Plaintiff alleges that, until she filed this lawsuit, Defendants refused to consider making reasonable modifications to their CDS closure policy, regardless of whether individual participants could comply with Illinois' COVID-19 safety guidelines. (Compl. ¶¶ 56–57.) According to the Complaint, McDonald was capable of complying with those guidelines, and as a result, Defendants reasonably could have permitted him to attend his program—even if it was closed to other disabled participants. (*See id.* ¶¶ 56–57, 70.) Plaintiff contends that rather than provide that accommodation, Defendants "offered [McDonald] only unreasonable and unrelated programs" that did not provide the same benefits as McDonald's CDS program. (Pl.'s Resp. at 21 (citing June 19 Letter at 3 (discussing alternative programing like "telehealth services for behavioral health").)

Defendants contend that Plaintiff has not adequately pleaded causation under a failure to accommodate theory, but their arguments do not support dismissal of Plaintiff's claim at the pleading stage. First, Defendants note that they did accommodate McDonald by allowing him to return to his program before they reopened it to all participants. (Defs.' Br. at 23.) But that accommodation was the product of a voluntary agreement that the parties reached after Plaintiff filed this lawsuit and therefore has no bearing on whether the allegations in the Complaint permit a reasonable inference that Defendants failed to provide an accommodation. Next, Defendants maintain that Plaintiff cannot plausibly allege that they denied McDonald a reasonable accommodation because the only accommodations McDonald sought—an early return to his CDS program and/or an immediate reopening of all CDS programs in Illinois—were unreasonable. According to Defendants, the fact that they permitted McDonald to return to his program only after members of his household signed COVID-19-related waivers of liability "directly contradicts" Plaintiff's position that the accommodation of an even earlier return to the program would have been reasonable. (Defs.' Reply [85] at 18.) But as just noted, Plaintiff contends that McDonald

29

can comply with the State's COVID-19-related safety protocols just as easily as able-bodied workers. She points out, further, that able-bodied workers continued packaging parts at CWTC throughout the pandemic. The court concludes she has sufficiently alleged that the individual accommodation Plaintiff sought for McDonald was reasonable.

The same allegations defeat Defendants' argument that, because they offered McDonald alternative programming while CDS programs were closed, Plaintiff cannot plausibly allege they refused McDonald an accommodation. True, the law does not require Defendants to provide the precise accommodation Plaintiff requests. *See, e.g.*, *Igasaki v. Ill. Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 961 (7th Cir. 2021). But McDonald's alleged ability to follow the State's safety protocols, coupled with the allegations that able-bodied persons packaged parts at CWTC during the closure, permit a reasonable inference that returning McDonald to his program early was a reasonable accommodation in this situation. As far as the court can tell, Plaintiff first asked Defendants for that early return in the June 17, 2020 letter from Plaintiff's counsel to Defendants. (*See* June 17, 2020 Letter at 2, 9.) Defendants refused the request in their June 19, 2020 response letter, in which they instead offered to help McDonald find alternative programming. (*See* June 19, 2020 Letter at 2–3.) Plaintiff then filed this lawsuit on June 23, 2020.

In light of the individualized, fact-intensive nature of the reasonable accommodation inquiry, it is doubtful that reopening programs statewide, for all CDS programs and participants, would have been reasonable. Because Plaintiff can, however, proceed on his theory that Defendants failed to offer McDonald himself a reasonable, individual accommodation, the court need not address the issue further.

### 3. Disparate Impact

To state a disparate impact claim under the ADA or Rehabilitation Act, Plaintiff must allege that a facially neutral policy "fall[s] more harshly on one group than another and cannot be justified by [a non-discriminatory] necessity." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quoting *Teamsters v. United States*, 431 U.S. 324, 335–36 & n.15 (1977)). Evidence in disparate impact

cases "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities." *Wisc. Cmty. Servs.*, 465 F.3d at 753 n.14 (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988)). A plaintiff can show disparate impact either by comparing persons in a protected class to persons outside the protected class, or by comparing persons within the same class; in other words, inter-class disparate impact claims are viable. *See, e.g.*, *Amundson*, 721 F.3d at 874 (citing *Olmstead v. L.C.*, 527 U.S. 581 (1999)). No showing of intent to discriminate is required. *See Raytheon*, 540 U.S. at 52–53. But "[b]ecause the factual issues, and therefore the character of the evidence presented, differ when the plaintiff claims that a facially neutral employment policy has a discriminatory impact on protected classes, courts must be careful to distinguish between [disparate treatment and disparate impact] theories." *Raytheon*, 540 U.S. at 53 (citation and internal quotation marks omitted).

In their briefs, both sides appear to be muddling the disparate impact analysis by confusing it with disparate treatment. Thus, Defendants argue that Plaintiff has not adequately pleaded that McDonald was "*treated worse* than any applicable comparison group." (Defs.' Br. at 25 (emphasis added).) Because CDS programs are available only for disabled persons, Defendants maintain, "every decision related to [those programs] will only impact disabled individuals," and "the only comparison group that provides for any meaningful analysis are other disabled individuals participating in IDHS programs." (*Id.* at 26.) Plaintiff responds that Defendants "*singled out* disabled individuals' participation in CDS programs, while at the same time permitting numerous businesses and programs for the non-disabled to reopen." (Pl.'s Br. at 26 (emphasis added).) Plaintiff insists that the relevant comparators are the able-bodied, but her argument sounds in disparate treatment, not disparate impact. "Singling out" people with disabilities by suspending a program designed for them is not facially neutral.

In its request for additional briefing, this court observed that examining how the challenged conduct affected CDS programs versus programs available to the general public might not be useful. (*See* Feb. 25, 2021 Order at 2.) As the court noted, some of the difficulty lies in Plaintiff's

31

definition of the program or benefit to which Defendants denied McDonald access. In a case that Plaintiff herself cites, the court stated that in determining whether a student with a learning disability could prevail on his ADA claim, "[t]he relevant question [was] not whether the school denied [him] a service he [was] entitled to under his [individualized education program ("IEP")]," which "provid[ed] accommodations and services he [was] supposed to receive to account for his learning disability." *Brown v. Dist. 299—Chicago Pub. Sch.*, 762 F. Supp. 2d 1076, 1078, 1084 (N.D. Ill. 2010). Because the ADA "protects a broader benefit"—in Brown's case, "access to the education nondisabled students receive"—the proper inquiry was "whether the denial of [the IEP] service affected Brown's access to education in relation to nondisabled students." *Id.* at 1084. Plaintiff has consistently referred to CDS programs as the relevant benefit and has not clearly defined the "broader" one.

More fundamentally, Plaintiff has not identified a facially neutral policy that fell more harshly on a protected group. *See Raytheon*, 540 U.S. at 52. Defendants' decision to suspend CDS programs, by definition, impacted only people with disabilities. To the extent that Plaintiff is making a disparate impact argument on the basis of distinctions among the disabled community, she has not specified what that distinction is. Some participants in CDS programs undoubtedly disabilities that are more severe than McDonald's, but Plaintiff has not provided allegations that would assist the court in drawing that line. The court concludes that Plaintiff has failed to state ADA and Rehabilitation Act claims under a disparate impact theory.

Because Plaintiff has stated a claim of intentional discrimination and failure to accommodate, however, the court denies Defendants' Rule 12(b)(6) motion to dismiss Plaintiff's request for a declaratory judgment that Defendants violated McDonald's rights under the ADA and the Rehabilitation Act.

## D.    Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend.

XIV.  An Equal Protection violation can occur "when a regulation draws distinctions among people based on a person's membership in a 'suspect' class" or when the state denies someone a fundamental right.  *Srail v. Vill. of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009).  Strict scrutiny is the proper standard of review for these types of Equal Protection claims.  *See id.*  "In the absence of deprivation of a fundamental right or the existence of a suspect class, the proper standard of review is rational basis."  *Id.*

Plaintiff alleges that Defendants treated McDonald (and other disabled participants in CDS programs) differently than similarly situated, able-bodied persons because of their intellectual and developmental disabilities.  (Compl. ¶¶ 76–85.)  Because the Supreme Court has held that disability is not a suspect or quasi-suspect classification under the Equal Protection Clause, *see, e.g.*, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985), and Plaintiff does not allege a deprivation of a fundamental right, rational basis review applies.  *See Srail*, 588 F.3d at 943.  Therefore, to state a claim for violation of the Equal Protection Clause, Plaintiff must allege that Defendants (1) "intentionally treated [McDonald] differently from others similarly situated; (2) this difference in treatment was caused by [McDonald's] membership in the class to which [he] belong[s]; and (3) this different treatment was not rationally related to a legitimate state interest."  *Id.*; *see also, e.g.*, *Cleburne*, 473 U.S. at 446 (to survive review under the Equal Protection Clause, "legislation that distinguishes between the mentally [disabled] and others must be rationally related to a legitimate governmental purpose. . . . The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

Defendants characterize Plaintiff's case as a "class of one" claim because, as they read her complaint, she has not alleged that McDonald is a member of a suspect class.  (Defs.' Br. at 27.)  The court disagrees.  Although Plaintiff alleges that Defendants discriminated against McDonald and others "solely for arbitrary . . . reasons," *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 596 (2008), the crux of her claim is that Defendants engaged in "class-based discrimination"

33

against disabled persons. *Id*. at 601. As discussed below, Plaintiff has adequately pleaded all three elements of such a claim.

First, Plaintiff alleges that in keeping CDS programs closed while allowing other businesses and activities to reopen, Defendants intentionally treated McDonald differently from similarly situated able-bodied persons—specifically, "[m]anufacturing employees, youth attendees of day camps, and children in [s]ummer school classes from pre-kindergarten through 12th grade," whom Plaintiff alleges are most similar to "the disabled workers in CDS programs." (Compl. ¶¶ 80–83.) Defendants observe that a similarly-situated comparator must be "prima facie identical in all relevant respects." (Defs.' Br. at 28 (quoting *Purze v. Vill. of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). As they did in connection with Plaintiff's disparate impact theory, Defendants argue that the only proper comparators are disabled persons participating in IDHS programs. (*See* Defs.' Br. at 28.) But Plaintiff alleges that Defendants allowed able-bodied workers to complete the same manufacturing tasks that disabled persons normally did in their CDS programs, and that Defendants reopened programs for pre-kindergarteners, who arguably have more trouble than many disabled persons with following COVID-19 safety protocols. Although a jury could ultimately disagree, these factual allegations plausibly allege that the comparators Plaintiff identifies are very similar to McDonald for purposes of the Equal Protection claim.

Turning to the second factor, *see Srail*, 588 F.3d at 943, Plaintiff alleges that McDonald's disabilities were the reason for the differential treatment. (*See, e.g.*, Compl. ¶ 83 (alleging that in the June 19 Letter, Defendants "explicitly discriminated against" McDonald based on stereotypes about persons with disabilities); *see also* June 19 Letter at 1–2 (explaining that Defendants were keeping CDS programs closed until approximately September 1, 2020, because, among other things, scientific data suggests that disabled persons face greater risks of serious complications from COVID-19, and many disabled persons "have incredible difficulty following instructions, understanding the need for and/or maintaining social distancing, hand washing and the need to

wear masks in enclosed environments").)  These allegations plausibly suggest that Defendants treated McDonald differently because of his disabilities.

Finally, Plaintiff alleges that the differential treatment was not rationally related to a legitimate government interest because (1) scientific data shows that disabled persons are not inherently at higher risk for COVID-19, and (2) many disabled persons (including McDonald) are just as capable of complying with the State's safety protocols as manufacturing workers and grade-schoolers.  (*See, e.g.*, Compl. ¶¶ 19, 57, 70, 79–83.)  Defendants argue that the purposes for the challenged classification were ensuring that they could safely operate CDS programs and reducing risks posed by a public health emergency.  They also maintain that the classification was rationally related to those goals:  for example, it was based on scientific evidence; considered the size of CDS programs (20,000+ participants); and strove to reopen CDS programs "gradually in as safe a manner as practicable under [the] extraordinary circumstances".  (Defs.' Br. at 29.)  And Defendants argue that other states' suspension of "similar services" is "further evidence of a clear rational basis."  (*Id.*)  According to Defendants, Plaintiff's allegations cannot "negate" these supporting bases for the challenged conduct.  (*Id.* (citing *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1053 (7th Cir. 2018) ("Under rational-basis review, a statutory classification comes to court bearing a strong presumption of validity, and the challenger must negative every conceivable basis which might support it." (internal quotation marks omitted)).

Although these arguments may ultimately carry the day, the court concludes Plaintiff's complaint survives a pleading challenge.  Plaintiff has not merely alleged that she disagreed with the challenged conduct or that there was an "imperfect fit" between the conduct and the safety goals.  (Defs.' Br. at 28 (quoting *Srail*, 588 F.3d at 946).)  Rather, she alleges that the decision to close CDS programs to all disabled participants was extremely attenuated from the stated safety goals because (1) scientific evidence shows that disabled persons are *not* inherently more susceptible to COVID-19 than the general population; (2) many disabled persons, including McDonald, can comply with COVID-19-related safety protocols just as easily as the proposed

35

comparators; and (3) Defendants nevertheless opened businesses and programs to those comparators. Accepting these allegations as true, they adequately plead that the challenged conduct was not rationally related to the safe operation of CDS programs or protecting public health. Likewise, they adequately plead that the challenged conduct had "no real or substantial relation to those objects." *Jacobson*, 197 U.S. at 31. Defendants' cited cases provide them no assistance because, as Plaintiff observes, none involved disability discrimination.[22]

Plaintiff states a claim under the Equal Protection Clause.

## CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [62] is denied.

ENTER:

Date: September 27, 2021

REBECCA R. PALLMEYER
United States District Judge

---

[22] *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 56–57 (2001) (challenge to statute that imposed different requirements for obtaining citizenship based on whether the applicant's citizen parent was the mother or father); *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 309 (1993) (challenge to regulation of cable television facilities that distinguished based on ownership structure); *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1006 (7th Cir. 2019) (challenge to free transportation program that distinguished between public and private school students); *Minerva*, 905 F.3d at 1050–51 (challenge to statute making it unlawful to sell ungraded butter); *Srail*, 588 F.3d at 942 (challenge to water supply services that distinguished between residential properties); *City of Chicago v. Shalala*, 189 F.3d 598, 600 (7th Cir. 1999) (challenge to provisions of Welfare Reform Act that distinguished between U.S. citizens and non-citizens).